John T. Jasnoch (No. 281605)
Cornelia J. B. Gordon (No. 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5310
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com

William C. Fredericks (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com

*Attorneys for Lead Plaintiff and Lead Counsel
for the Putative Class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE SENTINELONE, INC. SECURITIES LITIGATION | Case No.  4:23-CV-02786-HSG |
| | **AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates to All Actions | <u>DEMAND FOR JURY TRIAL</u> |

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class (the "Class") consisting of all persons and entities other than Defendants and their related parties that purchased or otherwise acquired SentinelOne, Inc. ("S1" or the "Company") common stock between June 1, 2022 and June 1, 2023, inclusive (the "Class Period").  The Action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company, its chief executive officer, Tomer Weingarten ("Weingarten") and its chief financial officer, David Bernhardt ("Bernhardt").

2.    S1 is a cybersecurity company that pioneered the world's first purpose-built AI-powered Extended Detection and Response (XDR) platform (the "Singularity Platform").  The Singularity Platform purports to instantly defend against cyberattacks, performing at a faster speed, at greater scale, and with higher accuracy than would be possible for a human team.  S1 also offers add-on services/products referred to as "modules" that complement and enhance the services offered as part of its Singularity Platform.

3.    S1 offers its products via subscription contracts, generally on terms of one to three years.  In most cases, S1 recognizes revenue ratably over the course of the contract in accordance with Generally Accepted Accounting Principles ("GAAP").  S1 also tracks three operational, non-GAAP "key business metrics," the most important of which is its Annualized Recurring Revenue ("ARR").  During the Class Period, Defendants defined ARR as "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us."  According to Defendants, ARR is not a forecast of future revenue (which can be impacted by contract start dates, end dates, and renewal rates), but Defendants nonetheless represented to investors throughout the Class Period that S1's revenue projections and its ARR tracked each other closely.  As one analyst put it, ARR is "**the** key metric" for S1 (emphasis in original).

4.    On June 1, 2023, after the close of the market, Defendants announced that the Company was revising downwards both its previously reported ARR figures and ARR projections.

1    Specifically, Defendants disclosed informed the market that S1 needed to make a "one-time

2    adjustment to ARR of $27.0 million or approximately 5% of total ARR" to its previously reported

3    ARR figures from FY2023 (the fiscal year ended January 31, 2023[1]).[2] Defendants also announced

4    that they were materially slashing the Company's projected ARR growth for FY2024 (the fiscal

5    year ending January 31, 2024) by roughly 25% (from 47% to "mid-30%"), and cut projected

6    revenue for FY2024 from $631-$640 million to $590-$600 million (reflecting a roughly 20%

7    reduction in their previously projected rate of revenue growth of 51%, to only 41%).

8         5.     Publicly, S1 offered two reasons for having to effectively restate its previously

9    reported ARR figures.  First, Defendants disclosed that they had previously been including, as part

10    of S1's ARR calculations, amounts for "consumption and usage" that its customers were not

11    actually required to incur under their contracts (such as for excess usage charges or other charges

12    for additional services that customers incurred, but were not required to incur), and were thus

13    outside of what Defendants termed "***committed contract values***."[3]  Thus, unbeknownst to

14    investors, Defendants were baking into S1's ARR ***assumptions*** that its customers would in the

15    future incur significant charges for data overages and other services that those customers were not

16    required to incur ("consumption and usage assumptions"), while misleading the market into

17    believing that S1's ARR calculations were based solely on the amounts for those services that S1's

18    customers were actually required to purchase under their existing contracts ("committed contract

19    services").

20

21

22

---

23    [1]    S1's fiscal quarters and year do not track the calendar year's quarters.  Instead, S1's fiscal year begins on February 1 (rather than January 1); for example, its Q1 FY2023 ended April 30, 2022, its Q2 FY2023 ended July 31, 2022, its Q3 FY2023 ended October 31, 2022, and its Q4 FY2023 (and full 2023 fiscal year) ended January 31, 2023.  Accordingly, almost all events that occurred in calendar 2022 actually occurred in S1's fiscal 2023 (and similarly, almost all events that have occurred in calendar 2023 have occurred in S1's fiscal 2024).

26    [2]    *SentinelOne Announces First Quarter Fiscal Year 2024 Financial Results*, SENTINELONE (June 1, 2023), https://investors.sentinelone.com/press-releases/news-details/2023/SentinelOne-Announces-First-Quarter-Fiscal-Year-2024-Financial-Results/default.aspx.

28    [3]    All emphasis in quoted material is added unless otherwise stated.

6.      In other words, Defendants' Class Period statements that S1's ARR represented the Company's annualized revenue run rate for "subscription and capacity contracts" were false and misleading because they failed to disclose that ARR included not only the annualized revenue from S1's active subscription contracts (which, as Defendants disclosed in other parts of S1's public filings, were "generally non-cancelable over the contractual term"), *but also included assumptions about anticipated revenue from customers' "consumption and usage" of data and/or services that customers were not contractually required to use.* Nonetheless, by their own admission, Defendants had knowingly included such assumptions in their ARR calculations – without disclosing this practice to investors – until the end of the Class Period, when Defendants were forced to disclose that S1 had "experienced a notable decline in usage" and that S1 would be belatedly restating their previously overstated ARR numbers.

7.      The second reason Defendants gave for having to restate the Company's ARR numbers was the Company's purported "discovery" of what they termed "historical upsell and renewal recording inaccuracies." In this context, "upsell" refers to situations where S1 had persuaded a customer to purchase additional types of services (such as new "modules," as further described below, or an upgrade to a higher tier of contract), which would result in increasing the amount the customer would be paying for committed contract services. As Defendant Bernhardt explained, "what we were seeing was we had upsell [situations] that included a renewal, *and we were adding that to the historical ARR versus just adding the upsell component of it*" – an error that he said had originated in S1's customer relationship management ("CRM") system, a system known as "Salesforce." In other words, if a customer renewed a contract, but with additional services (an "upsell"), both the cost of those additional services *plus* the value of the historical contract (now renewed) would be added into and included in the ARR – even though the ARR *already* accounted for the historical contract price. This double-counting practice further inflated S1's reported ARR over the Class Period, as well as Defendants' ARR projections. However, although Defendants claimed that they had only recently discovered this double-counting "problem," a well-placed confidential witness ("CW") has confirmed to Plaintiffs that the Company had actually identified instances of double-counting as a problem before the CW left S1

in early 2022.  Accordingly, Defendants, at a minimum, acted with reckless disregard for the truth (if not knowingly) in failing to eliminate this problem, or in allowing it to re-appear before, the start of the Class Period.  For the same reasons, Defendant Weingarten's and Bernhardt's respective (and repeated) Sarbanes-Oxley certifications during the Class Period as to the purported adequacy of S1's financial and reporting controls were equally fraudulent.

8.     In response to Defendants' revelations after the close on June 1, on June 2, 2023, S1's stock price plummeted by $7.28 per share – ***or more than 35%*** – to close at just $13.44 per share.  As one analyst noted in promptly downgrading S1's shares, "***[the Company's] narrative is too hard for us to defend***."

9.     Meanwhile, the Individual Defendants had not hesitated to take advantage of their knowledge of the truth to sell significant portions of their personal holdings of S1 stock during the Class Period at inflated prices.  For example, Defendant Weingarten alone sold a staggering 1,420,447 of his S1 shares at inflated prices during the Class Period, thereby reaping illicit insider selling proceeds of $22,817,766.  Indeed, although he had one or more so-called "Rule 10b5-1 Plan(s)" in place during the Class Period, Defendant Weingarten's relevant SEC Form 4 notes that he sold the vast majority of these shares (1.2 million of 1.42 million) over three consecutive days in mid- December 2022, and there is no indication on the Form 4 reporting these trades that they were made pursuant to a Rule 10b5-1 Plan.  The only explanation offered for each of the sales was that the "sale was effected in connection with year-end financial planning."

10.    Plaintiff and the members of the Class, however, did not fare as well as the Individual Defendants.  By this Action, Plaintiff, on behalf of himself and the Class he seeks to represent, now seeks to recover damages for the significant losses that they have suffered as a result of Defendants' wrongful acts and omissions.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

13. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). S1 is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

14. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15. Plaintiff Gupta, as set forth in his previously filed lead plaintiff certification, acquired S1 common stock at artificially inflated prices during the Class Period, and was damaged thereby.

16. Defendant S1 is a Delaware corporation with its principal executive offices located at 444 Castro Street, Suite 400, Mountain View, California 94041. S1 went public in an IPO in June 2021. The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "S."

