John T. Jasnoch (No. 281605)
Cornelia J. B. Gordon (No. 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5310
Facsimile:  (619) 233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com

William C. Fredericks (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com

*Attorneys for Lead Plaintiff and Lead Counsel
for the Putative Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE SENTINELONE, INC. SECURITIES LITIGATION | Case No.  4:23-CV-02786-HSG |
| | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates to All Actions | <u>DEMAND FOR JURY TRIAL</u> |

NATURE OF THE ACTION ........................................................................1

JURISDICTION AND VENUE ....................................................................4

PARTIES .......................................................................................................5

SUBSTANTIVE ALLEGATIONS ..............................................................6

I.     BACKGROUND ................................................................................6

     A.    S1's Cybersecurity Offerings .............................................6

     B.    S1's Singularity Platform as a Means for Providing for S1 Customers to Access Additional or Expanded S1 Services ........8

     C.    S1's Revenue Recognition Policies ...................................10

     D.    S1's Key Business Metric: Annualized Recurring Revenue (ARR) ...................12

          1.    Overview of ARR ...................................12

          2.    ARR's Importance to Analysts and Investors.................15

          3.    Defendants' Calculation of ARR Prior to the Class Period..........16

II.    THE UNDISCLOSED MATERIAL ADVERSE DECLINE IN S1'S REPORTED GROWTH AND DEFENDANTS' REPORTING OF INFLATED ARR METRICS .................19

     A.    S1's Undisclosed Inclusion of Consumption and Usage Revenue in ARR...........20

     B.    Inclusion of Double-Counted Revenue.........................23

III.   THE TRUTH BEGINS TO EMERGE ...........................................24

IV.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................31

     A.    Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter Ending April 30, 2022 (S1's 4/30/2022 10-Q and Defendants' Related Commentary)...........31

     B.    Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter Ending July 31, 2022 (S1's 7/31/2022 10-Q and Defendants' Related Commentary)...........33

     C.    Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter Ending October 31, 2022 (S1's 10/31/2022 10-Q and Defendants' Related Commentary)...........34

     D.    Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter and Year Ending January 31, 2023 (S1's 1/31/2023 10-K and Defendants' Related Commentary)...........35

     E.    Defendants' False and Misleading Definition of ARR During the Class Period  36

V.      ADDITIONAL SCIENTER ALLEGATIONS ................................................................37

        A.      Knowledge or Conscious Recklessness .........................................................37

                1.      *Scienter* as to S1's Inclusion in ARR of Consumption and
                        Usage Revenue.....................................................................................37

                2.      *Scienter* as to S1's Inclusion in ARR of Double-Counted
                        Revenue and S1's Internal Control Weaknesses ...........................39

        B.      Motive and Opportunity................................................................................43

                1.      Defendants' $240 Million Motive to Use S1 Stock as
                        Inflated Currency to Help Pay For Its Purchase of Attivo.............43

                2.      The Individual Defendants' Insider Selling...................................44

                        a.      Defendant Weingarten's Class Period Insider Sales..........45

                        b.      Defendant Bernhardt's Class Period Insider Sales ...........48

        C.      The Core Operations Doctrine Further Supports a Strong Inference of
                Defendants' *Scienter* ..................................................................................49

CLASS ACTION ALLEGATIONS ...........................................................................................49

INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................................51

COUNT I ...................................................................................................................................52

COUNT II ..................................................................................................................................55

PRAYER FOR RELIEF ............................................................................................................56

JURY DEMAND ........................................................................................................................56

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class (the "Class") consisting of all persons and entities other than Defendants and their related parties that purchased or otherwise acquired SentinelOne, Inc. ("S1" or the "Company") common stock between June 1, 2022 and June 1, 2023, inclusive (the "Class Period").  The Action seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company, its chief executive officer, Tomer Weingarten ("Weingarten"), and its chief financial officer, David Bernhardt ("Bernhardt").

2.     S1 is a cybersecurity company that pioneered the world's first purpose-built AI-powered Extended Detection and Response (XDR) platform (the "Singularity Platform").  The Singularity Platform purports to instantly defend against cyberattacks, performing at a faster speed, at greater scale, and with higher accuracy than would be possible for a human team.  S1 also offers add-on services/products referred to as "modules" that complement and enhance the services offered as part of its Singularity Platform.

3.     S1 offers its products via subscription contracts, generally on terms of one to three years.  In most cases, S1 recognizes revenue ratably over the course of the contract in accordance with Generally Accepted Accounting Principles ("GAAP").  S1 also tracks three operational, non-GAAP "key business metrics," the most important of which is its Annualized Recurring Revenue ("ARR").  At the start of the Class Period, Defendants defined ARR as "the annualized revenue run rate of our subscription contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us," a definition that had remained unchanged since the time of the IPO.

4.     In the first quarter of S1's fiscal year 2023 (the quarter ending April 30, 2022), ***without informing investors or updating their definition of ARR***, Defendants began including a new component in ARR: annualized data consumption and usage revenue.  This "volatile" (to quote Defendants) revenue source was a far cry from the subscription revenue that had previously comprised the whole of ARR, and throughout the Class Period – when S1's customers were

1  increasing their spending on data consumption and usage – it had the effect of boosting ARR,

2  allowing Defendants to benefit from using fewer shares to secure a major stock-and-cash

3  acquisition and to sell stock at inflated prices.

4      5.  The addition of consumption and usage revenue to ARR boosted not just the

5  quarterly ARR that Defendants reported; it also inflated the year-over-year growth of ARR that

6  Defendants reported each quarter.  That year-over-year analysis purported to compare two

7  equivalent numbers as a measure of growth: ARR for the present quarter, and ARR for the

8  corresponding quarter in the preceding fiscal year.  Unbeknownst to investors, however, beginning

9  in Q1 FY2023, Defendants' reported ARR growth rate switched from comparing "apples to

10  apples" to comparing "apples and oranges" – *i.e.*, comparing subscription-based ARR to ARR that

11  included both subscription revenue ***and*** variable consumption and usage revenue.  Defendants

12  have admitted to including consumption and usage revenue in ARR in "real time" without any

13  disclosure to investors; by their own admission, they knowingly changed their calculation of ARR

14  in such a way that it inflated their year-over-year ARR growth for each quarter during the Class

15  Period without informing investors.  Keeping growth up was extremely important to S1, which

16  relied on its status as a "hypergrowth" company to entice investors as it was not (and is still not) a

17  profitable Company.

18      6.  At the same time, ARR and year-over-year ARR growth were inflated by

19  Defendants' inclusion of double-counted revenue for certain contracts in its ARR calculations.

20  This double-counted revenue rendered Defendants' reported ARR numbers and ARR growth rates

21  during the Class Period false on their face.  As explained by one Confidential Witness, the error

22  that led to the double-counting of revenue was not a new one at S1 – the same error had occurred

23  prior to S1's Initial Public Offering ("IPO").  Defendants knew about the issue, but they allowed

24  the error to reoccur during the Class Period.

25      7.  On June 1, 2023, after the close of the market, Defendants announced that the

26  Company was revising downwards both its previously-reported ARR figures and its forecast of

27  ARR growth for FY2024 (*i.e.*, how much S1 expected ARR to grow over the upcoming fiscal

28  year).  Specifically, Defendants informed the market that S1 needed to make a "one-time

1    adjustment to ARR of $27.0 million or approximately 5% of total ARR" to its previously reported

2    ARR figures from FY2023 (the fiscal year ended January 31, 2023).[1]  Defendants also announced

3    that they were materially slashing the Company's projected ARR growth for FY2024 (the fiscal

4    year ending January 31, 2024) by roughly 25% (from 47% to "mid-30%"), and they cut projected

5    revenue for FY2024 from $631-$640 million to $590-$600 million (reflecting a roughly 20%

6    reduction in their previously-projected revenue growth of 51%, to only 41%).

7            8.      Defendants acknowledged on the June 1, 2023, Q1 FY2024 earnings call and in

8    their SEC filings for that quarter that during the Class Period, ARR had been "overstate[d]" both

9    by the inclusion of variable consumption and usage revenue and double-counted revenue.  With

10   respect to the consumption and usage revenue, without telling investors **when** they began including

11   it, Defendants stated that they had incorporated this "ad hoc" component into ARR in "real time,"

12   admitting that they only decided to excise it once customer spending on consumption and usage

13   began trending down and hurting their numbers.  As noted above, the undisclosed inclusion of the

14   consumption and usage revenue beginning in Q1 FY2023 rendered false and misleading both S1's

15   reported ARR and the year-on-year ARR growth rate for each quarter during the Class Period.

16           9.      With respect to the double-counted revenue, they claimed that they had only just

17   "discovered" it when reviewing the ARR methodology after deciding to take out the consumption

18   and usage revenue – despite knowing of the issue years earlier, per one Confidential Witness.

19   Accordingly, Defendants acted with reckless disregard for the truth (if not knowingly) in failing to

20   eliminate this problem, or in allowing it to reappear, before the start of the Class Period.  For the

21   same reasons, Defendant Weingarten's and Bernhardt's respective (and repeated) Sarbanes-Oxley

22   certifications during the Class Period as to the purported adequacy of S1's financial and reporting

23   controls were equally fraudulent.

24

25

---

26   [1]      S1's fiscal quarters and year do not track the calendar year's quarters.  Instead, S1's fiscal
     year begins on February 1 (rather than January 1): its Q1 FY2023 ended April 30, 2022, its Q2
27   FY2023 ended July 31, 2022, its Q3 FY2023 ended October 31, 2022, and its Q4 FY2023 (and
     full 2023 fiscal year) ended January 31, 2023.  Accordingly, almost all events that occurred in
28   calendar year 2022 actually occurred in S1's fiscal 2023 (and similarly, almost all events that have
     occurred in calendar year 2023 have occurred in S1's fiscal 2024).

10.     In response to Defendants' revelations after the close on June 1, on June 2, 2023, S1's stock price plummeted by $7.28 per share – *or more than 35%* – to close at just $13.44 per share.  As one analyst noted in promptly downgrading S1's shares, "*[the Company's] narrative is too hard for us to defend*."

11.     Meanwhile, the Individual Defendants had not hesitated to take advantage of their knowledge of the truth to sell significant portions of their personal holdings of S1 stock during the Class Period at inflated prices.  Defendant Weingarten alone sold a staggering 1,420,447 of his S1 shares at inflated prices during the Class Period, thereby reaping illicit insider selling proceeds of $22,817,766.  Indeed, although he had one or more so-called "Rule 10b5-1 Plan(s)" in place during the Class Period, Defendant Weingarten's relevant SEC Form 4 notes that he sold the vast majority of these shares (1.2 million of 1.42 million) over three consecutive days in mid-December 2022, and there is no indication on the Form 4 reporting these trades that they were made pursuant to a Rule 10b5-1 Plan.  The only explanation offered for each of the sales was that the "sale was effected in connection with year-end financial planning."

12.     Plaintiff and the members of the Class, however, did not fare as well as the Individual Defendants.  By this Action, Plaintiff, on behalf of himself and the Class he seeks to represent, now seeks to recover damages for the significant losses that they have suffered as a result of Defendants' wrongful acts and omissions.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  S1 is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

16.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff Amir Gupta, as stated in his previously filed lead plaintiff certification, acquired S1 common stock at artificially inflated prices during the Class Period, and was damaged thereby.

18.     Defendant S1 is a Delaware corporation with its principal executive offices located at 444 Castro Street, Suite 400, Mountain View, California 94041.  S1 went public in an IPO in June 2021.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "S."

19.     Defendant Tomer Weingarten ("Weingarten") is S1's co-founder, Chairman of the Board of Directors, President, and CEO.  Defendant Weingarten signed S1's Form 10-K for FY2023 (the fiscal year ending January 31, 2023) and the quarterly letters to S1's shareholders for S1's fiscal quarters Q1, Q2, Q3, and Q4 in FY2023, and Q2-Q4 in FY2022.  He was an architect and primary beneficiary of the scheme alleged herein.  During the Class Period, and as further detailed at §V.B.2 below, he sold roughly 1.4 million of his shares of S1 common stock at prices that were artificially inflated by Defendants' false and misleading statements, thereby reaping insider selling proceeds of over $22 million.

20.     Defendant David Bernhardt ("Bernhardt") is S1's CFO.  Defendant Bernhardt signed S1's Form 10-Qs for Q1 FY2023 (the quarter ending April 30, 2022), Q2 FY2023 (the quarter ending July 31, 2022), and Q3 FY2023 (the quarter ending October 31, 2022), S1's Form 10-K for FY2023 (the fiscal year ending January 31, 2023), and the quarterly letters to S1s shareholders for fiscal quarters Q1, Q2, Q3, and Q4 in FY2023, and Q2-Q4 in FY2022.  He was also an architect and beneficiary of the scheme alleged herein.  During the Class Period, and as further detailed at §V.B.2 below, he sold roughly 44,500 of his shares of S1 common stock at prices that were artificially inflated by Defendants' false and misleading statements, thereby reaping insider selling proceeds of over $840,000.

21.     Defendants Weingarten and Bernhardt are sometimes collectively referred to herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power, authority, and opportunity to control the contents of S1's SEC filings, press releases, and other market communications.  The Individual Defendants attested to their involvement in preparing S1's SEC filings and press releases, which are alleged herein to be misleading and had the ability and opportunity to prevent their issuance and cause them to be corrected.  Because of their positions at S1 and their access to material internal information, the Individual Defendants knew or recklessly disregarded that the material adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the statements at issue herein were materially false and misleading when made.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

<strong>SUBSTANTIVE ALLEGATIONS</strong>

**I.     BACKGROUND**

   **A.     S1's Cybersecurity Offerings**

23.     S1's Singularity Platform provides a suite of different services to its end user customers relating to cybersecurity and cyberattack threat detection and prevention.  Services are priced primarily based on the number of the customer's "endpoints," which are physical devices that connect to and exchange information within a computer network like a desktop computer, a laptop, or a mobile device.  Protection and monitoring at the endpoint level is important because cybersecurity attacks often target endpoints when trying to infiltrate a network.

24.     As described in its 10-Ks for its fiscal years 2022 (the fiscal year ending January 31, 2022) (the "1/31/2022 10-K") and 2023 (the fiscal year ending January 31, 2023) (the "1/31/2023 10-K"), which were filed on April 7, 2022 and March 29, 2023, respectively, S1 "generate[s] substantially all of [its] revenue by selling subscriptions to [its] Singularity Platform." In the 1/31/2023 10-K, S1 described its Singularity Platform as offering the following capabilities:

- **Proprietary Security Data Lake**: S1's "DataSet" is a "fully integrated security data lake that seamlessly fuses together the data, access, control and integration planes" of S1's other offerings "into a centralized platform," so that enterprises using the Singularity Platform have "access to their security data from multiple sources through a single pane of glass."