17. Defendant Tomer Weingarten ("Weingarten") is S1's co-founder, Chairman of the Board of Directors, President, and CEO. Defendant Weingarten signed S1's Form 10-K for FY 2023 (the fiscal year ending January 31, 2023) and the letters to S1's shareholders for fiscal quarters Q1, Q2, Q3, and Q4 in FY2023. Weingarten was an architect and primary beneficiary of the scheme alleged herein, and sold approximately $22,817,766 shares of his personal holdings of

1  S1 common stock at prices that were artificially inflated by Defendants' false and misleading

2  statements.

3       18.    Defendant David Bernhardt ("Bernhardt") is S1's CFO.  Defendant Bernhardt

4  signed S1's Form 10-Qs for the Q1 FY2023 (the quarter ending April 30, 2022), Q2 FY2023 (the

5  quarter ending August 31, 2022), and Q3 FY2023 (the quarter ending October 31, 2022), and the

6  letters to S1s shareholders for fiscal quarters Q1, Q2, Q3, and Q4 in FY2023.  Bernhardt was an

7  architect and primary beneficiary of the scheme alleged herein, and sold approximately $840,573

8  shares of his personal holdings of S1 common stock at prices that were artificially inflated by

9  Defendants' false and misleading statements.

10       19.    Defendants Weingarten and Bernhardt, collectively, are sometimes referred to

11  herein as the "Individual Defendants."

12       20.    The Individual Defendants possessed the power and authority to control the

13  contents of S1's SEC filings, press releases, and other market communications.  The Individual

14  Defendants attested to their involvement in the preparation and delivery of S1's SEC filings and

15  press releases alleged herein to be misleading and had the ability and opportunity to control their

16  contents, prevent their issuance, and cause them to be corrected.  Because of their positions within

17  S1, and their access to material information available to them but not to the public, the Individual

18  Defendants knew or recklessly disregarded that the adverse facts specified herein had not been

19  disclosed to and were being concealed from the public, and that the actionably false and misleading

20  statements alleged herein were materially false and misleading when made.  The Individual

21  Defendants are liable for the false statements and omissions pleaded herein.

22                    **SUBSTANTIVE ALLEGATIONS**

23  **I.    BACKGROUND**

24       **A.    S1's Cybersecurity Offerings**

25       21.    S1's Singularity Platform provides a suite of different services to its end user

26  customers related to cybersecurity and cyberattack threat detection and prevention.  Services are

27  priced primarily based on the number of the customer's "endpoints," which are physical devices

28  that connect to and exchange information within a computer network like a desktop computer, a

1    laptop, or a mobile device. Protection and monitoring at the endpoint level is critical since

2    cybersecurity attacks often target endpoints when trying to infiltrate a network.

3        22.    In its most recent 10-K, S1 states that it "generate[s] substantially all of [its] revenue

4    by selling subscriptions to [its] Singularity Platform," and describes its Singularity Platform as

5    offering the following capabilities:

6        a.    **Proprietary Security Data Lake**: S1's "DataSet" is a "fully integrated

7            security data lake that seamlessly fuses together the data, access, control

8            and integration planes" of S1's other offerings "into a centralized platform,"

9            so that enterprises using the Singularity Platform have "access to their

10           security data from multiple sources through a single pane of glass."

11       b.    **Endpoint Protection**: Protection at the endpoint level "is powered by

12           distributed AI which resides both on devices as well as in the cloud," and

13           which "is capable of autonomous decision making on the device and

14           stopping threats in milliseconds."

15       c.    **Endpoint Detection and Response ("EDR")**: S1's "ActiveEDR" solution

16           "enables on-device behavioral analysis" (which allows it to identify

17           potentially anomalous behavior on an endpoint device), "auto-remediation,

18           and response in a fully autonomous fashion." It relies heavily on S1's

19           patented "Storyline" technology, which "builds a model of real-time

20           running processes and their behaviors, to create rich, contextual data

21           narratives," to both identify and respond to potential threats – either

22           autonomously or, if the customer wants, at the initiation of a human operator

23           – at the endpoint level.

24       d.    **Multi-tenancy Architecture**: This feature allows S1 customers to set

25           security policies either within a hierarchy or at a specific level, or with a

26           combination of both options.

27       e.    **XDR Integrations**: In addition to its EDR offering, S1 also offers its

28           Singularity XDR, which "empowers security teams to see data collected by

7

AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG

disparate security solutions from all platforms, including endpoints, cloud workloads, network devices, email, identity, and more, within a single dashboard," and which "enables customers to seamlessly extend the power of the Singularity Platform across the entire IT stack – regardless of vendor – to automate response actions."

 f. **IT and Security Operations**: S1 touts its platform as having a number of IT and security capabilities that can address "vulnerabilities and mis-configured settings."

23. Per S1's most recent 10-K, S1 offers three different subscription tiers: Singularity Core, Singularity Control, and Singularity Complete. Different subscription tiers provide access to different capabilities, with Core being the "entry level security solution" and Complete being S1's "flagship offering that includes a comprehensive suite of product capabilities."

24. In addition to the above-listed capabilities, S1 offers add-on products it calls "Singularity Modules," which are priced as subscriptions on a per endpoint basis. S1 describes its "most notable modules" as:

 a. Cloud security modules, like Cloud Workload Protection;

 b. Identity protection modules, like Singularity Identity;

 c. The "Ranger" module, which deals with attack surface management;

 d. Singularity Mobile, which provides mobile endpoint security;

 e. XDR Power Tools modules that "complement and extend Singularity EDR & XDR capabilities," like Data Retention and Cloud Funnel;

 f. WatchTower; and

 g. Vigilance MDR.

25. The 10-K separately describes S1's "DataSet Platform," which is a "cloud-native flexible enterprise data platform built for all types of data live or historical" that can "process massive amounts of live data in real time."

26. Confidential Witness 1 ("CW1") served as a Team Lead and then as a Senior Manager from before the Company's 2021 IPO until mid-2023 within its Site Reliability

Engineering ("SRE") group,[4] which was a part of S1's DevOps (*i.e.*, Development & Operations) division.  CW1 described the process by which S1's Singularity Platform (and whichever Singularity Modules a customer might choose to purchase) would be installed and activated on a customer's endpoints and network.  CW1's role gave him substantial insight into this process, as the primary function of SRE was to ensure that the Company's software-as-a-service (*i.e.*, SaaS) products functioned properly and ran smoothly, and SRE was also responsible for the provisioning and delivery of products and services to customers.

27.    CW1 confirmed that when a customer purchases S1's Singularity Platform, an "agent" is downloaded to the customer's various endpoints.  Per CW1, an agent is a type of software program that performs actions continuously and autonomously on behalf of another (*e.g.*, a computer user or an organization's network), which in the IT security context could include conducting security scans and reporting findings therefrom, applying software patches, and rebooting the endpoint.  In S1's case, the agent is the Singularity Platform itself.

28.    As CW1 further confirmed, once the Singularity Platform agent has been downloaded to an endpoint, it already contains every additional S1 security offering within it.  Accordingly, if a customer chooses to purchase a subscription for additional services offered by a Singularity Module, the SRE group delivers such services simply by remotely enabling those elements in the existing Singularity Platform agent that the customer has previously downloaded.  In CW1's words, "everything [S1 offers] is already built into that agent, and [additional features] get turned on via a license."  According to CW1, such add-on services could be enabled from the outset for new customers that purchased them in the first instance, or enabled at a later time.  Moreover, customers often purchased add-on services only for certain areas of their networks/endpoints, and subscribed only to the standard Singularity Platform for the customer's remaining areas/endpoints.

29.    CW1 went on to confirm that based on the specific purchases made by a customer, the SRE team would receive a series of charts dictating which features should be enabled for which

---

[4]       CW1 was promoted to the Senior Manager role before the Class Period began.

AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG

1   client endpoints within the larger network for that client.  Via an internal IT platform called "Atlas,"

2   the SRE team would then use these charts to carry out client provisioning (*i.e.*, the activation of

3   specific Singularity Modules for the appropriate endpoints), thereby ensuring that each particular

4   endpoint received all the services purchased for and attributed to it.  According to CW1, Atlas is

5   the only system capable of activating modules for S1's customers.

**B.    S1's Revenue Recognition Policies**

7   30.    Per its most recent 10-K, S1 recognizes subscription revenue ratably over the term

8   of each customer's contract:

9       We **generate substantially all of our revenue from subscriptions** to our Singularity
10      Platform. . . . Customers can extend the functionality of their subscription to our
        platform by subscribing to additional Singularity Modules.  The nature of our
11      promise to the customer under the subscription is to stand ready to provide
        protection for the duration of the contractual term.  **As a result, we recognize**
        **revenue for these performance obligations ratably over the contractual term.**
12      Premium support and maintenance and other Singularity Modules are distinct from
        subscriptions and are recognized ratably over the term as the performance
13      obligations are satisfied.