- **Endpoint Protection**: Protection at the endpoint level "is powered by distributed AI which resides both on devices as well as in the cloud," and which "is capable of autonomous decision making on the device and stopping threats in milliseconds."

- **Endpoint Detection and Response** ("EDR"): S1's "ActiveEDR" solution "enables on-device behavioral analysis" (which allows it to identify potentially anomalous behavior on an endpoint device), "auto-remediation, and response in a fully autonomous fashion." It relies heavily on S1's patented "Storyline" technology, which "builds a model of real-time running processes and their behaviors, to create rich, contextual data narratives," to both identify and respond to potential threats – either autonomously or, if the customer wants, at the initiation of a human operator – at the endpoint level.

- **Multi-tenancy Architecture**: This feature allows S1 customers to set security policies either within a hierarchy or at a specific level, or with a combination of both options.

- **XDR Integrations**: In addition to its EDR offering, S1 also offers its Singularity XDR, which "empowers security teams to see data collected by disparate security solutions from all platforms, including endpoints, cloud workloads, network devices, email, identity, and more, within a single dashboard," and which "enables customers to seamlessly extend the power of the Singularity Platform across the entire IT stack – regardless of vendor – to automate response actions."

- **IT and Security Operations**: S1 touts its platform as having a number of IT and security capabilities that can address "vulnerabilities and mis-configured settings."

25. Per the same 10-K, S1 offered three different subscription tiers: Singularity Core, Singularity Control, and Singularity Complete. These different tiers provided access to different capabilities, with Singularity Core being the "entry level" solution and Singularity Complete being S1's "flagship offering that includes a comprehensive suite of product capabilities."

26. In addition to the capabilities provided through its "Core," "Control," and "Complete" packages, S1 offered add-on products that it called "Singularity Modules." Access to these additional module services was also licensed on a subscription basis (and also generally priced on a per-endpoint basis). S1 described its "most notable modules" as:

- Cloud security modules, such as Cloud Workload Protection;

- Identity protection modules, such as Singularity Identity;

- The "Ranger" module, which deals with attack surface management;

- Singularity Mobile, which provides mobile endpoint security;

- XDR Power Tools modules that "complement and extend Singularity EDR & XDR capabilities," like Data Retention and Cloud Funnel;

- WatchTower; and

7

- Vigilance MDR.

27.     In early 2021, S1 paid a total of $155 million in cash and stock to acquire Scalyr, Inc. ("Scalyr"), a "big data" analytics firm described as being able to make data ingestion and analysis more efficient from a performance, speed, and cost standpoint, and as having the ability to complement various aspects of S1's existing cybersecurity offerings.  The Scalyr acquisition occurred while Confidential Witness 2 ("CW2") was still at the Company and, per CW2, contracts with Scalyr customers post-acquisition included both a fixed baseline contractual component and a consumption component that would vary based on usage by the customer.  After CW2 left the Company, S1 rebranded Scalyr as "DataSet" and began offering customers (directly or indirectly) DataSet-branded services after launching DataSet as its integrated back-end data analytics platform in February 2022.  On S1's March 15, 2022 earnings call, Defendant Weingarten described DataSet as "a revolutionary live enterprise data platform for data queries, analytics, insights, and data retentions."  S1's 1/31/2023 10-K similarly described the DataSet product as offering a "cloud-native flexible enterprise data platform built for all types of data live or historical" that can "process massive amounts of live data in real time."

**B.     S1's Singularity Platform as a Means for Providing for S1 Customers to Access Additional or Expanded S1 Services**

28.     S1's Singularity Platform, once installed, allowed S1 to readily enable and activate (or deactivate) its array of various additional services, including those described above, for customers who wished to expand (or reduce) the services they received.

29.     More particularly, as described by Confidential Witness 1 ("CW1"), who joined S1 before its 2021 IPO and served as a Team Lead and then Senior Manager in S1's Site Reliability Engineering ("SRE") Group,[2] when a customer licenses S1's Singularity Platform, an "agent" is

---

[2]     CW1 was promoted to Senior Manager before the Class Period began. CW1's role gave CW1 an extensive understanding of the features and capabilities of the Singularity Platform, and of the process by which that Platform (and whatever Singularity Modules a customer might choose to license) would be installed and activated on a customer's endpoints and network(s).  Indeed, a primary function of the SRE Group was to ensure that S1's software-as-a-service ("SaaS") products functioned properly and ran smoothly, and the SRE Group (which was a unit within S1's

1    downloaded to that customer's various endpoints.  In this context, an "agent" is a type of software

2    program that performs actions continuously and autonomously on behalf of another person or

3    computer system (*e.g.*, an individual computer user or an organization's network); in the IT

4    security context specifically, such actions may include conducting security scans, reporting the

5    findings of such scans, applying software patches, and rebooting relevant endpoints.  In S1's case,

6    the agent is the Singularity Platform itself.

7         30.    As CW1 confirmed, once the Singularity Platform agent is downloaded and

8    installed on the desired endpoints, the Platform becomes a vehicle for S1 to provide its customers

9    with access to whatever additional S1 services – in addition to those already provided with the

10   customers' base subscription tier – that they might want to license and use; *i.e.*, the Singularity

11   Platform (when downloaded) has the capability to deliver all of S1's offerings if a customer later

12   decides to license additional services.  Accordingly, if a customer chooses to purchase a

13   subscription for additional services offered by a particular Singularity Module, the SRE Group

14   delivers such services simply by remotely enabling those elements in the existing Singularity

15   Platform that the customer has previously downloaded.  In other words, as CW1 confirmed,

16   "everything [S1 offers] is already built into that agent [the Singularity Platform], and [additional

17   features] get turned on via a license."  As CW1 further described, such add-on services could be

18   enabled from the outset for new customers that purchased them in the first instance or enabled at

19   a later time at the customer's discretion.  CW1 also noted that S1 customers might purchase add-

20   on services only for certain areas of their network(s) or certain endpoints, while buying only a

21   standard Singularity Platform subscription to protect their other areas or endpoints.

22        31.    Based on each customer's specific licensing decisions, CW1 also described how

23   SRE teams would receive various charts setting forth which specific additional features (if any)

24   should be enabled for which endpoints within the customer's network(s).  Via an internal IT

25   platform called "Atlas," SRE teams would then use these charts to carry out "client provisioning"

26

27   ——————————————

28   Development & Operations division) was also responsible for the provisioning and delivery of S1
     products and services to customers.

1    (including the activation of any specific Singularity Modules for the appropriate endpoints as

2    agreed by the customer), thereby ensuring that each particular endpoint received the specific

3    services that the customer had licensed, and for which S1 would be charging the customer.

4          **C.     S1's Revenue Recognition Policies**

5          32.    At all relevant times since its IPO, S1 recognized subscription revenue ratably over

6    the term of each customer's contract.  As stated in the 1/31/2022 and 1/31/2023 10-Ks:

> 7     The nature of our promise to the customer under [its] subscription is to stand ready
>       to provide protection for the duration of the contractual term.  ***As a result, we***
> 8     ***recognize revenue for these performance obligations ratably over the contractual***
>       ***term.***  Premium support and maintenance and other Singularity Modules are distinct
> 9     from subscriptions and are [also] recognized ratably over the term as the
>       performance obligations are satisfied.[3]
> 10

11          33.    Similarly, at all relevant times, S1 "generally invoice[d] [its] customers upfront

12   upon signing for the entire term of the contract, periodically, or in arrears," and its contract terms

13   were generally one to three years with payment terms "typically rang[ing] between 30 to 45 days."

14   At all relevant times, S1 also treated the amounts invoiced to customers for services that had not

15   yet been provided "as deferred revenue on the consolidated balance sheets," and (consistent with

16   GAAP) recognized the associated revenue on S1's income statement "ratably over the term of the

17   contract beginning on the date the customer is given access to our platform."  As also stated in the

18   1/31/2022 10-K and the 1/31/2023 10-K, S1's "contracts are ***generally non-cancelable over the***

19   ***contractual term***."

20          34.    In line with S1's public statements, CW1 described how S1 based its fees on the

21   total number of customer endpoints that had access to and availed themselves of the Singularity

22   Platform offerings, with respect to both base subscription services and any separate, additional

23   services its customers purchased.  For example, giving a hypothetical, CW1 described how if a

24   customer had 12 endpoints, and each endpoint were charged $20 per year under that customer's

25   contract, then S1 would be entitled to $240 (*i.e.*, 12 multiplied by 20) in annual revenue from that

26

27   _____

28   [3]         Unless otherwise noted, all emphasis is added and citations are omitted.

1   customer.  As CW1 stated, this endpoint-based approach reflected "how [S1] charged for the bulk

2   of their billing."

3       35.    However, as explained in S1's SEC filings (*see, e.g.*, S1's 1/31/2022 and 1/31/2023

4   10-Ks), the revenue in the above example, to the extent the customer paid in advance, would not

5   be immediately recognized (*i.e.*, included in reported revenue).  For example, if the customer in

6   CW1's hypothetical paid the full $240 upfront on the first day of S1's first fiscal quarter, S1 would

7   not immediately recognize all of that revenue at the end of its first quarter; instead, it would

8   recognize the revenue "ratably" – *i.e.*, on a per period basis over the life of the subscription, as the

9   services were used and the revenue was actually "earned," such that S1 would recognize $60 at

10   the end of each quarter.  In other words, S1 would report ("recognize") $60 of revenue in its first

11   quarter financial statements, another $60 in its second quarter financials, another $60 in its third

12   quarter financials, and the final $60 in its fourth quarter financials.  Consequently, and as confirmed

13   by S1's SEC filings (*see, e.g.*, S1's 1/31/2022 and 1/31/2023 10-Ks), "a substantial portion of the

14   revenue [S1] report[s] in each period is attributable to the recognition of deferred revenue relating

15   to agreements that [S1] [had] entered into during previous periods" that were still being serviced,

16   and as a result "any increase or decrease in new sales or renewals in any one period will not be

17   immediately reflected in [S1's] revenue for that period."

18       36.    While "substantially all" of S1's services stemmed from subscriptions and had a

19   fixed contractual price (the revenue from which was recognized ratably over the life of the

20   agreement, as in the example above), at all relevant times S1 reported in its 1/31/2022 and

21   1/31/2023 10-Ks that its contractual arrangements could include "fixed consideration, variable

22   consideration, or a combination of the two."  With respect to variable consideration, the 10-Ks

23   stated that it "is typically a function of transaction volume or another usage-based measure," and

24   that S1 recognized revenue for variable consideration as follows:

25       Depending upon the structure of a particular arrangement, we (1) allocate the
    variable amount to each distinct service period within the series and recognize
26       revenue as each distinct service period is performed (i.e. direct allocation), (2)
    estimate total variable consideration at contract inception (giving consideration to
27       any constraints that may apply and updating the estimates as new information
    becomes available) and recognizes [*sic*] the total transaction price over the period
28       to which it relates, or (3) apply the 'right to invoice' practical expedient and
    recognize revenue based on the amount invoiced to the customer during the period.

11

**D.      S1's Key Business Metric: Annualized Recurring Revenue (ARR)**

      **1.      Overview of ARR**

37.      Although S1 recognized revenue ratably over the course of a contract's term, it repeatedly identified Annualized Recurring Revenue, or "ARR," as one of the Company's two or three most important ("key") business metrics.  "ARR" is not a defined term under GAAP; rather, it is a so-called "non-GAAP" metric which instead is defined by S1.  The Company's 1/31/2022 10-K and its 10-Q for the first fiscal quarter in FY2023 (the fiscal quarter ending April 30, 2022) (the "4/30/2022 10-Q") defined ARR as "the annualized revenue run rate of our subscription contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us."  S1 thus represented ARR as being comprised of the value of the underlying subscription contracts, active as of the date at which ARR is being calculated (*e.g.*, as of the end of a fiscal quarter) and normalized to an annual basis – *i.e.*, annualized.  In other words, per its definition in the 4/30/2022 10-Q, ARR represented how much revenue a company expects to receive from recurring customers in the next 12 months, based on the services that its customers had committed to purchasing under the terms of their current contracts (assuming the customers renewed on the same terms), and it was and is a relatively common metric among companies that have a SaaS business model.

38.      Beginning with S1's 10-Q for its second fiscal quarter ended July 31, 2022 (the "7/31/2022 10-Q"), S1 made a slight change to its definition of ARR, defining it as "the annualized revenue run rate of our subscription ***and capacity*** contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us."  As further discussed below at §II.A, however, the addition of the words "and capacity" did not alter (or purport to alter) the basic character of ARR, namely, that it reflected how much revenue a company expected to receive from recurring customers in the next 12 months, based on the services that its customers had ***committed*** to purchasing under the terms of their current contracts (assuming the customers renewed on the same terms).

39.      As a non-GAAP metric, ARR is thus plainly distinct from "revenue," which is a defined term under GAAP.  While S1 policy recognizes revenue in accordance with GAAP, as

1    stated in its 1/31/2022 and 1/31/2023 10-Ks, "ARR is an operational metric, and there is no

2    comparable GAAP financial measure to which [S1] can reconcile this particular key metric."

3    These 10-Ks further state that "ARR is not a forecast of future revenue, which can be impacted by

4    contract start and end dates and renewal rates."[4]

5         40.    For an example of how ARR at any given point in time represents a straightforward

6    calculation based entirely on existing and presently-ascertainable facts, consider a scenario in

7    which (as in CW1's hypothetical) a customer signs a one-year, $240 contract on the first day of a

8    fiscal year.  At the time of signing, $240 will be added as an "asset" on S1's balance.  At the end

9    of Q3 of that fiscal year, S1 will have recognized $180, or three quarters' worth of the contract's

10   value, as revenue – *i.e.*, it will have recognized as ***revenue***, on its income statement, one quarter

11   of the contract value at the end of each of the first three quarters of the year – and it will have

12   reduced ***deferred revenue*** by the same amount each quarter.  Thus, S1's financial statements in

13   this scenario will reflect (a) ***deferred revenue*** of only $60 associated with that contract as of the

14   end of Q3, and also (b) that $180 of the contract's value has been recognized as ***revenue***, ratably,

15   in $60 amounts over each of the prior three quarters.  However, even though only $60 remains

16   under the contract, the ARR for that contract in Q3 will still be $240, because ARR measures the

17   full annual amount due under the contract.