14  31.    S1 "generally invoice[s] [its] customers upfront upon signing for the entire term of

15  the contract, periodically, or in arrears."  Contract terms are typically one to three years, and

16  payment terms "typically range between 30 to 45 days."  S1 treats the invoiced amounts "as

17  deferred revenue on the consolidated balance sheets," and recognizes the associated revenue on

18  S1's income statement "ratably over the term of the contract beginning on the date the customer is

19  given access to our platform."  Importantly, S1's "contracts are ***generally non-cancelable over the***

20  ***contractual term***."

21  32.    In line with S1's public statements in its most recent 10-K, CW1 stated that S1's

22  customer billing is based on the total number of customer endpoints that have accessed and availed

23  themselves of the Singularity Platform and add-on services/Singularity Modules.[5]  Providing a

24  hypothetical using arbitrary numbers, CW1 said that if a particular customer had 12

25  agents/endpoints, and each agent/endpoint is charged $20 annually under the terms of that

26

27  _____

28  [5]    In line with what CW1 said, S1's most recent 10-K states that it prices its Singularity
    Modules "as a subscription on a per agent basis."

customer's annual subscription agreement, then S1 will receive $240 (*i.e.*, 12 multiplied by 20) in annual revenue from that customer.  Per CW1, "That's how [S1] charged for the bulk of their billing."

33.    As explained by S1's most recent 10-K, however, the revenue in the above example would not be immediately recognized in full.  While the customer in the hypothetical scenario proffered by CW1 might pay the full $240 at the start of the calendar year,[6] S1 would not immediately recognize that revenue in its quarterly filing: rather, it would recognize "ratably" (*i.e.*, on a per period basis over the life of the subscription) $60 in each quarter, or $60 in the first quarter, $60 in the second quarter, $60 in the third quarter, and $60 in the fourth quarter.  Consequently, and as explained in the 10-K, "a substantial portion of the revenue [S1] report[s] in each period is attributable to the recognition of deferred revenue relating to agreements that we entered into during previous periods" which are still being serviced – and, as a result, "any increase or decrease in new sales or renewals in any one period will not be immediately reflected in [S1's] revenue for that period."

34.    While "substantially all" of S1's services stem from subscriptions and have a fixed contractual price which is recognized over the life of the agreement (as in the example above), in S1's most recent Form 10-K it discloses that its "arrangements may include fixed consideration, variable consideration, or a combination of the two."  With respect to variable consideration, the 10-K states it "is typically a function of transaction volume or another usage-based measure."  S1 recognizes revenue for variable consideration as follows:

> Depending upon the structure of a particular arrangement, we (1) allocate the variable amount to each distinct service period within the series and recognize revenue as each distinct service period is performed (i.e. direct allocation), (2) estimate total variable consideration at contract inception (giving consideration to any constraints that may apply and updating the estimates as new information becomes available) and recognizes the total transaction price over the period to which it relates, or (3) apply the 'right to invoice' practical expedient and recognize revenue based on the amount invoiced to the customer during the period.

---

[6]    Per S1's most recent 10-K, customers are invoiced "upfront upon signing for the entire term of the contract, periodically, or in arrears."  While the customer in this hypothetical example pays the full amount upon signing, other payment terms and periods are obviously possible.

35.    S1 does not clarify which of its services involve variable (as opposed to fixed) consideration in its public filings.

**C.    S1's Key Business Metric: Annualized Recurring Revenue (ARR)**

36.    Although S1 recognizes revenue ratably over the course of a contract's term, it states that one of its key business metrics is Annualized Recurring Revenue, or "ARR."  S1's most recent 10-K defines ARR as "the annualized revenue run rate of our subscription and capacity contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us."   In other words, ARR is represented to be comprised of the value of the underlying subscription contracts, active as of the date at which ARR is being calculated (*e.g.*, as of the end of a fiscal quarter) and normalized to an annual basis – *i.e.*, annualized.  ARR is intended to represent how much revenue a company expects to receive from recurring customers in the next 12 months, based on the services that its customers have committed to purchasing under the terms of their current contracts (assuming the customers renew on the exact same terms), and it is a relatively common metric among companies that have a SaaS business model.

37.    ARR is distinct from revenue.  While S1 recognizes revenue in accordance with GAAP, it states in its most recent 10-K that "ARR is an operational metric, and there is no comparable GAAP financial measure to which [S1] can reconcile this particular key metric."  S1's 10-K further states that "ARR is not a forecast of future revenue, which can be impacted by contract start and end dates and renewal rates."  Though ARR is not a revenue projection, the two should track to an extent.  As Defendant Bernhardt stated on the June 1, 2023 earnings call, "you would assume that ***about a quarter of ARR goes into revenue*** [each quarter], you know, absent some churn, absent some slower deployments, things like that, that are typical."

38.    For an example of how ARR relates to S1's revenue recognition, consider a scenario in which CW1's hypothetical customer subscribed on the first day of Fiscal Year 1.  At the end of Q3 of Fiscal Year 1, S1 would have recognized three quarters' worth of revenue (or $180) (*i.e.*, it would have recognized one quarter of the contract value at the end of each of the first three quarters of the year, and would have reduced "deferred revenue" by the same amount each quarter), and its

1   Q3 filing entry for "deferred revenue" would reflect deferred revenue of only $60 remaining under

2   that contract.  Though only $60 remained under the contract, however, the ARR for that contract

3   in Q3 would still be $240, because ARR is the measurement of expected revenue for the upcoming

4   year (Q3 Fiscal Year 1 to Q3 Fiscal Year 2), based on the committed contract value at the point in

5   time that ARR is captured and *assuming the customer renews on the same terms*.

6       39.    As stated in its most recent 10-K, S1 relies on ARR "to help [S1] evaluate [its]

7   business, identify trends affecting [its] business, formulate business plans, and make strategic

8   decisions."  The other two key business metrics cited by S1 in the 10-K are both pegged to ARR

9   in one way or another.  They are: (1) the number of customers with ARR of $100,000 or more, and

10  (2) the dollar-based net retention rate, or NRR, which "measures the percentage change in our

11  ARR derived from our customer base at a point in time."  Like ARR, NRR is an operational metric

12  for which there is no comparable GAAP financial measure.

13      40.    While ARR is distinct from revenue, Defendants noted throughout the class period

14  that ARR was linked to the Company's revenue guidance.  For example, in a December 6, 2022

15  call with investors, Defendant Bernhardt explained in the context of the revenue guidance for the

16  upcoming quarter: "While we don't specifically [guide] for ARR[,] being a subscription business,

17  our year-over-year revenue and total ARR growth tracked closely.  We expect that relationship to

18  hold in Q4."

19      41.    Throughout the Class Period, Defendants encouraged investors to focus on ARR,

20  and to consider it an accurate measure of S1's performance.  S1's most recent 10-K, for example,

21  stated that "We believe that ARR is a key operating metric to measure our business because it is

22  driven by our ability to acquire new subscription and capacity customers and to maintain and

23  expand our relationship with existing customers."

24  **II.    THE UNDISCLOSED ADVERSE MATERIAL FACTS**

25      42.    At the end of the Class Period, Defendants finally disclosed the fact that S1's ARR

26  numbers were over-inflated as a result of two systemic issues within S1.  Though unknown to

27  investors, both of the undisclosed issues were known at all times to both S1 and the Individual

28  Defendants, as discussed below.

**A.    S1 Failed to Disclose Its Inclusion of Consumption and Usage Estimates in Its ARR Calculations**

43.    In its Form 10-Q for Q1 FY2023 (the quarter ended April 30, 2022), which was filed on June 1, 2022, S1 defined ARR "as the annualized revenue run rate of our subscription contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us."

44.    Defendants, however, omitted the fact that throughout the Class Period (which began on this date), their ARR calculations included a component that was **_not_** part of its subscription contracts "on their existing terms."  Specifically, as Defendant Bernhardt later disclosed on the Q1 FY2024 earnings call which took place on June 1, 2023 (the "Q1 FY2024 Earnings Call"), S1 was accounting for "increasing usage and consumption patterns by [its] large customers . . . real-time in quarterly ARR" during the Class Period.  S1 failed to disclose this component of its ARR calculations (which were supposed to be derived solely from customer commitments under existing subscription contracts, **_without_** any assumptions about non-guaranteed revenue from "consumption and usage" overages and/or increased customer spending on data) in its public statements.  To the contrary, during the Class Period the Company expressly stated in each of its financial statements that "**_ARR is not a forecast of future revenue_**."