18

19

---

20   [4]    ARR itself is also plainly ***not*** a revenue "projection" (or a projection of anything else).
     Instead, ARR is simply a number that is calculated, using basic arithmetic, ***entirely*** from historical
21   and current information existing as of a particular historical date (*e.g.*, as of the last day of the
     fiscal quarter covered by a given set of financial statements).  However, just as current revenue
22   (which is obviously not a projection) is a generally useful metric to start from when trying to
     construct projections of future revenue, ARR is similarly a measurement of ***current annualized***
23   ***contract values***, which may also be useful as a starting point when trying to construct projections
     of future revenue.  For example, as Defendant Bernhardt stated on the June 1, 2023 earnings call,
24   "you [can] assume that ***about a quarter of ARR goes into revenue*** [each quarter], you know,
     absent some churn, absent some slower deployments, things like that, that are typical."  But as
25   Defendant Bernhardt's own comment reflects, ARR is simply a number reflecting ***then existing***
     contract values – and one can only convert a static ARR metric into a "projection" by making other
26   assumptions about, *e.g.*, contract renewal rates ("churn") and future usage ("slower deployments").
     Similarly, numerous GAAP metrics are universally viewed as representations of then-existing fact,
27   rather than as "forward-looking" projections; for example, the stated current value of a government
     bond is not a "forward-looking statement" or a "projection," even though the value of that bond
28   will, presumably, track the value of the required future payments that are still due on the bond
     (based on the assumption that those future payments will in fact be made).

---

13

41.     Calculating the Company-wide ARR at the end of a fiscal quarter, therefore, should be an exercise in arithmetic: the adding-together of the annualized contract value of all S1's active subscription contracts at the end of a reporting period.  The value of ARR as a non-GAAP metric to assess the Company's **present** condition is in its provision of an accurate snapshot of the annualized value of the Company's **current** book of business, assuming **only** that each **current** customer renews on the same terms.  By contrast, looking only at the past 12 months' revenue would provide a less current picture because, *inter alia*, that figure would necessarily reflect (to at least some extent) stale contract prices, and would be based on information from a less up-to-date customer universe.

42.     Defendants reported ARR each quarter and, along with it, how much that quarter's ARR had grown year over year (*i.e.*, compared to the ARR from the same quarter in the last fiscal year).  Defendants also reported two other significant metrics that were related to and/or derived from ARR.  Specifically, in S1's public filings both before and during the Class Period, Defendants reported (1) the number of current customers with ARR of $100,000 or more, and (2) S1's "Dollar-Based Net Retention Rate" (referred to as "DBNRR" or simply "NRR"), which measures "the percentage change in our ARR derived from our customer base at a point in time."  Defendants also described both of these measurements as additional "key" business metrics along with ARR.

43.     The Individual Defendants' own statements confirmed that they closely watched ARR – and S1's year-over-year ARR growth rate – and viewed both as key metrics for assessing the Company's financial condition and performance.  For example, during a December 12, 2021 podcast interview, Defendant Bernhardt responded to a question about how he was "looking at the business" and what metrics he was following by stating:

> We're a data-driven company, we've got a considerable amount of dashboards. And, you know, I'm more focused on the financial ones, but obviously throughout our organization we're focused on anything that's customer-facing . . . we're really trying to leverage everything whether its sales, whether it's support, whether it's engineering, whether it's, you know, finance.  **So the ones I'm focused on, just being a growth company—ARR.  Our ARR's $198 million in Q2 it's up 127% year-over-year.**

44.     Near the end of the same interview, when asked about plans for the business, Defendant Bernhardt added that "anyone who's investing in us now is looking for that continued *growth*, and how do I maintain that?  That is something that I'm maniacally focused on."

**2.      ARR's Importance to Analysts and Investors**

45.     S1 highlighted its reliance on ARR in its SEC filings as well, stating in its 1/31/2022 and 1/31/2023 10-Ks that S1 relies on ARR "to help [S1] evaluate [its] business, identify trends affecting [its] business, formulate business plans, and make strategic decisions."  Moreover, throughout the Class Period, Defendants encouraged investors to focus on ARR, and to consider it a key measure of S1's financial condition and performance.  S1's 4/30/2022 10-Q, for example, stated that "We believe that ARR is a key operating metric to measure our business because it is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers."

46.     Indeed, in each of S1's quarterly earnings calls with analysts during the Class Period, Defendants reported on ARR (including both ARR as of the end of the quarter and historical year-over-year ARR growth).  For their part, Wall Street analysts also routinely used reported ARR and ARR growth rates to help assess S1's current financial condition, performance, and value, and asked questions on S1's quarterly earnings calls about both the Company's reported ARR and its ARR growth rate.  In addition, analysts also used ARR to assess the current status of S1's market penetration.  For example, one analyst report noted that "[b]ased on SentinelOne's ~$237M in ARR as of FQ3'22, they've captured <1% of their TAM [Total Accessible Market of $28.7 billion], leaving ample opportunity for continued growth (as evidenced by their +130% Y/Y ARR growth in FQ3'22)."

47.     Analysts and investors thus carefully tracked ARR and, more specifically, ARR's year-over-year growth rate.  For example, during the Class Period, multiple analyst firms positively cited S1's track record of producing impressive levels of "triple-digit" ARR growth on a year-over-year basis in each of the first half-dozen quarters following S1's June 2021 IPO.

48.     In sum, as one analyst report put it in January 2023: "***We think ARR is <u>the best metric</u> to gauge SentinelOne's top-line health*** because it is driven by the company's ability to

acquire new subscription customers and maintain and expand relationships with existing subscription customers."

**3.    Defendants' Calculation of ARR Prior to the Class Period**

49.    Curiously, prior to the end of the Class Period, it appears that Defendants did not *expressly* state whether S1 excluded revenue from variable consumption and usage charges – *i.e.*, its revenue from its customers' use of services that they were not contractually obligated to use – from its calculation of ARR.

50.    However, as CW2 has confirmed, from the time that S1 went public in June 2021 through the end of its FY2022 (the fiscal year ended January 31, 2022), and in accord with the plain and ordinary meaning of S1's stated definition of ARR, ***S1 excluded consumption and usage revenue when calculating and reporting ARR throughout this period***.

51.    CW2 worked for S1 from before its IPO to early 2022, just prior to the start of the Company's fiscal Q1 FY2023 (the quarter beginning February 1, 2022 and ending April 30, 2022), and more particularly served from mid-2021 through CW2's departure as a senior manager in S1's Finance Department at S1's global corporate headquarters (located in Mountain View, California). During CW2's tenure at S1, CW2's responsibilities included, among other things, calculating ARR, monitoring S1's current financial performance, and helping prepare various financial forecasts and reports.  Beginning in the fall of 2021 and until CW2's departure, CW2 reported directly to S1's CFO, Defendant Bernhardt.

52.    As CW2 described, S1 utilized Salesforce for all its customer relationship management ("CRM") functions, including sales-related activity, and S1 would derive the information that it used to calculate ARR from information it extracted from Salesforce.  That information was principally derived from data within a Salesforce "object" (*i.e.*, function) called Opportunities.  As CW2 further described, each S1 salesperson was responsible for inputting into Salesforce Opportunities various data that was associated with each of the specific customers and

1   deals that that salesperson was handling, and for keeping that information current.[5]  Accordingly,

2   the "Opportunities" function enabled users to track key data associated with each of S1's current

3   customers (such as the account/customer's name, the deal amount/value, and subscription terms).

4   In sum, as CW2 stated, "[t]hose Opportunities house the data that are used to calculate ARR,"

5   which would be calculated by S1's Finance Department.  (CW2 noted that the Finance Department

6   also used data from Opportunities data to calculate another of S1's "key" non-GAAP metrics, Net

7   Retention Rate, a/k/a "NRR.")

8           53.     Per CW2, during CW2's tenure (which extended to just prior to the end of the Class

9   Period), the Finance Department calculated ARR based on the Opportunities outputs on both a

10  monthly and quarterly basis.  As a first step, the Finance Department generated customized reports

11  via Salesforce pertaining to Opportunities, and it then imported the relevant Opportunities data

12  from Salesforce into S1's principal accounting system (called NetSuite) for further calculations.

13          54.     Once the Finance Department had imported the relevant Opportunities data into

14  NetSuite, CW2 described how the Finance Department would then "organize the [Annual]

15  Contract Values by the different Opportunity types."   Through this process, the Finance

16  Department differentiated contracts by (1) new customers; (2) existing customers who had

17  expanded their subscriptions to include more endpoints or additional services ("upsells");

18  (3) existing customers who had reduced or downgraded their subscriptions (*i.e.*, downgrading

19  customers); and (4) "churning" customers who had canceled their subscriptions altogether.  The

20  values associated with these buckets, in the case of "new customers" and "churning/canceling"

21  customers, would be the full amount of the fixed, annualized amount due under the contract.  With

22  respect to the "existing/upsell" and "downgrading" buckets, however, Salesforce was also set up

23  to identify (and the Finance Department would extract) only the incremental increase in (or the

24

25  _____

26  [5]      For example, if a customer decided to buy more subscription licenses when its existing
    contract came up for renewal, sales personnel were responsible for accurately inputting the
27  resulting increased value of the customer's expanded contract into Salesforce.  CW2 confirmed
    that this information would then be used to calculate ARR.  In sum, the data in Salesforce allowed
28  S1 to track the status and value of the Company's existing contracts (including any new or
    upgraded contracts, as well as any contracts that had been canceled or "downgraded" in scope).

1   incremental reduction in) fixed, annualized amounts due under the associated contracts.  As CW2

2   stated, the Finance Department would then sum up the net total values[6] derived from the

3   "Opportunities data for each of the above four "buckets."  That aggregate data was then utilized to

4   calculate ARR.

5       55.   In other words, as CW2 described it, ARR is a "waterfall calculation."  The

6   calculation involves taking the ARR figures as of the last day of the ***prior*** monthly or quarterly

7   period and then, using the amounts calculated for the ***current*** month or quarter for the four buckets

8   above, (a) adding the amounts from new customer and upsell buckets, and (b) deducting the

9   amounts from the reduction/downgrade and cancellation/churn buckets.  This process yields, as of

10  the date in question, ARR – which, as noted above, was typically calculated monthly as of the last

11  day of the month or quarterly for the fiscal quarter just ended.  Consistent with the waterfall

12  calculation methodology, the resulting most current ARR figure would then serve as the starting

13  point for calculating ARR as of the end of the next monthly or quarterly period.[7]

14      56.   As noted above, CW2 also confirmed that during CW2's time at S1 (which lasted

15  until early calendar year 2022, *i.e.* until just around the start of S1's Q1 FY2023), consumption

16  and usage revenue was not included in the calculation of ARR.  CW2 further confirmed that this

17  was also true with respect to ARR associated with Scalyr, which was the predecessor of DataSet.

18  For example, CW2 confirmed that customers using Scalyr entered into "baseline" subscription

19  contracts, which provided for them to pay (1) a required fixed contract amount for the term of the

20  contract, plus (2) variable additional fees for consumption and usage services that customers were

---

[6]    In other words, ***increases*** attributable to new customers and "upsells" to existing customers would be netted against ***decreases*** attributable to "churning/canceling" customers and "downgrading" customers.

[7]    For example, if the Company was calculating the ARR as of the end of Q3, it would begin with the ARR reported as of the end of Q2, then ***add*** ARR from new customers who had signed up in Q3 (all of which would be new ARR and would be added in full, since new customers have no preexisting contracts to be accounted for), then add ARR attributable to "upsells" of existing customer contracts, and then ***subtract*** the ARR reductions attributable to customers who were reducing the S1 services they were receiving, and finally the ARR attributable to customers whose contracts were up for renewal in Q3 but who chose not to renew (*i.e.*, who ceased being S1 customers).  These calculations would yield the ARR as of the end of Q3, which would in turn then serve as the baseline value for the end-of-Q4 ARR calculations.

not required to incur.  As CW2 confirmed, as with S1's other (non-Scalyr) customer contracts, while CW2 was with S1, only the fixed, annualized baseline contract value for such contracts was included in S1's reported ARR, *but the consumption and usage component was not*.  An "inactive" set of terms and conditions for the DataSet product found on S1's website confirms that consumption and usage charges incurred in connection with a customer's use of the DataSet product were – similar to how CW2 described the Scalyr consumption and usage charges – tracked and billed separately from the fixed amounts due under their "baseline" contracts.[8]

## II.   THE UNDISCLOSED MATERIAL ADVERSE DECLINE IN S1'S REPORTED GROWTH AND DEFENDANTS' REPORTING OF INFLATED ARR METRICS

57.     As noted above, prior to the end of the Class Period, S1 had consistently reported strong growth, which included a string of consecutive quarters for which it reported "triple-digit" ARR growth on a year-over-year basis.  For example, as of the end of its fiscal quarters ending July 31, 2021, October 31, 2021, and January 31, 2022 (Q2, Q3, and Q4 of FY2022, respectively), S1 reported that its ARR was $197,963,000, $236,659, and $292,341,000, respectively, reflecting year-on-year ARR growth rates of 127%, 131%, and 123%, respectively.

58.     During the Class Period, to the investing public it appeared that S1's growth rate was beginning to slow, including as a result of competition from Microsoft, Crowdstrike, and other companies in the cybersecurity space – but that it was doing so at only a relatively gentle rate.  For example, as of the end of its fiscal quarters ending April 30, July 31 and October 31, 2022 (Q1, Q2, and Q3 of FY2023), S1 reported that its ARR was $338,962,000, $438,640,000, and $487,427,000, respectively, reflecting year-on-year ARR growth rates (compared to the corresponding quarters of the prior fiscal year) of 110%, 122% and 106%, respectively.  On March

---

[8]    The terms state:

Unless otherwise agreed by You and DataSet in a separate written agreement, *if Your use of the Services in any given calendar month exceeds Your chosen log volume and/or retention period* (the "Service Capacity"), *You will be charged at the end of such month for the excess usage over the Service Capacity*, at the rate set forth on the Site or, if you and DataSet have entered into an Order Form, at the rate(s) set forth in the Order Form.  You agree to pay the additional fees for excess usage for the applicable calendar month without any right of set-off or deduction.