45.    Defendant Weingarten tried to explain that "**_consumption is something. . . that we've had in our ARR.  It's something that is part of our ongoing operations_**" on the Q1 FY2024 Earnings Call held on June 1, 2023.  However, this was never adequately disclosed, and as certainly not clear to S1's analysts or the market as a whole based on what S1 had previously said regarding its methodology for calculating ARR.  In fact, the very first analyst question on the June 1, 2023 call was about what, exactly, the "consumption and usage" was, with an analyst asking, "Is this for kind of storage and query?  Maybe you can explain the underlying product that's related to this consumption-based revenue. . . . [Is this] kind of an extra layer of revenue we need to consider that's more variable in nature?"

46.    Later in the call, Defendant Weingarten elaborated:

**_[B]asically, the ARR adjustment that we've done was realizing that both we've had consumption is kind of an ad-hoc element to our ARR, which basically drives_**

*up ARR as consumption goes up, but it drives down ARR significantly when consumption is not continuing to grow.*  In the past couple of years, consumption for us was always on the up and up, and it created that overstatement of ARR, so to speak, which created an expectation for revenue for us internally as well.

47.    Defendant Bernhardt provided some limited additional information about the affected modules, clarifying that the change was "*about the data ingestion and the. . . security data lake and the dataset consumption products*." He further stated that "what we had been seeing historically was we were seeing customers that were signing up for contracts, *using the data in excess of what they were committed to*, renewing early, and we were reflecting that in the ARR balance."[7]

48.    While Defendants never explained the exact mechanism by which the customers were incurring these additional "consumption and usage" charges, products which were tied to "data ingestion (like DataSet) and data retention undoubtedly included caps on usage/consumption;[8] if a customer exceeded these contractual caps, the customer would be charged over and above the terms of the subscription contract based on the amount of data ingested and/or the duration that S1 retained that data on the customer's behalf.

49.    Alternatively, Defendants may have been assuming that certain customers – *e.g.*, customers with historic data overages and/or whose data usage was trending upward – who were scheduled to renew within the 12 months of the ARR calculation date would increase their

---

[7]    Defendant Bernhardt also admitted that the decreases in consumption and usage were "something that we'd seen going into late Q4 and early Q1 and then throughout Q1, even into May and likely into June, we're seeing a decrease in that and customers rightsizing their spend to get back to committed total."

[8]    For example, in an "inactive" set of terms and conditions for the DataSet product – one of the products to which Defendant Bernhardt attributed the consumption and usage adjustments – available on S1's website states as follows:

Unless otherwise agreed by You and DataSet in a separate written agreement, *if Your use of the Services in any given calendar month exceeds Your chosen log volume and/or retention period* (the "Service Capacity"), *You will be charged at the end of such month for the excess usage over the Service Capacity*, at the rate set forth on the Site or, if you and DataSet have entered into an Order Form, at the rate(s) set forth in the Order Form. You agree to pay the additional fees for excess usage for the applicable calendar month without any right of set-off or deduction.

spending on data when they renewed.  Defendants made little effort to clarify which (if not both) was the basis for the "consumption and usage" issue they identified on June 1, 2023.

50.     On the Q1 FY2024 Earnings Call, Defendant Weingarten further admitted that the improper inclusion of consumption, along with the control issue discussed below, had led to S1 missing its revenue projections, stating:

> [W]hen the quarter ended . . . the dust settled, when he started kind of figuring out, hey, ***why aren't we seeing that revenue***, a big part of it was the ARR was reflecting consumption that was now going down.  And that impacted what we should have seen in revenue.  And couple that with, again, some CRM inaccuracies that Dave mentioned as well, and that was mainly the reason for the ***revenue miss***.

51.     In addition to impacting S1's ability to meet the revenue guidance that it had provided to investors (as Defendant Weingarten acknowledged), the undisclosed inclusion of the "consumption and usage" assumptions was itself material and misleading.  S1 repeatedly made a point of noting in its Class Period public filings that its "contracts are generally non-cancelable over the contract term" (which S1 states generally have terms of one to three years).  Including assumptions about non-guaranteed revenue from data overage charges and/or increased customer spending on data in a metric (ARR) designed to measure the amount of non-cancelable, typically annual subscription contracts is by definition highly misleading – especially since, as Defendants reminded investors during the Class Period, the subscription nature of their business gave them "higher visibility" into customers' future spending than might otherwise be the case.

52.     With their corrective disclosures, Defendants acknowledged that these "consumption and usage" assumptions were being improperly included throughout the Class Period, and that they knew as much.  Defendant Bernhardt stated they "had seen steadily increasing usage consumption patterns by our large customers, which we accounted for real-time in quarterly ARR."   By their own admission, Defendants only excised the "consumption and usage" assumptions from their calculations when they saw "a notable decline in usage," after which they "elected to tighten the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values."   As their public statements regarding ARR demonstrate, however, Defendants should have been doing as much all along – they just declined to do so until they realized they could no longer hide what they were doing from the market.  They

1  knew that their ongoing inclusion of these "consumption and usage" assumptions in their ARR

2  calculations would become apparent as those assumptions trended ***downward***.

3       53.    As noted above and further detailed below, on June 1, 2023, S1 also disclosed that

4  it was restating its previously reported ARR throughout the prior fiscal year of 2023, including an

5  approximate $27 million reduction as of January 31, 2023 (together with other restatements of

6  previously reported ARR as of the ends of each prior quarter in the fiscal year 2023).  Defendants

7  attributed about half of the amount by which it was restating its previously reported ARR figures

8  to the removal of these "consumption and usage" assumptions from ARR calculations.  They

9  attributed the other half to another "problem" which is discussed below:  S1's double-counting of

10  ARR associated with contract renewals.

11       **B.    S1 Failed to Disclose It Was Double-Counting Certain Renewals**

12       54.    On the Q1 FY2024 Earnings Call, Defendants also stated that they recently

13  discovered certain "historical upsell and renewal recording inaccuracies relating to ARR on certain

14  subscription and consumption contracts."  According to Defendants, these "inaccuracies" occurred

15  in instances where S1 "had upsell [situations] that included a renewal, and [S1] w[as] adding that

16  [the underlying contract renewal] to the historical ARR versus adding just the upsell component

17  of it" when calculating ARR – thereby effectively double counting the renewed contract value.

18       55.    Defendants claimed that they came across the double-counting issue while

19  assessing the impact of their "consumption and usage" assumptions on ARR, which would place

20  their discovery of the issue sometime after they filed their From 10-K (for the year ending January

21  31, 2023) on March 29, 2023.

22       56.    However, according to another confidential witness ("CW2"), such double-

23  counting was by no means something new at S1.  CW2 worked for S1 from before its IPO to early

24  2022serving from mid-2021 through CW2's departure as a senior manager in the Finance

25  department.  During their tenure at S1, CW2 dealt with financial forecasting and monitoring of

26  actual financial performance, among other tasks.

27       57.    CW2 reported that then (as now) S1 utilized Salesforce for all CRM functions,

28  including sales-related activity, and ARR metrics were derived exclusively from information

within the Salesforce platform.  As CW2 confirmed, ARR was principally derived through data within a Salesforce "object" (*i.e.*, function) called Opportunities.  The Salesforce Opportunities function enabled users to track a variety of data within the CRM associated with prospective sales and deals in progress.  Each "Opportunity" contained predefined fields for specific data.  For example, fields for each current or prospective customer included the account/customer's name, the deal amount/value, the subscription terms, estimated close date, etc.  "Those Opportunities house the data that are used to calculate ARR," as CW2 said.  Put another way, Opportunities-derived data yielded "certain outputs" that the Finance team utilized to calculate ARR.

58.    Sales personnel were responsible for inputting data into Salesforce Opportunities associated with the specific customers and deals being handled by each respective salesperson.  CW2 confirmed that moreover, salespeople were expected to regularly and promptly update Opportunities based on the evolving stages of any given prospect/deal.  For example, if a customer was up for contract renewal and decided to buy more "licenses" (*i.e.*, subscriptions) in the next subscription year, sales personnel were responsible for accurately inputting that increase into Salesforce.  CW2 confirmed that correctly inputting this information is very important because it directly impacts "future revenue, [Annual] Contract Value [*i.e.*, ACV], and ARR."  According to CW2, other teams also made entries and adjustments within Opportunities on a regular basis.  As CW2 put it, there were "multiple touchpoints" meaning various S1 personnel accessed/input/revised data within Opportunities.

59.    Per CW2, the Finance team calculated ARR based on the Opportunities outputs from Salesforce, on a monthly and quarterly basis.  As a first step, the Finance department generated customized reports via Saleforce pertaining to Opportunities.  While CW2 was at S1, the Opportunities data was then imported from Salesforce into the Company's principal accounting system, NetSuite, for further calculation.  (CW2 further noted that Opportunities data was also used by the Finance department to calculate another important non-GAAP metric: Net Retention Rate ("NRR")).