14, 2023, S1 reported that the Company's ARR was $548.7 million as of the end of the quarter ending January 31, 2023 (Q4 of FY2023), which reflected a dip in its reported ARR growth rate to 88% on a year-on-year basis.  But investors continued to be reassured by S1's accompanying guidance for the coming year (including their guidance that revenue for Q1 of FY2024 would be $137 million, and that revenue for the full year for FY2024 would be $631-640 million) that S1's prospects remained quite strong.

59.     Unbeknownst to investors, however, during the Class Period, Defendants were resorting to at least two different types of manipulations to conceal the true, and far more significant, extent of the deterioration that S1, in the face of increasing competition, was experiencing in its single most important non-GAAP metric, ARR.  Specifically, as of the start of the Class Period, Defendants began to report ARR – and the resulting year-on-year ARR growth rate – as of the end of each fiscal quarter on an inflated and "apples to oranges" basis by (i) altering S1's method for calculating ARR to include not only the amount of the fixed, annualized revenue stream that its customers were required to pay for their subscription licenses, but also the revenue from variable consumption and usage charges that its customers were not required to incur; and (ii) including double-counted revenue in its reported ARR calculations.

**A.     S1's Undisclosed Inclusion of Consumption and Usage Revenue in ARR**

60.     As discussed above, prior to the start of the Class Period, S1 had consistently defined ARR "as the annualized revenue run rate of our ***subscription contracts*** at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us" (*see, e.g.*, S1's 1/31/2022 Form 10-K) – and this continued to be the definition for ARR that Defendants provided in S1's 4/30/2022 10-Q, which was filed on June 1, 2022 (the first day of the Class Period).

61.     The reference to subscription contracts in S1's definition of ARR also emphasized – both before and during the Class Period – the recurrent, predictable nature of the revenue from the Company's subscription contracts.  As S1 said of its subscription contracts in, *e.g.*, its 1/31/2022 10-K and 4/30/2022 10-Q:

Our subscription contracts ***typically range from one to three years***.  We recognize subscription revenue ratably over the term of a contract.  Most of our contracts are

20

for terms representing annual increments, therefore contracts generally come up for renewal in the same period in subsequent years.  The timing of large multi-year enterprise contracts can create *some* variability in subscription order levels between periods, though the impact to our revenue in any particular period is limited as a result of ratable revenue recognition.

62.     In other words, read together, S1's definition of ARR and its emphasis on and description of its subscription contracts stressed the supposed stability and dependability of ARR as a measure of the strength of S1's existing revenue stream, which was from contractually-assured payments pursuant to the Company's subscription licenses.  As Defendants further emphasized, the value of ARR as a metric for measuring the strength of S1's existing revenue stream was further bolstered by the fact that S1's subscription contracts were ***typically multi-year contracts***, such that analysts and investors could have comfort that even though ARR was a representation of ***annualized*** revenue flow under those contracts, at any given point in time the bulk of ARR's contracts would continue to be in force for at least the next 12 months.

63.     Moreover, the only reason implied as to why even this minority of existing subscription contracts (*i.e.*, those due to expire within 12 months as of the date of the stated ARR) might introduce an element of variability into the annualized revenue flow from such contracts was that such contracts might not be ***renewed***.  However, the definition made clear that ARR was calculated based on the assumption that such contracts "are renewed on their existing terms for customers that are under subscription contracts with us" – and conspicuously did ***not*** include any other assumptions.  As the above-quoted language emphasized, the only element of ***variability*** that S1 deemed worthy of referencing in connection with the reporting of its ARR was that resulting from "[t]he timing [of the renewals] of large multi-year enterprise contracts," and even that was expressly stated as giving rise to only "***some*** variability in subscription order levels between periods."  In line with these representations, Defendant Bernhardt assured investors on S1's June 1, 2022, Q1 FY2023 earnings call: "While we don't specifically guide for ARR, I do want to remind you that ***we are a subscription business, which gives us higher visibility.  Our ARR and revenue growth [thus] track very closely***."

1    64.    Consistent with the plain and ordinary meaning of "ARR" as defined in S1's above-

2    referenced SEC filings, and as discussed at §I.D.3, prior to the preparation of its Q1 FY2023

3    financial reports S1 had consistently included in its reported ARR calculations *only* amounts due

4    (on an annualized basis) under its then-existing subscription agreements – and had consistently

5    *excluded* from those calculations *any* revenue from its consumption and usage services which its

6    customers *might* utilize, *but which they were never under any obligation to use*.  Indeed, in sharp

7    contrast to the fixed amounts due for subscription services pursuant to S1's binding licensing

8    contracts – and in patent conflict with ARR's focus on measuring *non-variable* revenue streams –

9    the introduction of consumption and usage revenue into the calculation of ARR necessarily

10   introduced significant variability based on largely unpredictable changes in, *e.g.*, customers' usage

11   patterns and willingness to incur some (or even any) charges that they were not required to incur.

12   65.    Nonetheless – and even though S1's publicly-stated definition of ARR *did not*

13   *change* between the date of S1's IPO and the issuance of the Company's quarterly results for Q1

14   FY2023 on June 1, 2022 – stunned investors would learn following the close of the Class Period

15   that Defendants had actually been adding consumption and usage revenue into their ARR

16   calculations beginning in Q1 FY2023 (the quarter running February 1, 2022 through April 30,

17   2022).

18   66.    Beginning in Q2 FY2023 (and thereafter through the end of the Class Period),

19   Defendants tweaked their stated definition of ARR by adding the highlighted words below, so that

20   ARR was now defined as:  "[T]he annualized revenue run rate of our subscription *and capacity*

21   contracts at the end of a reporting period, assuming contracts are renewed on their existing terms

22   for customers that are under contracts with us."  Oddly, however, Defendants do not appear to have

23   ever flagged this change for investors (it was not discussed in any of Defendants' SEC filings,

24   quarterly earnings press releases, or analyst calls), nor did Defendants otherwise explain what "the

25   annualized run rate of our . . . capacity contracts" meant in the context of S1's reporting of ARR.

26   67.    Perhaps Defendants made this change in a deliberately vague manner, thinking that

27   they might later want to try to invoke it as a pretext for arguing that their otherwise-unexplained

28   tweak should actually be deemed "adequate disclosure" of what was a highly material change in

how S1 was now calculating ARR – though this explanation falls flat since, when Defendants removed consumption and usage revenue in Q1 FY2024 at the end of the Class Period, they left the language about "capacity contracts" in the definition.  But investors and analysts had no reason to suspect that anything material had changed in terms of how Defendants were calculating ARR; if anything, an eagle-eyed reasonable investor might have assumed that the reference to "capacity contracts" starting in Q2 FY2023 referred to a change in S1's business beginning that quarter (such as, *e.g.*, the integration of Attivo in Q2 FY2023), as opposed to a change that had occurred the prior quarter (*i.e.*, Q1 FY2023).  Regardless, nothing in the reference to "capacity contracts" would have caused a reasonable investor to conclude, let alone suspect, that this added language meant that S1 was now including in ARR any amounts for ***consumption and usage*** charges that its customers were under no obligation to incur, and which were inherently subject to wide fluctuation.

### B.    Inclusion of Double-Counted Revenue

68.    As shocked investors would also learn after the Class Period had ended, Defendants had also been further inflating their reported ARR by effectively "double-counting" certain contract values.  As discussed above, to accurately calculate ARR for subscription contracts that had been upgraded or "upsold" since the end of the last quarter (*i.e.*, for subscription customers who had increased the annualized value of their subscriptions by upgrading their base subscription tier, by adding more protected endpoints, or by purchasing additional Singularity Modules in the last quarter), S1's Finance Department would extract from Salesforce the relevant information regarding the ***incremental increase in the annualized revenue stream*** under the newly "upsold" contractual arrangements.

69.    However, as Defendants would later admit, in a significant number of cases involving "upsold" contracts (at least ***200***), S1 had actually been including in ARR not simply the ***incremental*** value in the increased amount of the customer's contractual commitments (compared to the annualized amount of the customer's commitments under the prior contract) ***but was instead including the <u>full</u> value of the customer's recently "upsold" contract.***  In other words, if a customer's prior contract that was in force at the end of Q1 required $10,000 in annual payments,

but the contract was upgraded during Q2 so that it now required $12,000 in annual payments, in certain cases, as of the end of Q2, S1 was now inflating its reported ARR by adding to the amount of its previous ARR value for such contracts ($10,000) the full value of the upsold contract ($12,000), rather than adding only the incremental added value ($2,000).  As a result, S1's quarter-end reporting of ARR became infected by the "double-counting" of such contracts' prior value (which was used as the baseline from which later ARR calculations were made), so that under this example a contract that should have been valued at $12,000 for ARR calculation purposes was instead valued at ***$22,000***.

70.     As discussed further below at §V.A.2, however, this was not a new problem at S1; the ***exact same problem*** had occurred prior to the IPO, with Defendant Bernhardt himself receiving reports on the issue.  Though this issue was unknown to investors during the Class Period, it was therefore not unknown to Defendants.

**III.     THE TRUTH BEGINS TO EMERGE**

71.     On June 1, 2023, the truth concerning Defendants' Class Period reporting of materially inflated ARR and year-on-year ARR growth rates began to emerge.  On that date, after the market had closed, S1 filed its 10-Q for the first quarter of its fiscal year 2024 (the quarter ended April 30, 2023) (the "4/30/2023 10-Q").  In addition to announcing quarterly reported revenue that fell well short of meeting consensus market estimates, the 4/30/2023 10-Q also stated:

> ***As a result of the decline in usage and consumption in the quarter ended April 30, 2023, we changed our methodology of calculating ARR for consumption and usage-based agreements to reflect committed contract values as opposed to [being] based on consumption and usage.***  By making this change now, we expect future ARR and revenue growth to be more closely aligned.  It should also reduce volatility in ARR compared to the prior methodology where usage and consumption changes could have a magnified impact on ARR.  In addition, as part of our quarter-end review of ARR in connection with the preparation of our condensed consolidated financial statements for the quarter ended April 30, 2023, ***we discovered some historical upsell and renewal recording inaccuracies relating to ARR on certain contracts, which we have corrected.  As a result of the change in methodology and correction of historical inaccuracies, we made a one-time adjustment to ARR of $27.0 million or approximately 5% of total ARR, which we reflected in our total ARR as of April 30, 2023.***  ARR for the prior periods in fiscal 2023 presented above have been adjusted based on the same percentage adjustment rate identified in the first quarter of fiscal 2024.

72.     The ARR adjustments were as follows:

SECOND AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG

| Fiscal Quarter | Previously Reported ARR | Restated ARR | Difference |
|---|---|---|---|
| Q1 FY2023 (ended 4/30/2022) | $339.0 mm | $322.3 mm | ($16.7 mm) |
| Q2 FY2023 (ended 7/31/2022) | $438.6 mm | $417.1 mm | ($21.6 mm) |
| Q3 FY2023 (ended 10/31/2022) | $487.4 mm | $463.4 mm | ($24.0 mm) |
| Q4 FY2023 (ended 1/31/2023) | $548.7 mm | $521.7 mm | ($27.0 mm) |
| Q1 FY2024 (ended 4/30/2023) | n/a | $563.6 mm[9] | n/a |

73.     S1's press release accompanying its 10-Q also discussed this restatement, stating that S1 had restated its previously reported ARR from the prior four quarters "due to a change in the methodology for reflecting consumption and usage based agreements as part of ARR to reflect committed contract values" and "to correct some historical recording inaccuracies relating to ARR on certain contracts that were discovered as part of our review of ARR in the first quarter of fiscal 2024."

74.     In their quarterly letter to shareholders, which was also made public after the market close on June 1, 2023, Defendants similarly attributed the ARR restatement to (1) "lower usage and consumption trends by certain large customers" due to "current macroeconomic conditions," which had made it desirable for S1 to "change[] the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values" in order to "reduce ARR volatility"; and (2) the need to correct "historical recording inaccuracies relating to ARR classifications of certain contracts that we discovered as part of our [later] review of ARR."

75.     On the earnings conference call with analysts later that day, Defendant Bernhardt further stated:

> In the past few years, **we had seen steadily increasing usage and consumption patterns by our large customers, which we accounted for real-time in quarterly ARR.** However, as the first quarter progressed, we experienced a **notable decline in usage, which continued in May.** In light of the current macro environment, we expect these lower usage and consumption trends to persist.
>
> Due to this new dynamic, **we elected to tighten the methodology for calculating ARR for consumption and usage-based agreements to reflect committed contract values.** This provides a cleaner view of growth for fiscal '24 and beyond. **By making this change now, we expect ARR and revenue to be more closely aligned.**

---

[9]     As reported on June 1, 2023.

It should also reduce volatility in ARR compared to the prior methodology, where usage and consumption changes could have a magnified impact on ARR.

As we reviewed the methodology, we also discovered *historical upsell and renewal recording inaccuracies relating to ARR on certain subscription and consumption contracts,* which are now corrected.  After considering these factors, this adjustment resulted in a onetime ARR reduction of $27 million or approximately 5% of ARR, resulting in Q4 fiscal '23 ending ARR of $522 million.

We are applying a comparable estimated adjustment to the remaining quarters in fiscal year '23, which we believe is a reasonable approximation of the impact in those periods.

76.     Defendant Bernhardt went on to state that for the full year S1 "expect[ed] revenue of $590 million to $600 million, growing 41% at the midpoint," as compared to S1's prior estimate of 51% growth at the midpoint.  He also stated that S1 now expected "full year ARR [as of the end of FY2024] to grow in the mid-30% range from the adjusted [FY2023]-ending ARR of $522 million" – as compared to Defendants' prior estimate of 47% ARR growth made on the prior quarter's earnings call.

77.     As the chart below shows, S1's newly provided guidance that ARR was expected to grow at only a paltry "mid-30%" year-over-year rate by the end of FY2024 represented an extraordinary disclosure of just how sharply the growth in S1's "key" metric was plummeting. But, as investors had belatedly learned on June 1, 2023, Defendants had been misleading investors for the past year as to the *true* state of S1's business by materially overstating its historical ARR growth rates.  The following chart reflects the differences between the ARR year-over-year growth rates that Defendants reported during the Class Period versus what the *actual* changes were based on S1's restated numbers:

| Fiscal Quarter | Previously Reported YoY ARR Growth | Actual YoY ARR Growth | % by Which Prior YoY ARR Growth Rate Was Inflated |
|---|---|---|---|
| Q1 FY2023 (ended 4/30/2022) | 110% | 100% | 10% |
| Q2 FY2023 (ended 7/31/2022) | 122% | 111% | 11% |
| Q3 FY2023 (ended 10/31/2022) | 106% | 96% | 10% |
| Q4 FY2023 (ended 1/31/2023) | 88% | 78% | 10% |

78.     In the Q&A portion of the June 1, 2023 earnings call, analysts expressed confusion and concern.  For example, one analyst asked whether "the slowdown in consumption and usage" was for "storage and [database] query[ing]," adding, "[m]aybe you can explain the underlying product that's related to this consumption-based revenue . . . [A]s we look in our models and try to forecast out the revenue generated from ARR, is this going to be – does this basically remain out of the ARR equation now?  [Is it] an extra layer of revenue we need to consider that's more variable in nature?"