60.    Once the Opportunities data was imported into NetSuite, as CW2 confirmed, the Finance department would then "organize the [Annual] Contract Values by the different

Opportunity types." Through this process, the Finance department differentiated contracts by (1) new customers, (2) existing customers expanding their subscriptions (*i.e.*, "upsells"), (3) existing customers reducing/downgrading their subscriptions, or (4) customers "churning"/canceling their subscriptions altogether. CW2 confirmed that the Finance department summed up total values derived from the "Opportunity data" for each of the above four categories or "buckets." That aggregate data was then utilized to calculate ARR.

61.     As CW2 confirmed, ARR is a "waterfall calculation." The calculation involves taking the ARR figures from the start of a given period, then adding ARR figures from (1) the new customers and (2) the upsell/expansion buckets, and then deducting ARR from the contraction and the cancellations buckets. This process yields the ARR for the period in question. Consistent with the waterfall methodology, these newly derived figures serve as the basis/starting point for the subsequent period's ARR calculation.[9]

62.     Once the above ARR calculations were complete, CW2 and members of the Corporate Financial Planning & Analysis team conducted "spot checks." This involved reviewing data for certain customers at random within Opportunities, to ensure that the data from those deals reconciled with what was being reported within larger financial reports, including the Company's financial forecasting reports. Any variances or discrepancies between the underlying Opportunities deal terms and the resulting financial forecasts were scrutinized by CW2 and their team.

63.     During CW2's tenure, there were certain instances where material variances were identified through the above review process – variances which were not due to any legitimate reason. Such a discrepancy could arise, for example, where an increase in a customer's Annual

---

[9]     For example, if the Company was calculating the ARR as of the end of Q3, it would begin with the ARR reported as of the end of Q2, then add ARR from new customers who had signed up in Q3 (all of which would be new ARR and would be added in full, since new customers have no preexisting contracts to be accounted for), then add ARR attributable to "upsells" of existing customer contracts, and then **subtract** the ARR reductions attributable to customers who were reducing the S1 services they were receiving, and finally the ARR attributable to customers whose contracts were p for renewal in the 3Q but who chose not to renew (*i.e.*, ceased being S1 customers). These calculations would yield the ARR as of the end of the Q3, which would in turn then serve as the baseline value for the end-of-Q4 ARR calculations.

Contract Value ("ACV") due to increased subscriptions had not been properly updated in Opportunities.  As CW2 explained using an example, a hypothetical customer's ACV could be $10,000.  Upon annual renewal, the customer in this example purchases additional licenses such that the customer's ACV increases to $12,000 in the second year of a three-year contract term. The "delta" between the first and second-year ACV is the increase of $2,000 in the second year. However, for Opportunities to accurately capture the new increase of $2,000 for the second year, the initial $10,000 data input needs to have been input correctly.  Accordingly, if the $10,000 ACV had not been input correctly, then the second year "delta" would not have been $2,000, but instead would have been incorrectly reported as $12,000 (*i.e.*, representing the entire ACV for year two).

64.     CW2 stated that to the best of their knowledge, errors like the one described above occurred prior to S1's IPO were detected "in time" to correct them.  Nonetheless, CW2's example closely tracks the explanation given by Defendant Bernhardt on the FQ1 2024 earnings call: namely, that S1 was seeing "***upsell[s] that included a renewal, and we were adding that to the historical ARR versus adding just the upsell component of it***," or that S1 was "stacking an upsell on top of an existing renewal without removing the previous renewal."  In other words, going back to CW2's example, there was an "upsell [] that included a renewal" (the $10,000 renewal, plus the $2,000 increase/upsell, for a total renewed annual contract of $12,000, which was incorrectly "add[ed]…to the historical ARR" ($10,000 historical ARR plus $12,000, for a total renewed annual contract of $22,000 for purposes of ARR reporting), "versus adding just the upsell component of it" (*i.e.*, just the incremental $2,000 addition to the prior historical ARR of $10,000). In this example, the value of the underlying contract ($10,000) would be double-counted in the ARR calculations.

65.     In the Q&A portion of the June 1, 2023 earnings call, Defendant Bernhardt twice confirmed that "this was an error in our CRM."  Defendant Weingarten likewise described the issue as stemming from "some CRM inaccuracies."  Moreover, in a June 13, 2023 piece published by Barclays Equity Research after analysts had spoken with Defendant Bernhardt, Barclays similarly reported that Defendants had "essentially double counted the renewal component in the CRM system, which was used for sales force automation/compensation."  Just as CW2 did,

Defendants traced the double-counting – the exact same kind of double-counting described by CW2 – to *inaccuracies in the Salesforce CRM*.

66.     The issue described by CW2 clearly persisted throughout the Class Period.  Yet Defendants never disclosed that the data on which their ARR calculations were based was inaccurate in any way, let alone subject to the double-counting of renewals like that described above.  As a result, Defendants' statements about ARR during the Class Period were false and misleading for this additional reason.

### C.     Defendants Monetized the Fraud Through Stock Sales

67.     Defendant Weingarten sold 1,420,447 of his personal holdings of S1 common stock during the Class Period, reaping illicit insider trading proceeds of $22,817.766.  The vast majority of Weingarten's stock sales (1,237,918 shares, of which 1.2 million were sold over three consecutive days from December 12 through 14, 2022, and resulted in $18,853,356 of illicit insider selling proceeds) were apparently not sold pursuant to a Rule 10b5-1 trading plan, even though publicly filed documents indicate Defendant Weingarten had one such plan in place starting July 14, 2021 and another one that started January 30, 2023.

68.     Per a Form 4 filed by Defendant Weingarten, on December 12, 2022, he exercised stock options to purchase S1 Class B common stock (which was not publicly traded) and then converted that S1 Class B common stock into S1 Class A common stock (which is publicly traded on the NASDAQ under the ticker symbol "S").  Defendants Weingarten exercised his options in two tranches, obtaining 122,685 Class B shares at a price of $1.1967 per share and 248,065 Class B shares at a price of $2.27 per share (a total of 370,750 shares).  That same day, Defendant Weingarten converted 400,000 Class B shares into Class A shares, which he promptly sold at prices ranging from $15.72 to $16.02, inclusive.

69.     On December 13, 2022, Defendant Weingarten purchased 400,00 more shares of Class B common stock at a price of $2.27 per share, all of which he then converted into Class A common stock.  That same day, Defendant Weingarten sold 400,000 shares of Class A common stock in two tranches: 329,961 shares at prices ranging from $15.335 to $16.335, inclusive, and 70,039 shares at prices ranging from $16.34 to $17.30, inclusive.

70.     On December 14, 2022, Defendant Weingarten purchased yet another 400,000 shares of Class B common stock at a price of $2.27 per share, all of which he again converted into Class A common stock.  That same day, Defendant Weingarten sold 400,000 shares of Class A common stock at prices ranging from $15.00 to $15.905, inclusive.

71.     In the case of each of these sales, the only explanation offered in the Form 4 was that the "sale was *effected in connection with year-end financial planning*."

72.     During the Class Period, Defendant Weingarten engaged in a total of 14 stock sales on 13 separate days, in varying amounts and for varying prices, which he reported in eight Form 4s.  For only six of those fourteen sales, the relevant Form 4 reported that the sale was made pursuant to a Rule 10b5-1 Plan.  For the other eight sales apparently not  made pursuant to such a plan, *every sale other* than the three mid-December sales was purportedly "an Issuer mandated sale by the Reporting Person to cover tax withholding obligations in connection with the vesting and settlement of Restricted Stock Units" and did "not represent a discretionary trade by the Reporting Person," as "[p]ursuant to the Issuer's equity incentive plan, an award recipient's tax withholding obligations must be funded by a 'sell to cover' transaction."

73.     Moreover, although as noted above, Defendant Weingarten made six sales of a combined total of 182,529 shares (resulting in additional illicit insider selling proceeds of $3,238,491) pursuant to a 10b5-1 Plan in April and May 2023, that Plan was only implemented *during the Class Period* – on January 13, 2023.

74.     Defendant Bernhardt also sold 44,524 shares of S1 stock at inflated prices during the Class Period.  While the majority of the stock Bernhardt sold (30,784 shares) was sold pursuant to a Rule 10b5-1 trading plan, that plan was implemented during the Class Period, on July 14, 2022.