79.     In response, Defendant Bernhardt stated:

> When you asked specifically what's that about, ***it's about the data ingestion and the security data lake and the data set consumption products***.  So those are approximately ***single digit of our total ARR***.  But what we had been seeing historically was we were seeing customers that were signing up for contracts, using the data in excess of what they were committed to, renewing early, and we were reflecting that in the ARR balance.

80.     When another analyst asked for further clarification on the guidance change, Defendant Weingarten added:

> The third factor that we see in play is that consumption dynamic.  ***I mean consumption is something that we've had in our ARR.  It's something that is part of our ongoing operations***, obviously.  So taking out consumption from ARR obviously forces us to also take the guide down and really not consider consumption as part of our go-forward but only as upside, as I mentioned.

81.     Another analyst asked whether the "data ingestion piece" of S1's "negative surprise" foreshadowed "broader challenges coming in the business with the logic saying, hey, it's easier to shut off consumption quickly, and we'll get to the contractual stuff later and ultimately start shutting it off."

82.     In his response, Defendant Weingarten acknowledged that customers' consumption and usage, and the revenue from variable data consumption and usage in excess of what was covered by customers' subscription contracts, was inherently volatile and created a disconnect between revenue and ARR (which Defendants had repeatedly told investors and analysts during the Class Period were supposed to "track closely"):

> Consumption, in its nature, is just more volatile.  And I think that for companies out there, when they're under the gun to save, obviously, something as intangible as data is something that they can start thinking twice about.  That's not the same

27

for their core security posture, and that is something that we've seen very, very stable over time.

*Even if we imply some factor of rightsizing into it, that doesn't create that same volatility that an ad hoc consumption model would have.* Obviously, *these are multiyear contracts. Obviously, these are tied specifically to the amount of people you have in the organization.* Even if you have some volatility in that, it is not even close to the volatility that you can have with data volumes. And that's why, once again, to kind of remove that volatility, we [have] remove[d] that from our ARR.

83.     In response to another analyst question, Defendant Weingarten again confirmed how including "consumption and usage" in past ARR calculations had meant that those calculations had been made subject to much greater volatility, stating:

So I think, generally, if you just look at our new and upsell target for the quarter, it was pretty much in line with what we expected.

*But when you couple that [i.e., in-line upsell growth] with that downsizing of consumption, then you just arrive at a very, very different result.* And to us, I mean, once again, win rates sustained, revenue still growing about 70%. I think if you take out that consumption element, I mean, things would have looked very, very different.

84.     Analysts continued to press Defendants for answers, with another analyst asking what "the main driver of just you[r] missing the Q1 revenue guidance" was, because Defendants had just recently provided revenue guidance on March 14 "and revenue is mostly ratable." In short, the analyst wanted to know "why this won't happen again." Defendant Weingarten responded:

I'll try and iterate for Dave [Bernhardt] because it's going to be the third time. *But basically, the ARR adjustment that we've done was realizing that both we've had consumption is kind of an ad hoc element to our ARR, which basically drives up ARR as consumption goes up, but it drives down ARR significantly when consumption is not continuing to grow.* In the past couple of years, consumption for us was always on the up and up, and it created that overstatement of ARR, so to speak, which created an expectation for revenue for us internally as well.

So when the quarter ended, the dust settled, when he started kind of figuring out, hey, why aren't we seeing that revenue, a big part of it was the ARR was reflecting consumption that was now going down. And that impacted what we should have seen in revenue. *And couple that with, again, some CRM inaccuracies that Dave mentioned as well, and that was mainly the reason for the revenue miss*….

So all in all, a lot of it was cleaned and will never happen again, given that rebasing of ARR and the removal of consumption from the base.

28

SECOND AMENDED CLASS ACTION COMPLAINT – No. 4:23-CV-02786-HSG

85.    Defendant Weingarten provided further context at a Bank of America 2023 Global Technology Conference on June 6, 2023, where he clarified that Defendants' decision to remove the consumption and usage revenue was "elective," adding that "[w]e could have also elected to do it at a different time."  However, "*given that we saw that this adjustment is anyway going to be bad news*," and that the Company would have to explain a significant revenue miss and disappointing ARR in any case, Defendant Weingarten effectively conceded that "*there's no going around it*" (*i.e.*, there was really no good way for Defendants to "go[] around" announcing how gravely they had misstated ARR during the Class Period – and if announcing the restated ARR numbers was in any event "bad news," they had might as well admit it alongside their Q1 FY2024 revenue miss).  In other words, Defendants effectively admitted that they only revealed how they had *actually* been calculating their ARR numbers when it behooved them to do so.

86.    Analysts also reacted harshly to S1's disclosures.  For example, in a report issued June 2, 2023, BTIG downgraded S1 shares to "Neutral" from "Buy," stating that "S's Q1/April print was *disappointing on multiple levels and quite frankly hard to dissect*."  As the report further noted:

> S grew delivered ARR of $564MM / +75% y/y vs. our estimate of $591MM /+74% (Street $594MM).  The $27MM shortfall relative to our model was entirely due to a reclassification that reduced the starting point of ARR in FQ4. . .  *We would like to say that the issues facing S are just a weak macro.  But given the degree of the Q1 miss after the company initially guided in mid-March and the magnitude of the guide down, it simply feels like something else is at play here*.  Admittedly the stock appears cheap, but concerns on increased competition from Microsoft . . . and CrowdStrike . . . are going to be hard to shake near term.  And since we are cutting our FY24 / FY25 revenue estimates by 6% and 18%, respectively, *the narrative is too hard for us to defend*.

87.    Guggenheim similarly issued a report expressing a strong negative reaction to Defendants' June 1, 2023 disclosures:

> **Key Message**: SentinelOne reported a *surprisingly weak quarter* as necessary revisions to historical ARR figures *clearly impeded Management's ability (and ours) to forecast revenue and ARR with any sort of accuracy*.  This, no doubt, will lead to a *loss of confidence* and *has us questioning internal controls and whether ARR is a reliable metric* to base our forecasts on going forward. . . . *[I]t's hard to have any confidence in forecasts at this point*.

The Guggenheim report also reduced its price target for S1 shares from $24.00 to $16.00.

88.     Barclays Equity Research also took note of the "surprise miss" on ARR and lowered its price target sharply, by more than 30%, from $22.00 to $15.00.

89.     In a similar vein, Wolfe Research described the quarterly results as "clearly disappointing," adding that "management's credibility will likely take a big hit."

90.     In response to Defendants' June 1, 2023 disclosures and related analyst commentary, S1's share price dropped over $7.00 per share – from $20.72 to $13.44 per share at the close on June 2, 2023 – *a single-day drop of more than 35%*.

91.     As noted above, Defendant Bernhardt acknowledged on the Q1 FY2024 earnings call that S1 had based its restatement of ARR for Q1-Q3 FY2023 on its investigation of the Q4 FY2023 numbers.  Defendants only ***actually*** calculated the amount by which ARR was inflated for that final quarter and then, having determined that ARR for that quarter was overstated by approximately 5%, they "appl[ied] a comparable estimated adjustment [*i.e.*, a 5% reduction in ARR] to the remaining quarters in fiscal year '23, which [they] believe[d] [wa]s a reasonable approximation of the impact in those periods."  Accordingly, Defendants declined to report restated numbers based on any actual investigation into false reporting of ARR (and associated year-over-year ARR growth rates) in any of the first three quarters of FY2023.  As a result, it is highly likely that the disparities were substantially greater than 5% of ARR (and 10% of year-over-year ARR growth) in at least some of the quarters in question.

92.     Moreover, although S1 has declined to provide a breakdown of the extent to which S1's restated ARR numbers were due to the undisclosed inclusion of consumption and usage revenue versus its undisclosed double-counting of revenue, it appears that the bulk of the inflation was due to the former.  For example, Defendant Weingarten, at the Bank of America 2023 Global Technology Conference on June 6, 2023, described the "change [in] our consumption methodology recognition into ARR" as "basically indexing all of our consumption business, ***which is about 10% of our overall ARR***," such that "***we're talking about $50 million of ARR that is consumption base in our business post-adjustment***" – in other words, substantially more than half of the $27 million downward adjustment in Q4 FY2023, which was the portion of ARR that Defendants suggested was attributable to consumption and usage revenue on the June 1, 2023 earnings call.

IV.    **DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

93.    Defendants' materially false and misleading statements during the Class Period fall into the following three general categories:  (1) Defendants' reported ARR, which was materially false and misleading because (a) Defendants failed to disclose that, beginning with the first day of the Class Period, S1 was artificially inflating its reported ARR by including consumption and usage revenue from charges that its customers were not obligated to incur, and (b) Defendants' reported ARR was further artificially inflated by S1's double-counting of revenue for certain contracts; (2) Defendants' reported year-over-year ARR growth, which was materially false and misleading throughout the Class Period because it effectively compared current vs. historical ARR on an "apples to apples" basis, ***without*** disclosing that (a) S1 had materially ***changed*** its methodology for calculating ARR as of the start of Class Period to include consumption and usage revenue from charges that its customers were not obligated to incur, and (b) the FY2023 ARR numbers included double-counted revenue; and (3) Defendants' certifications pursuant to §302 of the Sarbanes-Oxley Act of 2002 regarding the sufficiency of S1's internal financial controls, which were all materially false and misleading because, throughout the Class Period, S1 either lacked adequate internal controls to prevent the recurrence of double-counting of revenue (a problem it had been well aware of prior to the Class Period), or recklessly or deliberately allowed such internal controls to be overridden.

94.    In addition, Defendants' changing definition of ARR during the Class Period was also false and misleading because Defendants changed the way in which ARR was calculated in Q1 FY2023, but failed to modify the definition until Q2 FY2023 – and then, when they did modify it (by adding "capacity contracts" to the definition), doing so in a way that was not meaningful and without flagging or explaining the change to investors.

A.    **Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter Ending April 30, 2022 (S1's 4/30/2022 10-Q and Defendants' Related Commentary)**

95.    On June 1, 2022, Defendants issued the 4/30/2022 10-Q.  This 10-Q reported that S1's ARR for Q1 FY2023 was $338,962,000, representing a $177,639,000 year-over-year increase in ARR from the $161,323,000 in ARR reported in Q1 FY2022 (a 110% year-over-year ARR

31

growth rate). The quarterly ARR and year-over-year ARR growth were also reported in S1's earnings press release and shareholder letter for the quarter, which were issued that same day, and on the quarterly earnings call that took place the same day.

96. The reported quarterly ARR for Q1 FY2023 of $338,962,000 was materially false and misleading because it was overstated by S1's undisclosed inclusion of both (a) consumption and usage revenue from charges that its customers were not obligated to incur (as detailed at §II.A above) and (b) double-counted revenue (as detailed at §II.B above). Indeed, Defendants subsequently restated S1's reported Q1 FY2023 ARR downward from $338,962,000 to $322,281,000 – a reduction of roughly 5%.

97. In addition, Defendants' reporting of year-over-year ARR growth, from the $161,323,000 reported in Q1 FY2022 to the purported $338,962,000 in Q1 FY2023 (equal to a 110% year-over-year ARR growth rate), was also materially false and misleading because it purported to compare the same metrics on a year-over-year basis – ARR for Q1 FY2022 versus ARR for Q1 FY2023 – without ever disclosing that (a) S1 was now calculating ARR on a *different* basis in FY2023 from what it had used in FY2022 (specifically, by including in FY2023 previously-unincluded consumption and usage revenue) and (b) the FY2023 ARR numbers included double-counted revenue. As a result, investors were materially misled as to S1's actual year-over-year ARR growth rate, which was *not* 110% but was instead (based on Defendants' own subsequently restated Q1 FY2023 figures) only 100%, or roughly 10% *less* than what investors had been led to believe.

98. Defendants Weingarten and Bernhardt each certified the contents of the Company's Q1 FY2023 10-Q – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in which they each stated as follows:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting ... for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation…

99.     Each of these certifications, however, was materially false and misleading because, throughout the Class Period, S1 did ***not*** have adequate or sufficient disclosure and internal controls in place to ensure that ARR was reported on an accurate and consistent basis, and that it was free of the deficiencies detailed above at §II.B that led to Defendants' reporting of artificially inflated ARR.

**B.     Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter Ending July 31, 2022 (S1's 7/31/2022 10-Q and Defendants' Related Commentary)**

100.     On August 31, 2022, Defendants issued S1's 7/31/2022 10-Q.  This 10-Q reported that S1's ARR for Q2 FY2023 was $438,640,000, representing a $240,677,000 year-over-year increase in ARR from the $197,963,000 in ARR reported in Q1 FY2022 (a 122% year-over-year ARR growth rate).  The quarterly ARR and year-over-year ARR growth were also reported in S1's earnings press release and shareholder letter for the quarter, which were issued that same day, and on the quarterly earnings call that took place the same day.

101.     The reported quarterly ARR for Q2 FY2023 of $438,640,000 was materially false and misleading because it was overstated by S1's undisclosed inclusion of both (a) consumption and usage revenue from charges that its customers were not obligated to incur (as detailed at §II.A above) and (b) double-counted revenue (as detailed at §II.B above).   Indeed, Defendants subsequently restated S1's reported Q2 FY2023 ARR downward from $438,640,000 to $417,054,000 – a reduction of roughly 5%.

102.     In addition, Defendants' reporting of year-over-year ARR growth, from the $197,963,000 reported in Q2 FY2022 to the purported $438,640,000 in Q2 FY2023 (equal to a 122% year-over-year ARR growth rate) was also materially false and misleading because it

1    purported to compare the same metrics on a year-over-year basis – ARR for Q2 FY2022 versus

2    ARR for Q2 FY2023 – without ever disclosing that (a) S1 was now calculating ARR on a *different*

3    basis in FY2023 from what it had used in FY2022 (specifically, by including in FY2023

4    previously-unincluded consumption and usage revenue) and (b) the FY2023 ARR numbers

5    included double-counted revenue.  As a result, investors were materially misled as to S1's actual

6    year-over-year ARR growth rate, which was *not* 122% but was instead (based on Defendants' own

7    subsequently restated Q2 FY2023 figures) only 111%, or roughly 11% *less* than what investors

8    had been led to believe.