## III.     THE TRUTH BEGINS TO EMERGE

75.     On June 1, 2023, the truth began to emerge.On that date, after the market closed, S1 filed its 10-Q for its first quarter of fiscal year 2024 (the quarter ending April 30, 2023).  In that 10-Q, S1 disclosed, in relevant part, as follows:

> *As a result of the decline in usage and consumption in the quarter ended April 30, 2023, we changed our methodology of calculating ARR for consumption and*

***usage-based agreements to reflect committed contract values as opposed to based on consumption and usage.*** By making this change now, we expect future ARR and revenue growth to be more closely aligned. It should also reduce volatility in ARR compared to the prior methodology where usage and consumption changes could have a magnified impact on ARR. In addition, as part of our quarter-end review of ARR in connection with the preparation of our condensed consolidated financial statements for the quarter ended April 30, 2023, ***we discovered some historical upsell and renewal recording inaccuracies relating to ARR on certain contracts, which we have corrected. As a result of the change in methodology and correction of historical inaccuracies, we made a one-time adjustment to ARR of $27.0 million or approximately 5% of total ARR, which we reflected in our total ARR as of April 30, 2023.*** ARR for the prior periods in fiscal 2023 presented above have been adjusted based on the same percentage adjustment rate identified in the first quarter of fiscal 2024. This adjustment to ARR did not impact historical total bookings or revenue.

76. The ARR adjustments were as follows:

| FO Ending | Old ARR | New ARR | Difference |
|---|---|---|---|
| April 30, 2023 | n/a | $563,559,000 | n/a |
| January 31, 2023 | $548,652,000 | $521,652,000 | ($27,000,000) |
| October 31, 2023 | $487,427,000 | $463,440,000 | ($23,987,000) |
| July 31, 2023 | $438,640,000 | $417,054,000 | ($21,586,000) |
| April 30, 2022 | $338,962,000 | $322,281,000 | ($16,681,000) |

77. S1's press release accompanying its 10-Q also disclosed the adjustment, stating that it had adjusted historical ARR "due to a change in the methodology for reflecting consumption and usage based agreements as part of ARR to reflect committed contract values" and "to correct some historical recording inaccuracies relating to ARR on certain contracts that were discovered as part of our review of ARR in the first quarter of fiscal 2024."

78. In its quarterly letter to shareholders also made public after the market closed on June 1, 2023, S1 similarly attributed the ARR adjustment to (1) "lower usage and consumption trends by certain large customers" (which it connected to "the current macroeconomic conditions") and which had caused it to "change[] the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values" so as to "reduce ARR volatility"; and (2) the correction of "historical recording inaccuracies relating to ARR classifications of certain contracts that we discovered as part of our review of ARR."

79. On the earnings conference call with analysts later that day, Defendant Bernhardt further stated as follows:

First, some context.  In the past few years, ***we had seen steadily increasing usage and consumption patterns by our large customers, which we accounted for real-time in quarterly ARR***.  However, as the first quarter progressed, we experienced a ***notable decline in usage, which continued in May***.  In light of the current macro environment, we expect these lower usage and consumption trends to persist.

Due to this new dynamic, ***we elected to tighten the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values***.  This provides a cleaner view of growth for fiscal '24 and beyond.  ***By making this change now, we expect ARR and revenue to be more closely aligned.***  It should also reduce volatility in ARR compared to the prior methodology, where usage and consumption changes could have a magnified impact on ARR.

As we reviewed the methodology, we also discovered ***historical upsell and renewal recording inaccuracies relating to ARR on certain subscription and consumption contracts***, which are now corrected.  After considering these factors, this adjustment resulted in a onetime ARR reduction of $27 million or approximately 5% of ARR, resulting in Q4 fiscal '23 ending ARR of $522 million.

We are applying a comparable estimated adjustment to the remaining quarters in fiscal year '23, which we believe is a reasonable approximation of the impact in those periods.  Importantly, this adjustment did not impact historical revenue or bookings.  We wanted to be transparent to address this upfront and move forward on a clearer path.

80.    Defendant Bernhardt went on to state that S1 "expect[ed] revenue of about $141 million, up 38% year-over-year," and "net new ARR in the low $40 million range, consistent with Q1."  He added that S1 "expect[ed] second half net new ARR to be higher than the first half, consistent with typical seasonality," and that for the full year S1 "expect[ed] revenue of $590 million to $600 million, growing 41% at the midpoint" (as compared to Defendants' prior estimate made on prior quarter's earnings call of 51% growth at the midpoint).  He also stated that S1 now expected "full year ARR to grow in the mid-30% range from the adjusted [FY 2023]-ending ARR of $522 million" (as compared to Defendants' prior estimate of 47% ARR growth made on the prior quarter's earnings call).

81.    In the Q&A portion of the June 1, 2023 earnings call, analysts expressed confusion and concern.  For example, one analyst asked whether "the slowdown in consumption and usage" was for "storage and query," adding, "Maybe you can explain the underlying product that's related to this consumption-based revenue…[A]s we look in our models and try to forecast out the revenue generated from ARR, is this going to be – does this basically remain out of the ARR equation now? [Is it] an extra layer of revenue we need to consider that's more variable in nature?"

82.     Defendant Bernhardt then clarified:

When you asked specifically what's that about, ***it's about the data ingestion and the security data lake and the data set consumption products***. So those are approximately ***single digit of our total ARR***. But what we had been seeing historically was we were seeing customers that were signing up for contracts, using the data in excess of what they were committed to, renewing early, and we were reflecting that in the ARR balance.

83.     Defendant Bernhardt also attempted to explain why none of the changes would require the Company to restate its financials:

So we believe that this is -- this, going forward, it's going to reduce the quarterly ARR fluctuations. ***It's going to more correlate ARR and revenue.*** And that's the reason that we did this. The reason it doesn't change any historical bookings, in terms of the other side of this, which was historical upsell and renewal inaccuracies, what we were seeing was ***we had upsell motions that included a renewal, and we were adding that to the historical ARR versus adding just the upsell component of it. This was an error in our CRM***. We have fixed this and should not have that error going forward. That's why it didn't affect revenue, didn't affect overall total bookings, didn't affect cash flows, didn't affect the income statement. But what it did do is ***it set external expectations for what revenue should be going forward***, both externally and internally, that's why we made this adjustment now.

84.     None of this directly answered the analyst's original question, which was how this "consumption and usage" factored into S1's business, and when a different analyst asked for clarification on the guidance change, Defendant Weingarten offered some additional explanation:

The third factor that we see in play is that consumption dynamic. ***I mean consumption is something that we've had in our ARR. It's something that is part of our ongoing operations***, obviously. So taking out consumption from ARR obviously forces us to also take the guide down and really not consider consumption as part of our go-forward but only as upside, as I mentioned.

85.     Another analyst asked whether the "data ingestion piece" (which was "a smaller part of the business") of the "negative surprise" forebode "broader challenges coming in the business with the logic saying, hey, it's easier to shut off consumption quickly, and we'll get to the contractual stuff later and ultimately start shutting it off."

86.     Defendant Weingarten's answer was not illuminating:

I think these are two completely separate things. . . . Consumption, in its nature, is just more volatile. And I think that for companies out there, when they're under the gun to save, obviously, something as intangible as data is something that they can start thinking twice about. That's not the same for their core security posture, and that is something that we've seen very, very stable over time.

***Even if we imply some factor of rightsizing into it, that doesn't create that same volatility that an ad hoc consumption model would have***. Obviously, ***these are***

*multiyear contracts. **Obviously, these are tied specifically to the amount of people you have in the organization.*** Even if you have some volatility in that, it is not even close to the volatility that you can have with data volumes. And that's why, once again, to kind of remove that volatility, we remove that from our ARR projections.

87.     In response to another analyst question, Defendant Weingarten made remarks that seemed to directly conflict with Defendant Bernhardt's statement that "the data ingestion and the security data lake and the data set consumption products" were just a "single digit of [S1's] total ARR," stating:

> ***I think generally, when we look at it, we see kind of the end of the quarter is the point where we started noticing more and more pronounced consumption changing.*** To us, that was a point where couple that with a couple of deals slips and suddenly, you're looking at a very different outcome for the quarter. So I think, generally, if you just look at our new and upsell target for the quarter, it was pretty much in line with what we expected.
>
> ***But when you couple that with that downsizing of consumption, then you just arrive at a very, very different result.*** And to us, I mean, once again, win rates sustained, revenue still growing about 70%. I think if you take out that consumption element, I mean, things would have looked very, very different. So that, I think, is kind of the reason where parts of the business here are really humming. And suddenly, we saw this, which, frankly, we were surprised by and we were surprised by the magnitude, and that's where we are today.