9        103.   Defendants Weingarten and Bernhardt each certified the contents of the Company's

10   Q2 FY2023 10-Q – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in

11   the same form as set forth in ¶98 above, which certifications were also each materially false or

12   misleading for the same reasons as set forth in ¶99 above.

13       **C.    Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal
             Quarter Ending October 31, 2022 (S1's 10/31/2022 10-Q and Defendants'
14           Related Commentary)**

15       104.   On December 6, 2022, Defendants issued S1's 10-Q for Q3 FY2023 (the fiscal

16   quarter ending October 31, 2022) (the "10/31/2022 10-Q").  This 10-Q reported that S1's ARR for

17   Q3 FY2023 was $487,427,000, representing a $250,768,000 year-over-year increase in ARR from

18   the $236,659,000 in ARR reported in Q3 FY2022 (a 106% year-over-year ARR growth rate).  The

19   quarterly ARR and year-over-year ARR growth were also reported in S1's earnings press release

20   and shareholder letter for the quarter, which were issued that same day, and on the quarterly

21   earnings call that took place the same day.

22       105.   The reported quarterly ARR for Q3 FY2023 of $487,427,000 was materially false

23   and misleading because it was overstated by S1's undisclosed inclusion of both (a) consumption

24   and usage revenue from charges that its customers were not obligated to incur (as detailed at §II.A

25   above) and (b) double-counted revenue (as detailed at §II.B above).  Indeed, Defendants

26   subsequently restated S1's reported Q3 FY2023 ARR downward from $487,427,000 to

27   $463,440,000 – a reduction of roughly 5%.

28

106.    In addition, Defendants' reporting of year-over-year ARR growth, from the $236,659,000 reported in Q3 FY2022 to the purported $487,427,000 in Q3 FY2023 (equal to a 106% year-over-year ARR growth rate) was also materially false and misleading because it purported to compare the same metrics on a year-over-year basis – ARR for Q3 FY2022 versus ARR for Q3 FY2023 – without ever disclosing that (a) S1 was now calculating ARR on a *different* basis in FY2023 from what it had used in FY2022 (specifically, by including in FY2023 previously-unincluded consumption and usage revenue) and (b) the FY2023 ARR numbers included double-counted revenue.  As a result, investors were materially misled as to S1's actual year-over-year ARR growth rate, which was *not* 106% but was instead (based on Defendants' own subsequently restated Q3 FY2023 figures) only 96%, or roughly 10% *less* than what investors had been led to believe).

107.    Defendants Weingarten and Bernhardt each certified the contents of the Company's Q3 FY2023 10-Q – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in the same form as set forth in ¶98 above, which certifications were also each materially false or misleading for the same reasons as set forth in ¶99 above.

**D.      Defendants' Reporting of False and Misleading ARR Metrics for the Fiscal Quarter and Year Ending January 31, 2023 (S1's 1/31/2023 10-K and Defendants' Related Commentary)**

108.    On March 29, 2023, Defendants issued the 1/31/2023 10-K.  This 10-K reported that S1's ARR for FY2023 (*i.e.*, as of the end of the fourth quarter of FY2023) was $548,652,000, representing a $256,311,000 year-over-year increase in ARR from the $292,341,000 in ARR reported in Q4 FY2022 (an 88% year-over-year ARR growth rate).  ARR and year-over-year ARR growth were also reported in S1's earnings press release and shareholder letter for the quarter, which were issued roughly two weeks before the 10-K, and on the quarterly earnings call that took place the same day the press release and shareholder letter were issued.

109.    The reported quarterly ARR for FY2023 of $548,652,000 was materially false and misleading because it was overstated by S1's undisclosed inclusion of both (a) consumption and usage revenue from charges that its customers were not obligated to incur (as detailed at §II.A above) and (b) double-counted revenue (as detailed at §II.B above).   Indeed, Defendants

1  subsequently restated S1's reported FY2023 ARR downward from $548,652,000 to $521,652,000

2  – a reduction of roughly 5%.

3     110.   In addition, Defendants' reporting of year-over-year ARR growth, from the

4  $292,341,000 reported for FY2022 to the purported $548,652,000 for FY2023 (equal to an 88%

5  year-over-year ARR growth rate) was also materially false and misleading because it purported to

6  compare the same metrics on a year-over-year basis – ARR for FY2022 versus ARR for FY2023

7  – without ever disclosing that (a) S1 was now calculating ARR on a ***different*** basis in FY2023

8  from what it had used in FY2022 (specifically, by including in FY2023 previously-unincluded

9  consumption and usage revenue) and (b) the FY2023 ARR numbers included double-counted

10 revenue.  As a result, investors were materially misled as to S1's actual year-over-year ARR growth

11 rate, which was ***not*** 88% but was instead (based on Defendants' own subsequently restated FY2023

12 figures) only 78%, or roughly 10% ***less*** than what investors had been led to believe.

13     111.   Defendants Weingarten and Bernhardt each certified the contents of the Company's

14 FY2023 10-K – as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 – in the

15 same form as set forth in ¶98 above, which certifications were also each materially false or

16 misleading for the same reasons as set forth in ¶99 above.

17     **E.    Defendants' False and Misleading Definition of ARR During the Class
              Period**

18

19     112.   As discussed above in §II.A, Defendants' definition of ARR as "the annualized

20 revenue run rate of our subscription contracts at the end of a reporting period, assuming contracts

21 are renewed on their existing terms for customers that are under subscription contracts with us"

22 was the same from the time of the IPO through Q1 FY2023 (the quarter ending April 30, 2022),

23 the results from which Defendants reported on June 1, 2022 at the start of the Class Period.  This

24 definition was false and misleading because in that quarter – though the published definition of

25 ARR remained the same – Defendants began including variable consumption and usage revenue

26 in ARR.

27     113.   In S1's Q2 FY2023 (the quarter ending July 31, 2022) reporting, Defendants made

28 a minor change to the definition of ARR.  Throughout the remainder of the Class Period,

Defendants defined ARR as "the annualized revenue run rate of our subscription **and capacity** contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us."[10]  The change was not flagged for investors, and the term "capacity contracts" was nowhere defined in any of S1's public filings or earnings calls during the Class Period.  In each quarter from Q2 to Q4 FY2023, Defendants continued to include consumption and usage revenue in ARR.  Because the addition of the term "capacity contracts" was never flagged or explained for investors – and because investors had no reason to suspect that the addition of "**capacity** contracts" to ARR would result in **consumption and usage** revenue being added to ARR, when such had previously been excluded – the definition of ARR in Q2-Q4 FY2023 was still false and misleading.

114.    Both the Q1 FY2023 definition of ARR and the definition used in Q2 FY2023 through Q4 FY2023 were false and misleading by omission because Defendants failed to disclose that they had materially changed how they were calculating ARR beginning in Q1 FY2023, when they began including (where they had not before) consumption and usage revenue.

V.    **ADDITIONAL SCIENTER ALLEGATIONS**

A.    **Knowledge or Conscious Recklessness**

1.    ***Scienter* as to S1's Inclusion in ARR of Consumption and Usage Revenue**

115.    Defendants have admitted to adding consumption and usage revenue into their ARR calculations in "real time," and they began to do so (per CW2) at the start of Q1 FY2023, despite having never included this variable revenue category in ARR before – and despite failing to disclose to investors that the way Defendants were now calculating ARR had materially changed beginning with that quarter.

---

[10]    In the Form 10-K for S1's FY2024 filed on March 27, 2024, Defendants began defining ARR as "the annualized revenue run rate of our subscription **and consumption and usage-based agreements** at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us."

116.    As a result, it may be strongly inferred that Defendants *knew* (or at least recklessly disregarded) that including consumption and usage revenue in ARR – when they had never included it before – would cause the Company's ARR throughout the Class Period to be reported on an "apples to oranges" basis compared to how the Company had reported ARR *prior* to the Class Period, rendering the year-over-year ARR growth rates reported during the Class Period false and misleading.  For the same reason, it can be strongly inferred that Defendants knew or were reckless in not knowing that as a result of this material change in ARR's calculation and its inflationary impact on ARR's reported historical year-over-year growth rate (which had been inflated due to Defendants' overstatement of ARR in FY2023), investors and financial markets would be materially misled as to the actual state of S1's business and true extent to which S1's reported ARR growth rate was declining (and declining fast) during the Class Period, which in turn would cause Class members to purchase S1 shares at inflated prices.

117.    Moreover, as discussed above at §§II.A and IV.E, given that Defendants began adding consumption and usage revenue to ARR in Q1 FY2023 without updating, in that quarter, the definition of ARR – which continued to be unmodified since S1's IPO, and which referred only to subscription contracts – it may also be strongly inferred that Defendants Weingarten and Bernhardt, in their roles as CEO and CFO of a publicly-traded company, *knew* (or at least recklessly disregarded) that the undisclosed inclusion of this new revenue category in ARR also rendered the reported Class Period ARR numbers false on their face, as they were *not* being calculated in accord with S1's stated (and unchanged) definition of ARR.  And as also explained above at §§II.A and IV.E, Defendants' addition of the reference to "capacity contracts" was patently insufficient to put a reasonable investor on notice that S1 was now beginning to include in ARR revenue from "consumption and usage" charges that customers were not required to incur.  Indeed, to the extent that Defendants may argue that the addition of the words "capacity contracts" was somehow an indication of their "good faith" in disclosing the true nature and significance of S1's underlying change in ARR reporting, the more compelling inference is that Defendants' real intent was to continue to obfuscate and mislead – as they could hardly have devised a more innocuous, opaque, vague and utterly inadequate way to purportedly put investors "on notice"

38

(belatedly) of such a significant change in the methodology for calculating S1's most important "key metric."

### 2. *Scienter* as to S1's Inclusion in ARR of Double-Counted Revenue and S1's Internal Control Weaknesses

118.    Although Defendants claimed that they were surprised to "discover" S1's significant double-counting of base contract values in calculating ARR during the Class Period – and that they purportedly did not discover this "problem" until sometime after they filed S1's 1/31/2023 10-K on March 29, 2023 – once again the much stronger inference from the relevant facts is that Defendants *knew* (or at least recklessly disregarded) that (a) significant double-counting was indeed going on, and that (b) S1 lacked adequate internal controls during the Class to provide reasonable assurance that no such double-counting would occur, and hence lacked adequate internal controls to provide reasonable assurance that its financial reporting of its most important key metric – ARR – would be reliable.

119.    However, this double-counting problem (which was an obvious material internal control deficiency) was by no means something new at S1.  Instead, as CW2 advised, during CW2's tenure at S1 (which lasted until early calendar year 2022), CW2 and members of S1's Corporate Financial Planning & Analysis team would conduct "spot checks" in connection with their finalization of reported ARR data to determine if there were any discrepancies between (a) the incremental value-add figures that the Finance Department  had extracted from Salesforce using the previously-described "Opportunities" functions (§I.D.3, *supra*), which the Company's sales personnel were primarily responsible for inputting, and (b) what the actual incremental value-add figures were based on the Finance Department's spot checks.  If discrepancies arose due to legitimate reasons, the rationales would be noted in writing and submitted to the CFO for approval as a matter of standard procedure.  By contrast, if variances/discrepancies could not be explained by CW2 and the FP&A team – including the type of double-counting of revenue described above in §II.B – or if the CFO disagreed with the underlying rationale in the written commentary provided to him, then CW2 and the team would investigate and rectify the identified variances (including from double-counting) before any ARR data was publicly reported.

120. Indeed, as CW2 described, during CW2's tenure at S1 the Finance Department identify multiple instances where material variances which were identified through the above review process arose from situations where an increase in a customer's Annual Contract Value ("ACV") due to increased subscriptions had ***not*** been properly updated in Opportunities.  As CW2 explained using an example, a hypothetical customer's ACV could be $10,000.  Upon annual renewal, the customer in this example purchases additional licenses such that the customer's ACV increases to $12,000 in the second year of a three-year contract term.  The "delta" between the first and second-year ACV is the increase of $2,000 in the second year.  However, for Opportunities to accurately capture the new increase of $2,000 for the second year, the initial $10,000 had to have been inputted correctly in Salesforce.  Accordingly, if the $10,000 ACV had not been inputted correctly, then the second year "delta" would not have been reported as $2,000, but instead would have been incorrectly reported as being $12,000 (*i.e.*, the entire ACV for purposes of calculating post-renewal ARR).  It is thus not hard to see that, especially with respect to S1's larger contracts, such double-counting could quickly become significant.

121. CW2 stated that to the best of CW2's knowledge, discrepancies like the one described above that occurred prior to the IPO were detected "in time" to correct them. Nonetheless, CW2's example appears factually indistinguishable from the description given by Defendant Bernhardt on the FQ1 2024 earnings call of the "double-counting" problem that Defendants were reportedly surprised by in the spring of calendar year 2023: namely, that S1 was seeing "***upsell[s] that included a renewal, and we were adding that to the historical ARR versus adding just the upsell component of it***," and that S1 was "stacking an upsell on top of an existing renewal without removing the previous renewal."  In other words, going back to CW2's example, if there was an "upsell[] that included a renewal" (the $10,000 renewal, plus the $2,000 increase/upsell, for a total renewed annual contract value of $12,000), which was then incorrectly "add[ed] . . . to the historical ARR" ($10,000 historical ARR plus $12,000, resulting in the erroneous inclusion in ARR of a total renewed annual contract of $22,000) as opposed to "adding just the upsell component of it" (*i.e.*, just the incremental $2,000 addition to the prior historical ARR of $10,000), then the value of the underlying contract ($10,000) would be double-counted in

1   the ARR calculations and the total ARR for that contract would be reported as $22,000 instead of

2   $12,000.

3       122.   In the Q&A portion of the June 1, 2023 earnings call, Defendant Bernhardt twice

4   confirmed the double-counting issue as stemming from "an error in our CRM" (*i.e.*, Salesforce).

5   Defendant Weingarten likewise described the issue as stemming from "some CRM inaccuracies."

6   Moreover, in a June 13, 2023 piece published by Barclays Equity Research after analysts had

7   spoken with Defendant Bernhardt, Barclays similarly reported that Defendants had "essentially

8   double counted the renewal component in the CRM system, which was used for [S]ales[F]orce

9   automation/compensation."