88.     Analysts continued to press Defendants for answers, with another analyst asking what "the main driver of just you missing the Q1 revenue guidance" was, because Defendants had just provided guidance on March 14 "and revenue is mostly ratable." In short, the analyst wanted to know "why this won't happen again." Defendant Weingarten responded:

> I'll try and iterate for Dave [Bernhardt] because it's going to be the third time. ***But basically, the ARR adjustment that we've done was realizing that both we had consumption is kind of an ad hoc element to our ARR, which basically drives up ARR as consumption goes up, but it drives down ARR significantly when consumption is not continuing to grow.*** In the past couple of years, consumption for us was always on the up and up, and it created that overstatement of ARR, so to speak, which created an expectation for revenue for us internally as well.
>
> So when the quarter ended, the dust settled, when he started kind of figuring out, hey, why aren't we seeing that revenue, a big part of it was the ARR was reflecting consumption that was now going down. And that impacted what we should have seen in revenue. ***And couple that with, again, some CRM inaccuracies that Dave mentioned as well, and that was mainly the reason for the revenue miss.***
>
> ***Outside of that, the ARR for the quarter was roughly in line with what we expected, minus again that consumption downsizing.*** So all in all, a lot of it was cleaned and will never happen again, given that rebasing of ARR and the removal of consumption from the base.

89.　　Analysts reacted harshly to S1's disclosures.　For example, in a report issued June 2, 2023, BTIG downgraded S1 shares to "Neutral" from "Buy," stating that "S's Q1/April print was ***disappointing on multiple levels and quite frankly hard to dissect***."　As the report further noted:

> S grew delivered ARR of $564MM / +75% y/y vs. our estimate of $591MM /+74% (Street $594MM).　The $27MM shortfall relative to our model was entirely due to a reclassification that reduced the starting point of ARR in FQ4…. ***We would like to say that the issues facing S are just a weak macro.　But given the degree of the Q1 miss after the company initially guided in mid-March and the magnitude of the guide down, it simply feels like something else is at play here***.　Admittedly the stock appears cheap, but concerns on increased competition from Microsoft (MSFT, Not Rated) and CrowdStrike (CRWD, Buy, $188 PT) are going to be hard to shake near term.　And since we are cutting our FY24 / FY25 revenue estimates by 6% and 18%, respectively, ***the narrative is too hard for us to defend***.

BTIG also noted that S1's prior reporting "did not impact reported revenue, billings or bookings in historical periods," but had caused S1's "view of its Q1 starting point for revenue to be too high."

90.　　Guggenheim also issued a report expressing a strong negative reaction to Defendants' June 1, 2023 disclosures:

> **Key Message**: SentinelOne reported a ***surprisingly weak quarter*** as necessary revisions to historical ARR figures ***clearly impeded Management's ability (and ours) to forecast revenue and ARR with any sort of accuracy***.　This, no doubt, will lead to a ***loss of confidence*** and ***has us questioning internal controls and whether ARR is a reliable metric*** to base our forecasts on going forward. . . . ***[I]t's hard to have any confidence in forecasts at this point***.

The Guggenheim report also reduced its price target for S1 shares from $24.00 to $16.00.

91.　　Barclays Equity Research also took note of the "surprise miss" on ARR and lowered its price target sharply from $22.00 to $15.00.

92.　　In response to Defendants' June 1, 2023 disclosures and related analyst commentary, S1's share price dropped fell over $7.00 per share – from $20.72 to $13.44 per share at the close on June 2, 2023 – a single-day drop of ***more than 35%***.

## IV.　　DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

**A.    Defendants Statements of June 1, 2022**

93.    The Class Period begins on June 1, 2022.  On that day, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended April 30, 2022 (the "Q1 FY2023 10-Q").  In the Q1 FY2023 10-Q, the Company purported to define ARR, stating: "We define ARR as the annualized revenue run rate of our **subscription contracts** at the end of a reporting period, **assuming contracts are renewed on their existing terms** for customers that are under subscription contracts with us."  The Company further stated that "**ARR is not a forecast of future revenue**, which can be impacted by contract start and end dates and renewal rates."  The Q1 FY 2023 10-Q also stated that S1 had ARR of $339 million as of the end of that quarter (the quarter ended April 30, 2022), and that "**ARR grew 110% year-over-year to $339.0 million as of April 30, 2022**."  Defendants Weingarten and Bernhardt repeated the same false and misleading statements regarding the Q1 ARR metrics during the Company's Q1 FY2023 Earnings Call on June 1, 2022.

94.    However, the foregoing definition of ARR in the Q1 FY2023 10-Q was materially false and misleading, because S1 did not calculate its ARR based only on the amounts that its subscription customers were committed to pay under the terms of their existing contracts, and ARR was in fact a partial forecast, as S1 improperly included in its ARR calculations (a) **non-guaranteed amounts for various "consumption and usage" charges** for excess usage services (or for additional optional services) that the customer was not required or committed to use under their existing contract, and/or otherwise included assumptions that some customers would spend more going forward than what was reflected in what they were committed to pay under their current contracts (*see* §II.A above); and (b) **double-counting** of amounts under certain contracts (see also §II.C above).  In addition, and for the same reasons, Defendants' statement that S1 had ARR of $339 million as of the end of the first quarter of FY2023 (the quarter ended April 30, 2022) was materially false and was materially overstated by at least $17 million dollars (and would later be restated by Defendants as having been only $322 million), and its statement of year-on-year growth was also materially inflated.  Moreover, Defendants' statements regarding S1's ARR were

materially misleading because they failed to disclose that S1 lacked adequate controls to ensure that their reporting of ARR was not materially false or misleading.

95.    Defendants Weingarten and Bernhardt each certified the contents of the Company's Q1 FY2023 10-Q – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in which they each stated as follows:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting ... for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]
>>
>> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation…

96.    Each of these certifications was materially false and misleading because, throughout the Class Period, the Company did not in fact have adequate or sufficient disclosure and internal controls in place to ensure that (1) ARR was accurately and adequately defined; and (2) S1's reporting of ARR would be both accurate and free from the deficiencies referenced above and in §II.A and §II.B (and which deficiencies in turn led to the reporting by Defendants of improperly inflated ARR).

**B.    Defendants' Statements of August 31, 2022**

97.    On August 31, 2022, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended July 31, 2022 (The "Q2 FY2023 10-Q"). In the Q2 FY2023 10-Q, the Company purported to define ARR, stating: "We define ARR as the annualized revenue run rate of our ***subscription and capacity contracts*** at the end of a reporting period, ***assuming contracts are renewed on their existing terms***

for customers that are under subscription contracts with us."  The Company further stated that "***ARR is not a forecast of future revenue***, which can be impacted by contract start and end dates and renewal rates."  The Q2 FY2023 10-Q also stated that S1 had ARR of $438.6 million as of the end of that quarter (the quarter ended July 31, 2022), and that "***ARR grew 122% year-over-year to $438.6 million as of July 31, 2022***."  Furthermore, Defendants Weingarten and Bernhardt repeated the same false and misleading statements regarding the Q2 ARR metrics during the Company's Q2 FY2023 Earnings Call on August 31, 2022.

98.    However, the foregoing definition of ARR in the Q2 FY2023 10-Q was materially false and misleading, because S1 did not calculate ARR based only on the amounts that its subscription customers were committed to pay under the terms of their existing contracts, and ARR was in fact a partial forecast, as S1 improperly included in its ARR calculations (a) ***non-guaranteed amounts for various "consumption and usage" charges*** for excess usage services (or for additional optional services) that the customer was not required or committed to use under their existing contract, and/or otherwise included assumptions that some customers would spend more going forward than what was reflected in what they were committed to pay under their current contracts (see §II.A above); and (b) ***double-counting*** of amounts under certain contracts (see also §II.B above).  In addition, and for the same reasons, Defendants' statement that S1 had ARR of $438.6 million as of the end of the second quarter of FY2023 (the quarter ended July 31, 2022) was materially false and was materially overstated by nearly $22 million dollars (and would later be restated by Defendants as having been only $417 million), and its statement of year-on-year growth was also materially inflated.  In addition, Defendants' statements regarding S1's ARR were materially misleading because they failed to disclose that S1 lacked adequate controls to ensure that their reporting of ARR was not materially false and misleading.

99.    Defendants Weingarten and Bernhardt each certified the contents of the Company's Q2 FY2023 10-Q – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in the same form as set forth in ¶97 above, which certifications were also each materially false or misleading for the same reasons as set forth in that same paragraph above.

1

**C.**    **Defendants' Statements of December 6, 2022**

2        100.    On December 6, 2022, the Company filed a quarterly report on Form 10-Q with the

3    SEC, reporting the Company's financial and operating results for the quarter ended October 31,

4    2022 (the "Q3 FY2023 10-Q").  In the Q3 FY2023 10-Q, the Company purported to define ARR,

5    stating: "We define ARR as the annualized revenue run rate of ***our subscription and capacity***

6    ***contracts*** at the end of a reporting period, assuming contracts are renewed on their existing terms

7    for customers that are under subscription contracts with us."  The Company further stated that

8    "***ARR is not a forecast of future revenue***, which can be impacted by contract start and end dates

9    and renewal rates."  The Q3 FY2023 10-Q also stated that S1 had ARR of $487.4 million as of the

10    end of the that quarter (the quarter ended October 31, 2022), and that "***ARR grew 106% year-over-***

11    ***year to $487.4 million as of October 31, 2022***."  Furthermore, Defendants Weingarten and

12    Bernhardt repeated the same false and misleading statements regarding the Q3 ARR metrics during

13    the Company's Q3 FY2023 Earnings Call on December 6, 2022.