10       123.   This was not an insignificant problem.  As Defendant Weingarten would also

11   concede at the June 6, 2023 Bank of America 2023 Global Technology Conference, the recent

12   "errors" did not affect just a handful of accounts, but rather involved roughly ***200 accounts***.

13   Furthermore, the notion that Defendants could have "unaware" either of the continued existence

14   of this double-counting or the deficiencies in the Company's reporting systems that had allowed

15   these problems to occur – in circumstances where ***the same issue*** had arisen before and been

16   flagged in written variance reports sent to the CFO for his review – defies credulity.

17       124.   Moreover, Defendants' characterizations in June 2023 of their approach to

18   remediating the newly "discovered" double-counting earlier in 2023 as rapid and rigorous actually

19   cuts ***in favor*** of a further strengthened inference of *scienter* here.  Specifically, as Defendant

20   Weingarten stated in June 2023:

> We saw that there was lack of controls for a portion of our upsell opportunities where people entered upsell opportunities that were in aggregate amount of both the renewal and the upsell but did not churn properly the renewal portion of it, which created an expectation of that renewal ARR to be there come the date for that renewal.

> Again, about 200 accounts that we found that discrepancy.  We worked incredibly hard to make sure that by earnings, and this was concluded 2 days prior to earnings, ***was brought into the Board's attention, the Audit Committee, to our auditors***.  We work incredibly hard to make sure that we give you the full scope of everything that's there.  And that adjustment amounts to about half of that overall $27 million number.

And as Defendant Bernhardt (himself a former auditor) stated on the same call, echoing Defendant Weingarten's earlier statements:

> I mean when we first noticed it, **we reached out to [Defendant CEO] Tomer [Weingarten] immediately, reached out to our General Counsel to external legal, to our auditors, to the Audit Committee, to the Board**. So like the path of – from the point where you identified it to the point where we made this a full scope and it was, can we possibly get through the entire audience of analysis. I think that happened within, I don't know, 12 hours before we started the process. And then we just kept going. And obviously, ARR is not a GAAP metric. It is a number that gets reviewed by auditors, but it's more of a cursory review where they make sure it ties out. They look at the logic. **We are [now] working with them [the auditors] to make sure that we have better controls around it because it is a public reporting number that we have out of the key metric.**
>
> So we are working with them to make sure we have the tightest of controls around this metric going forward. **So it's not going to be an issue.**

125.     Simply stated, Defendants' June 2023 statements about their "good faith" in having promptly responded to the double-counting problem are flatly belied by their patent failure to take adequate steps years earlier, when they **_first_** became aware of what they only belatedly acknowledged was an obvious threat to the reliability of S1's publicly-reported ARR numbers. Moreover, Bernhardt's June 2023 assurances that the double-counting problem was "**_not going to be an issue_**" going forward begs the question of why Defendants had previously failed to get their auditors to "**_work[] with them to make sure that we have better controls around . . . this key metric_**" – but instead had, during the Class Period, knowingly allowed their auditors to simply conduct a "cursory review" of such matters.   Accordingly, the strong inference here is that Defendants **_knew_** – or at least recklessly disregarded – that there was a high risk of material double-counting in the way S1's systems were set up, but that during the Class Period they deliberately watered down or terminated the procedures that S1 had previously used to identify and correct the problem before.  Indeed, Defendants' conspicuous failure in their June 2023 statements to even refer to the kind of internal corrective procedures that CW2 described as having been used during CW2's tenure pre-Class Period is a failure that strongly suggests that Defendants **_knew_** (or recklessly ignored) that, as result of a deliberate plan or otherwise, such measures were no longer being pursued with any vigor at S1, and that S1's reported ARR numbers during the Class Period were highly likely to be materially inflated as a result.

**B.      Motive and Opportunity**

126.      Defendants had concrete motives and opportunity to overstate ARR (and to falsely certify the adequacy of S1's internal controls) for at least two reasons: first, to inflate S1's stock price for use as currency to cover roughly $240 million of the total $616.5 million cost of S1's purchase of Attivo Networks, Inc. ("Attivo") in a combined stock-and-cash transaction; and second, so as to benefit both Defendant Weingarten and Bernhardt by allowing them to sell S1 stock (and in Defendant Weingarten's case, an unusually large amount of stock) at inflated prices caused by their scheme.

**1.      Defendants' $240 Million Motive to Use S1 Stock as Inflated Currency to Help Pay For Its Purchase of Attivo**

127.      On May 3, 2022 – less than a month before the start of the Class Period – S1 closed its acquisition of a company called Attivo, which was in the identity threat detection and response business.  The parties had signed a non-binding letter of intent in January 2022, and the merger agreement was signed in mid-March 2022.

128.      Of the total $616.5 million purchase price, however, S1 structured the deal so that it could pay for roughly ***$240 million*** of that price in the form of 6 million shares of S1 stock, which was valued at $40.49 per share at the time of the merger.

129.      Accordingly, Defendants had an exceptionally strong motive to inflate the price of S1 shares just as the Class Period was beginning (the reporting on June 1, 2022 of the quarterly results for Q1 FY2023, which was the quarter running from February 1, 2022 through April 30, 2022, began the Class Period), given that the more it could inflate the price of S1 shares, the fewer S1 shares it would have to pay as currency towards the purchase of Attivo – and given that, conversely, a lower price for S1 shares would mean that S1 would have to pay materially more shares as currency to complete the purchase.

130.      A group of Attivo's former shareholders have since brought their own separate claims against S1 in Delaware Chancery Court based on S1's overstatement of ARR and premised on the same underlying facts as this action.  Attivo's filings in the Delaware litigation also make clear that S1's ARR was very important to Attivo's shareholders in assessing the value of S1's

business and the S1 shares they had agreed to accept as payment to cover roughly $240 million of Attivo's $616.5 million total purchase price.  As stated in the former Attivo shareholders' complaint, "***S1's ARR calculations and SEC disclosures of ARR were material to the Converting [Attivo] Holders, because—as S1 [has stated]—recurring revenue is the key metric on which businesses like S1 and Attivo are valued***."

2.  **The Individual Defendants' Insider Selling**

131.  Both Defendants Weingarten and Bernhardt sold stock at prices during the Class Period that were artificially inflated as a result of the false and misleading statements and omissions alleged herein.  These sales were suspicious in their timing and amount.

132.  In particular, Defendant Weingarten sold an extremely large quantity of S1 shares during the Class Period – and not pursuant to a Rule 10b5-1 Trading Plan – which was patently out of line with his pre- and post-Class Period trading practices.  Moreover, Defendant Weingarten's Class Period sales (which he claimed to have made primarily as part of his "year-end financial planning") were made in the heart of the Class Period, and just as the decline in S1's ARR growth rate was accelerating – but at a time when the ***true*** extent of the decline was being concealed by Defendants' fraudulent reporting of inflated ARR figures.

133.  Moreover, while both Individual Defendants purported to sell S1 stock during the Class Period pursuant to Rule 10b5-1 trading plans, those trading plans were implemented during the Class Period, at a time when Defendants are alleged to have access to material nonpublic information regarding the alleged fraud.  Accordingly, these sales also contribute to the drawing of a strong inference of scienter as to each Individual Defendant.

134.  To evaluate the Individual Defendants' insider stock sales, Plaintiff analyzed trading data that they publicly reported to the SEC on SEC Form 4.  In particular, Plaintiff analyzed the Defendants' trading (a) during the Class Period (a 365-day period running from June 1, 2022 through June 1, 2023), and (b) compared it to both (i) a pre-Class Period 336 day-long "control

period" (running from June 30, 2021 through May 31, 2022[11]) and a post-Class Period control period of 365 days (running from June 2, 2023 through June 2, 2024) (the "Control Periods").

### a.   Defendant Weingarten's Class Period Insider Sales

135.   Defendant Weingarten sold a total of 1,420,447 shares of S1 common stock during the Class Period.  Of these sold shares, he sold the vast majority – 1,237,918 shares (or 87%) – *outside* of any personal 10b5-1 Trading Plan (the "Non-Plan Insider Sales").   Defendant Weingarten's Non-Plan Insider Sales resulted in massive insider selling proceeds of $19,579,276, and the bulk of the shares he sold (96.9%, or 1.2 *million* shares) were sold between December 12 and 14, 2022 for insider selling proceeds of $18,853,357 (the "December 2022 Sales"). According to the Form 4s filed in connection with the December 2022 Sales, Defendant Weingarten's *only* explanation for these sales was that he did so "in connection with year-end financial planning," and he did *not* declare the sales as having been made pursuant to any 10b5-1 trading plan.[12]

136.   More specifically, on December 12, 2022, Defendant Weingarten sold 400,000 of his S1 shares at prices ranging from $15.72 to $16.02, for net proceeds of $6,324,160.[13]   On December 13, 2022, Defendant Weingarten sold another 400,000 of his S1 shares (which he had acquired that day for $908,000 through an options exercise) in two tranches: 329,961 shares at prices ranging from $15.335 to $16.335, and 70,039 shares at prices ranging from $16.34 to

---

[11]   S1 insiders had no obligation to report any insider sales (which in any event would have had to have been made pursuant to an exemption for unregistered securities) prior to the date that S1 went public (its IPO date) on June 30, 2021 – a date that was eleven (11) months prior to the start of the Class Period. For this reason, Plaintiff could obtain and evaluate pre-Class Period insider selling data only for this slightly shorter, 11-month period.

[12]   In connection with his December 2022 Sales, Weingarten first exercised stock options on the shares in question before promptly converting the resulting Class B shares (which were not publicly tradable) into fully tradeable Class A common stock shares, which he then sold on the same day as discussed above.  Specifically, on December 12, 2022, Weingarten exercised stock options to purchase 370,750 shares of S1 Class B common stock in two tranches – first obtaining 122,685 Class B shares at a price of $1.1967 per share and then obtaining 248,065 Class B shares at a price of $2.27 per share – and then converted all of those shares into Class A shares.  On each of December 13-14, 2022, Defendant Weingarten purchased 400,000 additional Class B shares at a price of $2.27 per share on each day, all of which he converted into Class A common stock the same day as the purchase.

[13]   Of the 400,000 shares he sold that day, Weingarten had acquired 370,750 through his same-day exercise of multiple options for $709,925.

$17.30, resulting in additional insider selling proceeds of $6,402,397.  On December 14, 2022, Weingarten sold another 400,000 S1 shares (which he had acquired that day for $908,000 through an options exercise) at prices ranging from $15.00 to $15.905, resulting in still further insider selling proceeds of $6,126,800.  Defendant Weingarten's total insider selling proceeds from just his December 2022 sales amounted to a staggering **$18,853,357**.

137.    In addition, according to Defendant Weingarten's Form 4's, Defendant Weingarten sold an additional 37,918 shares in Non-Plan Insider Sales on various other dates during the Class period.  The relevant Form 4's note that these sales were "mandated" by S1 policy "to cover tax withholding obligations in connection with the vesting and settlement of Restricted Stock Units" and thus did not "represent a discretionary trade by [Weingarten]."  In any event, however, these "non-discretionary" sales represented only about 3% of Weingarten's total Non-Plan Insider Sales during the Class Period.

138.    The foregoing insider sales are summarized in the chart below:

| Defendant Weingarten's Non-Plan Insider Selling During The Class Period | | | |
|---|---|---|---|
| Sale Date | "Mandatory" Non-Plan RSU-related Sales | Discretionary Non-Plan Insider Sales | Sale Proceeds |
| 8/8/2022 | 9,944 | | $263,019 |
| 11/8/2022 | 10,542 | | $176,051 |
| 12/12/2022 | | 400,000 | $6,324,160 |
| 12/13/2022 | | 400,000 | $6,402,397 |
| 12/14/2022 | | 400,000 | $6,126,800 |
| 2/6/2023 | 7,488 | | $115,315 |
| 5/8/2023 | 9,944 | | $171,534 |

139.    Furthermore, a comparison of Defendant Weingarten's Non-Plan Insider Sales during the Class Period with his Control Period sales from both before and after the Class Period also confirm that these sales were suspicious in timing and amount.

140.    Specifically, in the Control Period preceding the Class Period, Defendant Weingarten sold only 399,395 shares, or approximately 28% of his Class Period sales.  Of this total, 10,131 (or 2.5%) were described as non-discretionary sales in connection with the vesting or

46

settlement of RSUs, with the remaining 389,264 shares being sold pursuant to a 10b5-1 trading plan.  Defendant Weingarten had *zero* non-mandatory and non-plan sales in the pre-Class Control Period, compared to 1.2 *million* such Non-Plan Insider Sales during the Class Period.

141.    As for the *post*-Class Control Period, Defendant Weingarten sold a total of 1,710,866 shares, of which 127,444 shares (or 7.5%) reflected "mandatory" RSU-related sales, with the balance of 1,583,422 shares being sold pursuant to an established 10b5-1 trading plan.  In other words, as in the pre-Class Control Period, Defendant Weingarten had *zero* non-mandatory and non-plan sales, compared to 1.2 million such Non-Plan Insider Sales during the Class Period. Two charts providing a visual representation of Defendant Weingarten's stock sales during the Control Periods and the Class Period are attached hereto as Exhibit B.

142.    Plaintiff further notes that, during the Class Period, Defendant Weingarten sold 182,529 shares for proceeds of $3,238,491 pursuant to 10b5-1 Plans.  However, of the 182,529 shares that Defendant Weingarten sold pursuant to a 10b5-1 Plan during the Class Period, *all* of those shares were sold pursuant to a Trading Plan that Defendant Weingarten had adopted *during* the Class Period.  Specifically, Defendant Weingarten adopted a new Trading Plan on January 13, 2023 – smack in the middle of Class Period – and all of his "in-plan" sales were made pursuant to that Plan.  Moreover, as shown below, each of those sales was made within just 20 to 44 days before the alleged fraud was revealed to the market, as shown in the following chart:

| Defendant Weingarten's Sales Pursuant to 10b5-1 Trading Plans Adopted During Class Period | | | | |
|---|---|---|---|---|
| Sale Date | Date 10b5-1 Plan Was Adopted | Days From Sale Until Fraud Was Revealed on June 1, 2023 | Shares Sold | Sale Proceeds |
| 4/18/2023 | January 13, 2023 | 44 | 12,468 | $ 223,033 |
| 4/19/2023 | January 13, 2023 | 43 | 40,000 | $ 699,900 |
| 4/20/2023 | January 13, 2023 | 42 | 40,000 | $ 702,980 |
| 5/10/2023 | January 13, 2023 | 22 | 10,061 | $ 180,498 |
| 5/11/2023 | January 13, 2023 | 21 | 40,000 | $ 718,232 |
| 5/12/2023 | January 13, 2023 | 20 | 40,000 | $ 713,848 |

143.    Accordingly, none of Defendant Weingarten's sales made pursuant to his 10b5-1

1    plan are eligible for "safe harbor" treatment under Rule 10b5-1, and all are particularly suspicious

2    in terms of their timing.[14]

### b. Defendant Bernhardt's Class Period Insider Sales

4        144.    During the Class Period, Defendant Bernhardt sold 44,524 shares, reaping total

5    insider selling proceeds of approximately $840,600. Of those sales, Bernhardt sold (i) 30,784

6    shares for proceeds of $578,057 pursuant to 10b5-1 Plans, and (ii) 13,740 shares in the open market

7    outside of a Trading Plan.

8        145.    However, all of the shares that Defendant Bernhardt sold pursuant to a 10b5-1 Plan

9    were sold pursuant to a trading plan that he adopted shortly after the start of the Class Period, on

10   July 14, 2022. Accordingly, as with Defendant Weingarten, Defendant Bernhardt's Class Period

11   "per Plan" sales are not entitled to any "safe harbor" treatment under Rule 10b5-1.  And although

12   comparison of his insider selling activity during the Class Period as opposed to his pre- and post-

13   Class Period trading does not show a suspiciously large deviation between those periods, his total

14   Class Period sales, resulting in over $840,000 in personal insider selling proceeds, should still be

15   considered as providing a modest contribution to Plaintiff's overall scienter allegations when

16   viewed in their totality – and at a minimum refute the notion that there was some total lack of

17   insider sales by Defendant Bernhardt that would count ***against*** drawing, on a holistic basis, a strong

18   inference of scienter against him here.

---

[14]    Rule 10b5-1, 17 C.F.R. § 240.10b5-1, provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.  To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans," "Trading Plans," or "Plans").  See Selective Disclosure and Insider Trading, 65 Fed.Reg. 51,716, 727-28 (Aug. 24, 2000).  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "[b]efore becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.  Moreover, the adoption or modification of these Trading Plans while in possession of material non-public information is highly suspicious and supports an inference of scienter.

### C. The Core Operations Doctrine Further Supports a Strong Inference of Defendants' *Scienter*

146.    S1's quarterly ARR and its year-over-year ARR growth rate were critical metrics for S1's business.  Indeed, S1 described ARR as a "key business metric" and highlighted ARR and ARR year-over-year growth in its public filings and on earnings calls.  Defendant Bernhardt even acknowledged in a 2021 interview that as S1 was "a growth company," and that ARR was ***the*** metric he was focused on.  Similarly, S1's 10-Qs and 10-K filed during the Class Period all stated that "*[w]e believe that ARR is a key operating metric to measure our business*," with the 4/30/2022 10-Q stating that this was "because [ARR] is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers," and the Q2-Q4 FY2023 10-Qs and 10-K stating that it was "because [ARR] is driven by our ability to acquire new subscription and capacity customers and to maintain and expand our relationship with existing customers."  Defendants tracked this critical metric closely, changing the calculations (as they subsequently acknowledged) in "real time."  As such, there can also be no doubt that Defendants also had extensive access to the most current available ARR data, even outside of the end of S1's quarterly reporting periods.  Accordingly, the core operations doctrine also contributes to a strong inference of *scienter* as to all Defendants, at least with respect to Defendants' decision to materially change S1's methodology for calculating historical ARR and the resulting (and materially misleading) "apples to oranges" reporting of historical year-on-year ARR growth rates.

### CLASS ACTION ALLEGATIONS

147.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired S1 common stock during the Class Period, and were damaged thereby.  Excluded from the Class are Defendants; S1's parents and subsidiary corporations; each of the foregoing entities' respective successors, assigns, and past or current officers or directors; the members of the immediate families of, and any trusts set up for the benefit of any such family member of any of the foregoing excluded natural Persons; any entity in which any of the foregoing

1  Persons have or had a controlling interest; and the legal representatives, heirs, successors-in-

2  interest or assigns of any of the foregoing excluded Persons.

3      148.   The members of the Class are so numerous that joinder of all of its members is

4  impracticable.  Throughout the Class Period, S1 common stock was actively traded on the NYSE.

5  While the exact number of Class members is unknown to Plaintiff, Plaintiff believes based on the

6  millions of S1 shares that were outstanding and traded on the NYSE during the Class Period that

7  there are hundreds or thousands of members in the proposed Class.  Record owners and other

8  members of the Class may be identified from records maintained by S1 or its transfer agent and

9  may be notified of the pendency of this action by mail using forms of notice similar to those

10 customarily used in securities class actions.

11     149.   Plaintiff's claims are typical of the claims of the members of the Class as all

12 members of the Class (including Plaintiff) were similarly affected by Defendants' common course

13 of wrongful conduct in violation of federal laws complained of herein.

14     150.   Plaintiff will fairly and adequately protect the interests of the members of the Class

15 and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has

16 no interests antagonistic to or in conflict with those of the Class.

17     151.   Common questions of law and fact exist as to all members of the Class and

18 predominate over any questions solely affecting individual members of the Class.  Among the

19 questions of law and fact common to the Class are:

20
- whether the federal securities laws were violated by Defendants' acts as
   alleged herein;

21

22
- whether statements made by Defendants to the investing public during the
   Class Period misrepresented material facts about S1's business, condition,
   and financial performance, or omitted to disclose material facts necessary

23
   to render such statements not materially misleading;

24
- whether the Individual Defendants caused S1 to issue or make false and
   misleading statements during the Class Period;

25

26
- whether Defendants acted with scienter, *i.e.*, knowingly or with reckless
   disregard for the truth, in issuing false and misleading statements;

27
- whether the price of S1 common stock was inflated during the Class Period
   due to Defendants' fraudulent conduct as complained of herein; and

28

50

1

- whether the members of the Class have sustained damages and, if so, what
  is the proper measure of damages.

2

3    152.    A class action is superior to all other available methods for the fair and efficient

4  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

5  damages suffered by individual Class members may be relatively small, the expense and burden

6  of individual litigation make it impossible as a practical matter for members of the Class to seek

7  individual redress of the wrongs done to them.  There will be no difficulty in the management of

8  this action as a class action.

9    153.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-

10  on-the-market doctrine in that during the Class Period:

11

- Defendants made public misrepresentations or failed to disclose material
  facts needed to render such statements not materially misleading;

12

- the omissions and misrepresentations were material;

13

- S1 common shares traded in an efficient market, the NYSE;

14

- S1 common shares were highly liquid and traded with moderate to heavy
  volume during the Class Period;

15

16

- S1 common stock was covered by multiple analysts;

17

- the misrepresentations and omissions alleged would tend to induce a
  reasonable investor and the market to materially misjudge the value of the
  Company's common stock; and

18

19

- Plaintiff and members of the Class purchased or acquired shares of S1
  common stock after Defendants' first materially false or misleading
  statements as alleged herein (but before the first alleged corrective
  disclosures), and did so without knowledge of the omitted or misrepresented
  material facts.

20

21

22    154.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a

23  presumption of reliance upon the integrity of the market for S1 common stock.

24    155.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption

25  of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

26  *States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period

27  statements in violation of a duty to disclose such information, as detailed above.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

28

51

156.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint.  The statements alleged to be materially false and misleading all relate to historical or then-existing metrics, or measures of historical or then-existing financial condition (including S1's reported ARR at the end of a reporting period, and S1's reported year-over-year ARR growth rate, as measured by the difference between reported ARR as of the end of the most recently closed quarter versus ARR as of the end of the corresponding (even older) quarter from the prior fiscal year).  In addition, even to the extent that any of the statements at issue might conceivably be construed as having a potentially forward-looking aspect, the statements also conveyed non-forward-looking information and are thus actionable, in whole or in substantial part, as non-forward-looking (*i.e.*, present) statements.  Moreover, even assuming *arguendo* (and contrary to fact) that any of the statements at issue herein may be characterized as forward-looking, they were never adequately identified as "forward-looking" when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly "forward-looking" statements.  Alternatively, to the extent that the statutory safe harbor for forward-looking statements would otherwise apply to any statement at issue herein, Defendants would still be liable for each such statement because, at the time each such statement was made, the speaker knew the statement was materially false and misleading, or was authorized or approved by an executive officer of S1 who knew that the statement was materially false or misleading.

**COUNT I**
**(Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

157.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

158.    This Count is asserted against each Defendant and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

159.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud or deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of S1 common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire S1 common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions and made the statements set forth herein.

160. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for S1 common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about S1's finances and business prospects.

161. By virtue of their positions at S1, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, alternatively, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

162. Information beyond that as alleged herein showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior executives of S1, the Individual Defendants had knowledge of the details of

1    S1's internal affairs, including of the materially false and misleading nature of the statements at

2    issue herein.

3    163.    The Individual Defendants are liable both directly and indirectly for the wrongs

4    complained of herein.   Because of their positions of control and authority, the Individual

5    Defendants were able to and did, directly or indirectly, control the content of the statements of S1.

6    As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to

7    disseminate timely, accurate, and truthful information with respect to S1's businesses, operations,

8    and financial condition and prospects.  As a result of the dissemination of the aforementioned false

9    and misleading public statements, the market price of S1 common stock was artificially inflated

10   throughout the Class Period.  In ignorance of the truth concerning S1's business and financial

11   condition which was misrepresented or concealed by Defendants, Plaintiff and the other members

12   of the Class purchased or otherwise acquired shares of S1 common stock at artificially inflated

13   prices and relied upon the integrity of the market price for those shares and/or upon Defendants'

14   false and misleading statements, and were damaged thereby.

15   164.    During the Class Period, S1 common stock traded on an active and efficient market.

16   Plaintiff and the other members of the Class, relying directly on the materially false and misleading

17   statements described herein that Defendants made, issued, or caused to be disseminated, and/or

18   relying upon the integrity of the market price, purchased, or otherwise acquired shares of S1

19   common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and

20   the other members of the Class known the truth, they would not have purchased or otherwise

21   acquired said shares or would not have purchased or otherwise acquired them at the inflated prices

22   that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true

23   value of S1 common stock was substantially lower than the prices paid by Plaintiff and the other

24   members of the Class.

25   165.    The market price of S1 common stock declined sharply upon public disclosure of

26   the facts alleged herein, causing losses, injury, and recoverable damages to Plaintiff and Class

27   members.

28

1    166.    By reason of the conduct alleged herein, Defendants knowingly or recklessly,

2    directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

3    167.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

4    other members of the Class suffered damages in connection with their respective purchases or

5    acquisitions of S1's common stock during the Class Period upon the disclosure that Defendants

6    had been making and disseminating false and misleading statements to the investing public.

7                                    **COUNT II**
     **(Violations of §20(a) of the Exchange Act Against the Individual Defendants)**
8

9    168.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing

10   paragraphs as if fully set forth herein.

11   169.    During the Class Period, the Individual Defendants participated in the operation

12   and management of S1, and conducted and participated, directly and indirectly, in the conduct of

13   S1's business.  Because of their senior positions, they knew the adverse non-public information

14   about S1's business, financial condition, and results of operations.

15   170.    As senior executive officers and/or directors of a publicly owned company, the

16   Individual Defendants had a duty to disseminate accurate and truthful information with respect to

17   S1's business, financial condition, and results of operations, and to correct promptly any public

18   statements issued by S1 which had become materially false or misleading.

19   171.    Because of their positions of control and authority as senior executive officers, the

20   Individual Defendants were able to, and did, control the contents of the various press releases, SEC

21   filings, and other statements that S1 disseminated in the marketplace during the Class Period

22   concerning S1's results of operations.  Throughout the Class Period, the Individual Defendants

23   exercised their power and authority to cause S1 to engage in the wrongful acts complained of

24   herein.  The Individual Defendants, therefore, were "controlling persons" of S1 within the meaning

25   of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct

26   alleged which artificially inflated the market price of S1 common stock.

27   172.    Each Individual Defendant, therefore, acted as a controlling person of S1.  By

28   reason of their senior management positions and/or being directors of S1, each Individual

---

55

1   Defendant had the power to direct the actions of, and exercised the same to cause, S1 to engage in

2   the unlawful conduct complained of herein.  Each Individual Defendant exercised control over the

3   general operations of S1 and possessed the power to control the specific activities which comprise

4   the primary violations about which Plaintiff and the other members of the Class complain.

5       173.   By reason of the above misconduct, the Individual Defendants are liable pursuant

6   to §20(a) of the Exchange Act for the violations committed by S1.

7                          **PRAYER FOR RELIEF**

8       WHEREFORE, Plaintiff demands judgment against Defendants as follows:

9       A.   Determining that the instant action may be maintained as a class action under Rule

10  23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

11      B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason

12  of the acts and transactions alleged herein;

13      C.   Awarding Plaintiff and the other members of the Class prejudgment and post-

14  judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

15      D.   Awarding such other and further relief as this Court may deem just and proper.

16                          **JURY DEMAND**

17      Plaintiff hereby demands a trial by jury.

18  Dated:  August 1, 2024                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

19                                        */s/ William C. Fredericks*
20                                        William C. Fredericks (*pro hac vice*)
                                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
21                                        230 Park Avenue, 17th Floor
                                          New York, NY 10169
22                                        Telephone: (212) 223-6444
                                          Facsimile:  (212) 223-6334
23                                        wfredericks@scott-scott.com

24                                        John T. Jasnoch (CSB No. 281605)
25                                        Cornelia J. B. Gordon (CSB No. 320207)
                                          600 West Broadway, Suite 3300
26                                        San Diego, CA 92101
                                          Telephone: (619) 798-5310
27                                        Facsimile:  (619) 233-0508
                                          jjasnoch@scott-scott.com
28                                        cgordon@scott-scott.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brian J. Schall (CA Bar No. 290685)
Rina Restaino (CA Bar No. 285415)
Christopher Mooney (*pro hac vice*)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com
rina@schallfirm.com
chris@schallfirm.com

*Lead Counsel for Plaintiff*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 1, 2024, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on August 1, 2024, at New York, New York.


  *s/ William C. Fredericks*
William C. Fredericks