14        101.    However, the foregoing definition of ARR in the Q3 FY2023 10-Q was materially

15    false and misleading, because S1 did not calculate ARR based only on the amounts that its

16    subscription customers were committed to pay under the terms of their existing contracts, and ARR

17    was in fact a partial forecast, as S1 improperly included in its ARR calculations (a) ***non-***

18    ***guaranteed amounts for various "consumption and usage" charges*** for excess usage services (or

19    for additional optional services) that the customer was not required or committed to use under their

20    existing contract, and/or otherwise included assumptions that some customers would spend more

21    going forward than what was reflected in what they were committed to pay under their current

22    contracts (*see* §II.A above); and (b) ***double-counting*** of amounts under certain contracts (see also

23    §II.B above).  In addition, and for the same reasons, Defendants' statement that S1 had ARR of

24    $487.4 million as of the end of the third quarter of FY2023 (the quarter ended October 31, 2022)

25    was materially false and was materially overstated by at least $24 million dollars (and would later

26    be restated by Defendants as having been only $463 million), and its statement of year-on-year

27    growth was also materially inflated.  In addition, Defendants' statements regarding S1's ARR were

28

1  materially misleading because they failed to disclose that S1 lacked adequate controls to ensure

2  that their reporting of ARR was not materially false and misleading.

3      102.    Defendants Weingarten and Bernhardt each certified the contents of the Company's

4  Q3 FY2023 10-Q – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in

5  the same form as set forth in ¶100 above, which certifications were also each materially false or

6  misleading for the same reasons as set forth in that same paragraph above.:

7          **D.    Defendants' Statements of March 29, 2022**

8      103.    On March 29, 2023, the Company filed an annual report on Form 10-K with the

9  SEC, reporting the Company's financial and operating results for the quarter and year ended

10  January 31, 2023 (the "FY2023 10-K").  In the FY2023 10-K, the Company purported to define

11  ARR, stating: "We define ARR as the annualized revenue run rate of *our subscription and capacity*

12  *contracts* at the end of a reporting period, assuming contracts are renewed on their existing terms

13  for customers that are under subscription contracts with us."  The Company further stated that

14  "*ARR is not a forecast of future revenue*, which can be impacted by contract start and end dates

15  and renewal rates."  The FY2023 10-K also stated that S1 had ARR of $548.7 million as of the end

16  of the fourth quarter of FY2023 (the quarter ended January 31, 2023), and that "*ARR grew 88%*

17  *year-over-year to $548.7 million for fiscal 2023*."  Furthermore, Defendants Weingarten and

18  Bernhardt repeated the same false and misleading statements regarding the FY23 ARR metrics

19  during the Company's FY23 Earnings Call on March 14, 2023.

20      104.    However, the foregoing definition of ARR in the FY2023 10-K was materially false

21  and misleading because S1 did not calculate ARR based only on the amounts that its subscription

22  customers were committed to pay under the terms of their existing contracts, and ARR was in fact

23  a partial forecast, as S1 improperly included in its ARR calculations (a) *non-guaranteed amounts*

24  *for various "consumption and usage" charges* for excess usage services (or for additional

25  optional services) that the customer was not required or committed to use under their existing

26  contract, and/or otherwise included assumptions that some customers would spend more going

27  forward than what was reflected in what they were committed to pay under their current contracts

28  (see §II.A above); and (b) *double-counting* of amounts under certain contracts (see also §II.B

above). In addition, and for the same reasons, Defendants' statement that S1 had ARR of $548.7 million for fiscal 2023 was materially false and was materially overstated by $27.1 million dollars (and would be restated by Defendants in the next quarterly reporting period as having been only $521.6 million. In addition, the Defendants' statements regarding S1's ARR were materially misleading because they failed to disclose that S1 lacked adequate controls to ensure that their reporting of ARR was not materially false and misleading.

105. Defendants Weingarten and Bernhardt each certified the contents of the Company's FY2023 10-K – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in in the same form as set forth in ¶103 above, which certifications were also each materially false or misleading for the same reasons as set forth in that same paragraph.

## CLASS ACTION ALLEGATIONS

106. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired S1 common stock during the Class Period (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, their respective successors and assigns, the past and current officers, and directors; the members of the immediate families of the Individual Defendants; any entity in which any of the foregoing persons have or had a controlling interest; and the legal representatives, heirs, successors-in-interest or assigns of any such excluded Persons.

107. The members of the Class are so numerous that joinder of all of its members is impracticable. Throughout the Class Period, S1 common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by S1 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

109.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of S1;

- whether the Individual Defendants caused S1 to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of S1 common stock was inflated during the Class Period due to the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

112.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- S1 common stock is traded in an efficient market;

- S1's common shares were liquid and traded with moderate to heavy volume during the Class Period;

- S1 common stock traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased or acquired chares of S1 common stock after Defendants' first materially false or misleading statements as alleged herein (but before the first alleged corrective disclosures) without knowledge of the omitted or misrepresented facts.

113.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market for S1 common stock.

114.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

115.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

116.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

117.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of S1 common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire S1 common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

118. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for S1 common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about S1's finances and business prospects.

119. By virtue of their positions at S1, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

120. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of S1, the Individual Defendants had knowledge of the details of S1's internal affairs.

121. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of S1.

1  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to

2  disseminate timely, accurate, and truthful information with respect to S1's businesses, operations,

3  future financial condition and future prospects. As a result of the dissemination of the

4  aforementioned false and misleading reports, releases and public statements, the market price of

5  S1 common stock was artificially inflated throughout the Class Period. In ignorance of the adverse

6  facts concerning S1's business and financial condition which were concealed by Defendants,

7  Plaintiff and the other members of the Class purchased or otherwise acquired S1 common stock at

8  artificially inflated prices and relied upon the price of the securities, the integrity of the market for

9  the securities and/or upon statements disseminated by Defendants and were damaged thereby.

10      122.    During the Class Period, S1 common stock was traded on an active and efficient

11  market. Plaintiff and the other members of the Class, relying on the materially false and misleading

12  statements described herein, which the Defendants made, issued, or caused to be disseminated, or

13  relying upon the integrity of the market, purchased, or otherwise acquired shares of S1 common

14  stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other

15  members of the Class known the truth, they would not have purchased or otherwise acquired said

16  securities or would not have purchased or otherwise acquired them at the inflated prices that were

17  paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of

18  S1 common stock was substantially lower than the prices paid by Plaintiff and the other members

19  of the Class. The market price of S1 common stock declined sharply upon public disclosure of the

20  facts alleged herein to the injury of Plaintiff and Class members.

21      123.    By reason of the conduct alleged herein, Defendants knowingly or recklessly,

22  directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5

23  promulgated thereunder.

24      124.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

25  other members of the Class suffered damages in connection with their respective purchases,

26  acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

27  that the Company had been disseminating misrepresented financial statements to the investing

28  public.

AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG

<u>**COUNT II**</u>
**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

125.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    During the Class Period, the Individual Defendants participated in the operation and management of S1, and conducted and participated, directly and indirectly, in the conduct of S1's business affairs.  Because of their senior positions, they knew the adverse non-public information about S1's misstatement of income and expenses and false financial statements.

127.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to S1's financial condition and results of operations, and to correct promptly any public statements issued by S1 which had become materially false or misleading.

128.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which S1 disseminated in the marketplace during the Class Period concerning S1's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause S1 to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of S1 within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of S1 common stock.

129.    Each of the Individual Defendants, therefore, acted as a controlling person of S1. By reason of their senior management positions and/or being directors of S1, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, S1 to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of S1 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

130.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by S1.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  December 18, 2023                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ John T. Jasnoch*
John T. Jasnoch (CSB No. 281605)
Cornelia J. B. Gordon (CSB No. 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5310
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com


William C. Fredericks (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brian J. Schall (CA Bar No. 290685)
Rina Restaino (CA Bar No. 285415)
Christopher Mooney (*pro hac vice* forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 310-388-0192
brian@schallfirm.com
rina@schallfirm.com
chris@schallfirm.com


*Lead Counsel for Plaintiff*

AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on December 18, 2023, I caused the foregoing document to be filed

3  with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4  to the email addresses denoted on the Electronic Mail Notice List.

5      Executed on December 18, 2023, at San Diego, California.

6

7       s/ *John T. Jasnoch*

8      John T. Jasnoch (CA 281605)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG