1

2

3

4                   UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    IN RE SENTINELONE, INC.                Case No.  23-cv-02786-HSG
     SECURITIES LITIGATION
8                                           **ORDER GRANTING MOTION TO
                                            DISMISS**
9
     This Document Relates to All Actions   Re: Dkt. No. 76
10

11

12

13          Pending before the Court is the second motion to dismiss this putative securities class

14   action.  Dkt. No. 76.  The Court finds this matter appropriate for disposition without oral argument

15   and the matter is deemed submitted.  *See* Civil L.R. 7-1(b).  For the reasons detailed below, the

16   Court **GRANTS** the motion.

17   **I.    BACKGROUND**

18          This is Defendants' second motion to dismiss this consolidated securities class action.[1]

19   *See* Dkt. No. 69 (granting first motion to dismiss).  The parties are thus familiar with the

20   allegations in this case, and the Court summarizes them here only as relevant to the discussion

21   below.  SentinelOne is a cybersecurity company that offers its products on a subscription basis.

22   *See* SAC at ¶¶ 2–3, 24–27.  Plaintiff contends that the company generally follows Generally

23   Accepted Accounting Principles ("GAAP") and recognizes revenue ratably over the course of the

24   contract.  *See id.* at ¶¶ 3, 32–33.  The company also tracks a non-GAAP metric, Annualized

25   Recurring Revenue ("ARR"), which it defined at the start of the Class Period as "the annualized

26

27   _____

[1] Defendants include SentinelOne, Inc. ("SentinelOne" or the "company"); Tomer Weingarten, the
28   company's CEO; and David Bernhardt, the company's CFO during the class period.  *See* Dkt. No.
     75 ("SAC") at ¶¶ 18–20.

revenue run rate of our subscription contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under subscription contracts with us." *Id.* According to the SAC, beginning sometime in the first quarter of fiscal year 2023, the company included "annualized data consumption and usage revenue" as part of its ARR.[2] *See id.* at ¶¶ 4–5. It did not disclose the addition of this component to investors at the time or update the ARR definition. *See id.* at ¶¶ 5, 8. Plaintiff contends that doing so was misleading and artificially inflated the company's quarterly ARR but also its year-over-year ARR growth. *See id.* According to Plaintiff, this ARR change meant that the company's reported ARR growth rate was comparing "apples to oranges": comparing subscription-based ARR to ARR that included both subscription revenue *and* consumption and usage revenue. *Id.* at ¶¶ 5, 8, 59.

On June 1, 2023, Defendants announced that SentinelOne was revising downward its previously reported ARR figures for fiscal year 2023 and its projected ARR and revenue growth for fiscal year 2024. *Id.* at ¶¶ 6–7, 71–74. Defendants explained that the company's prior ARR figures had been overstated because of its inclusion of consumption and usage revenue, which was variable and was declining due to macroeconomic patterns, and because it had double-counted revenue in certain circumstances. *See id.* at ¶¶ 5–6, 8–9, 68–74. Specifically, in some instances, if a customer renewed a contract but added additional services or upgraded their subscription tier, the company did not just add the incremental increase from the "upsold" contract to its ARR calculation. *Id.* at ¶¶ 68–69. Instead, the company included both the historic contract price *and* the full value of the "upsold" contract price to the ARR calculation.[3] *See id.* at ¶ 69. This double-counting occurred for approximately 200 contracts. *See id.* Plaintiff contends that according to a confidential witness, this same double-counting error also had occurred before SentinelOne's initial public offering ("IPO") in June 2021. *Id.* at ¶¶ 6, 9, 70, 118–21.

---

[2] SentinelOne's fiscal year ends on January 31 of each year. *See* Dkt. No. 76 at 2, n.2. Therefore, the first quarter of fiscal year 2023 began on February 1, 2022, and ended on April 30, 2022. *See id.*; *see also* SAC at ¶ 4.
[3] As an example, assume that under a customer's prior contract it paid $10,000 annually, but the customer upgraded its services such that it now paid $12,000 annually. The company's ARR already included the prior contract price ($10,000). But once the customer upgraded, rather than adding just the incremental added value of the upsold contract ($2,000) to the ARR, the company added the entire price of the upsold contract ($12,000) to the ARR. *See* SAC at ¶ 69.

On June 2, 2023, the day after the company's announcement, SentinelOne's stock price fell by $7.28 per share, from $20.72 to $13.44 per share, or more than 35%.  *Id.* ¶ 10.

Based on these allegations, Lead Plaintiff Amir Gupta brings this putative class action on behalf of all persons or entities that purchased or otherwise acquired SentinelOne common stock between June 1, 2022 and June 1, 2023, inclusive (the "Class Period").  *See id.* at ¶ 1.  Plaintiff alleges two causes of action under (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5; and (2) Section 20(a) of the Exchange Act.  *See id.* at ¶¶ 157–73.  As before, Defendant contends that Plaintiff has not sufficiently alleged any actionable misstatement or scienter, and moves to dismiss the Second Amended Complaint in its entirety.  Dkt. No. 76.[4]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.

---

[4] As with their initial motion to dismiss, Defendants request that the Court incorporate by reference or take judicial notice of several exhibits.  Dkt. No. 76-26.  Plaintiff does not object.  *See* Dkt. No. 79 at 25.  The Court previously incorporated by reference and judicially noticed all but four of these documents.  *See* Dkt. No. 69 at 4–6.  The new documents are similarly materials filed with the SEC that are not subject to reasonable dispute.  The Court's prior reasoning therefore still applies and the Court adopts it here in granting Defendants' request.

United States District Court
Northern District of California

1    2008).  Nonetheless, courts do not "accept as true allegations that are merely conclusory,

2    unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536

3    F.3d 1049, 1055 (9th Cir. 2008).

4         At the pleading stage, a complaint alleging claims under Section 10(b) of the Exchange

5    Act and Rule 10b-5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but

6    also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and

7    the Private Securities Litigation Reform Act ("PSLRA").  *In re Rigel Pharm., Inc. Sec. Litig.*, 697

8    F.3d 869, 876 (9th Cir. 2012).  Under Rule 9(b), claims alleging fraud are subject to a heightened

9    pleading requirement, which requires that a party "state with particularity the circumstances

10   constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Additionally, all private securities fraud

11   complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require

12   that the complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v.*

13   *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

### III.    DISCUSSION

15        Section 10(b) of the Exchange Act provides that it is unlawful "[t]o use or employ, in

16   connection with the purchase or sale of any security registered on a national securities exchange or

17   any security not so registered . . . any manipulative or deceptive device or contrivance . . . ."  15

18   U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b-5, which makes it unlawful,

19   among other things, "[t]o make any untrue statement of a material fact or to omit to state a

20   material fact necessary in order to make the statements made, in the light of the circumstances

21   under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To prevail on a claim

22   for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: "(1) a

23   material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

24   the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

25   misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv.*

26   *Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

27        As it did in its prior order, the Court again finds that Plaintiff has failed to adequately

28   allege scienter.  Dkt. No. 69.

### A.    Scienter

The PSLRA requires a plaintiff to specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and show that the allegations "give rise to a strong inference that the defendant acted with the required state of mind." *See Schueneman v. Arena Pharm. Inc*, 840 F.3d 698, 705 (9th Cir. 2016) (quotations omitted).  Thus, a plaintiff's burden "is to allege sufficiently particular facts to demonstrate a strong inference of scienter—a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Id.* (quotations omitted).  The Ninth Circuit has defined "deliberate recklessness" as more than "mere recklessness or a motive to commit fraud." *See Zucco*, 552 F.3d at 991 (quotation omitted).  "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Schueneman*, 840 F.3d at 705 (quotation omitted) (emphasis omitted).

"A complaint will survive," the Supreme Court has instructed, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  "All in all, though not impossible, this is not an easy standard to comply with— it was not intended to be—and plaintiffs must be held to it." *Schueneman*, 840 F.3d at 705 (quotation omitted).  The Court "conducts a dual inquiry when assessing whether the strong inference standard is met:  first, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).  Although some facts might be used to support both an inference of scienter and an inference of falsity, the Ninth Circuit "consistently refrain[s] from co-mingling the inquiries." *Id.*

The Court finds that Plaintiff's allegations, even when viewed holistically and in the light most favorable to him, do not support a strong inference of scienter.

### i.    ARR Methodology and Data Inaccuracies

Plaintiff's asserted inference of scienter turns primarily on SentinelOne's accounting practices:  Defendants changed the way SentinelOne calculated ARR and also later acknowledged—and corrected—errors in its ARR calculations.  *See* SAC at ¶¶ 115–25.  At bottom, Plaintiff asks the Court to infer that because Defendants eventually revised the company's ARR calculations, Defendants must have intended to mislead investors at the time the ARR calculations were initially calculated and disclosed.  This is not enough, and the Court declines the invitation to transform every accounting correction into an inference of scienter.  As the Court previously explained, "Plaintiff may not bootstrap Defendants' acknowledgments that the ARR figures turned out to be inaccurately determined into an inference that Defendants deliberately tried to mislead investors or were deliberately reckless in making the original representations." *See* Dkt. No. 69 at 11.

**ARR Methodology.**  Plaintiff alleges that Defendants added consumption and usage revenue into their ARR calculations sometime in the first quarter of fiscal year 2023, and at the time did not disclose this methodological change.  *See* SAC at ¶¶ 4–5, 60–67, 115.  Plaintiff urges that this change was significant because this revenue source was "volatile."  *Id.*  As Mr. Weingarten explained, consumption and usage revenue "drives up ARR as consumption goes up, but it drives down ARR significantly when consumption is not continuing to grow."  *See id.* at ¶ 84.  Moreover, Plaintiff contends that SentinelOne's year-over-year ARR calculations were comparing fiscal year 2022 numbers that did not include consumption and usage revenue with fiscal year 2023 numbers that were "boosted" by this additional revenue.  *See id.* at ¶¶ 4–5. Plaintiff also alleges that beginning in the second quarter of fiscal year 2023, Defendants adjusted the definition of ARR to include "capacity contracts," without explaining the change.[5]  *See id.* at ¶ 66.  Plaintiff suggests that this addition may have been intended to as a "pretext" to cover Defendants' addition of consumption and usage revenue.  *Id.* at ¶ 67.  In short, Plaintiff now

---

[5] The language in bold was added to the definition:  "[T]he annualized revenue run rate of our subscription ***and capacity*** contracts at the end of a reporting period, assuming contracts are renewed on their existing terms for customers that are under contracts with us."  *See* SAC at ¶ 66.

United States District Court
Northern District of California

asserts that consumption and usage revenue was "new" to ARR, undisclosed, and intended to project misleading growth. Plaintiff's string of inferences relies on a confidential witness ("CW2"), who worked for the company as a senior manager in the finance department before the Class Period, and states that consumption and usage revenue was not previously included in ARR. *See id.* at ¶¶ 50, 56. But CW2 left in January 2022, before the purported methodology change occurred, and the SAC thus does not include any allegations about why the change occurred, when it happened, or who was involved in the decision. All CW2 can confirm, therefore, is that consumption and usage revenue was added to ARR sometime after their departure.

Based simply on the change to how ARR was calculated, Plaintiff asserts that "it may be strongly inferred that Defendants knew (or at least recklessly disregarded)" that ARR and year-over-year growth would be inflated and investors would be misled as a result. *See id.* at ¶ 116. But this argument is entirely circular, and conflates alleged falsity with scienter: Plaintiff believes the ARR calculations were misleading, and therefore Defendants must have intended to mislead investors. But Plaintiff does not plead any factual support for his contention that the methodology change was intended to mislead rather than more accurately capture SentinelOne's revenue streams.[6] Plaintiff speculates about a motive, suggesting that the company changed the way it calculated ARR because of a slowing growth rate due to increased competition in the cybersecurity space. *See id.* at ¶ 58. But again, Plaintiff offers no allegations supporting this supposition. Moreover, Plaintiff's repeated assertion that consumption and usage revenue was "volatile"—a term that Defendants also used—undermines the suggestion that Defendants altered the ARR methodology to boost its numbers. *See id.* at ¶¶ 4, 82–83. Even as alleged, it could just as easily drag ARR down as artificially inflate it.

**Double Counting.** Plaintiff similarly urges that Defendants knew or were deliberately reckless in not knowing about the "double counting" of contract revenue in ARR. *See* SAC at ¶¶ 118–25. Plaintiff contends that according to CW2, the company's finance department had identified similar discrepancies in the past. *See id.* at ¶¶ 6, 9, 51, 119. While at the company,

---

[6] As the SAC indicates, SentinelOne did offer services that generated consumption and usage revenue. *See* SAC at ¶¶ 27, 56.

United States District Court
Northern District of California

1    CW2 was responsible for, among other things, calculating the ARR.  *See id.* at ¶ 51.  The SAC

2    also now states that CW2 reported directly to Mr. Bernhardt for a few months, beginning in Fall

3    2021 to January 2022.[7]  *See id.* at ¶ 51.  But notably, the SAC does not contain any allegation that

4    CW2 ever reported instances of double counting contract revenue to Mr. Bernhardt.  In passing,

5    Plaintiff asserts that "Defendant Bernhardt himself receiv[ed] reports on the issue."  *See id.* at

6    ¶ 70; *see also* Dkt. No. 79 at 3.  But that is not what the CW2 actually claimed.

7         Rather, CW2 described at a high level how the finance department calculated ARR and at

8    least some of the internal controls that the company's finance department had in place to review

9    the calculations.  *See id.* at ¶¶ 52–56, 68, 119–21.  CW2 explained for example, that when the

10   finance department would calculate ARR, the software the company used allowed the team to

11   extract just the incremental increase in upsold contracts.  *See id.* at ¶ 54.  CW2 also explained that

12   CW2 and members of the finance department "would conduct 'spot checks' in connection with

13   their finalization of reported ARR to determine if there were any discrepancies . . . ."  *Id.* at ¶ 119.

14   If they detected discrepancies that did not appear to arise for "legitimate reasons," they "would

15   investigate and rectify the identified variances (including from double-counting) before any ARR

16   data was publicly reported."  *See id.*  But CW2 only described submitting discrepancies that arose

17   for "legitimate reasons" in writing to the CFO for his approval.  *See id.*  CW2 identified instances

18   of double counting as the kind of discrepancy that could not be explained and required

19   investigation, rather than an issue that would have been reported to the CFO.  *Id.* at ¶¶ 119–21.

20        CW2 further noted that at some time before the Class Period and while they were still at

21   the company, such double counting discrepancies occurred.  *Id.*  But at least according to CW2,

22   such issues "were detected in time to correct them."  *Id.*  The SAC does not say that these issues

23   were reported to the CFO.  Thus, despite Plaintiff's insistence otherwise, there are no allegations

24   to support the inference that Defendants knew or should have known about any improper double

25   counting.  Moreover, as the Court explained in the prior motion to dismiss order, Plaintiff's

26   allegations—including CW2's account—actually indicate that the company had some controls in

27

28   ———————————
     [7] CW2 does not suggest that he had any interaction with Mr. Weingarten, and thus CW2 does not
     provide any allegations supporting an inference of scienter as to him.

*United States District Court*
*Northern District of California*

1    place to detect and fix accounting errors, including the double counting at issue here.  *See* Dkt. No.

2    69 at 12.  That these controls failed to detect all instances of double counting, or that the company

3    later decided to work with auditors to enhance these controls, *see* SAC at ¶ 124, does not give rise

4    to an inference of scienter.

5                                   *       *       *

6            Plaintiff posits a series of intentional decisions by which Defendants (1) surreptitiously

7    altered the ARR methodology; and (2) ignored known accounting errors, all in an attempt to

8    mislead investors.  But as discussed above, Plaintiff provides nothing more than unsupported post

9    hoc assertions.  There are simply no well-pled allegations that support the inference that

10   Defendants knowingly or recklessly altered or miscalculated the ARR.  As explained further

11   below, Plaintiff's additional allegations similarly fall short.

12           **ii.    Individual Trading Activity**

13           Plaintiff alleges that Defendants Weingarten and Bernhardt both sold stock during the

14   Class Period, benefiting from inflated stock prices before Defendants' June 1 disclosure.  *See* SAC

15   at ¶¶ 131–45.  Plaintiff contends that these sales were suspicious in both timing and amount, and

16   therefore add to the inference of scienter.  *See id.* at ¶ 131.

17           "While 'suspicious' stock sales by corporate insiders may constitute circumstantial

18   evidence of scienter, such sales only give rise to an inference of scienter when they are

19   dramatically out of line with prior trading practices at times calculated to maximize the personal

20   benefit from undisclosed inside information."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

21   540 F.3d 1049, 1066–67 (9th Cir. 2008) (quotations omitted).  Courts look to the following factors

22   to evaluate insider stock sales:  "(1) the amount and percentage of the shares sold; (2) the timing of

23   the sales; and (3) whether the sales were consistent with the insider's trading history."  *Id.*

24           **David Bernhardt.**  Plaintiff offers very little factual support for his assertion that Mr.

25   Bernhardt made suspicious sales during the Class Period.  Plaintiff alleges that during the Class

26   Period, Mr. Bernhardt sold 44,524 shares for approximately $840,600.  *See* SAC at ¶ 144.  Of

27   these sales, Mr. Bernhardt sold (1) 30,784 shares for $578,057 pursuant to 10b5-1 plans; and

28   (2) 13,740 shares for approximately $262,543 in the open market and outside of a trading plan.

United States District Court
Northern District of California

*See id.* In the SAC, Plaintiff does not offer any detail about Mr. Bernhardt's stock sales before or after the Class Period, but instead acknowledges that Mr. Bernhardt's "pre- and post-Class Period trading does not show a suspiciously large deviation between those periods . . . ." *See id.* at ¶ 145; *see also* Dkt. No. 79 at 24, n.25. In his opposition, Plaintiff further notes that Mr. Bernhardt only "sold approximately 2% of the stocks and options he beneficially owned during the Class Period . . . ." *See* Dkt. No. 79 at 23.

Nevertheless, Plaintiff urges the Court to consider the "timing and volume" of his trades for purposes of scienter. *See id.* at 24, n.25. But as already noted above, stock sales only give rise to an inference of scienter "when they are dramatically out of line with prior trading practices." *See Metzler*, 540 F.3d at 1066–67. Plaintiff has not identified anything unusual or suspicious about Mr. Bernhardt's trading during the Class Period.

**Tomer Weingarten.** Plaintiff also alleges that during the Class Period, Mr. Weingarten sold 1,420,447 shares for approximately $22.82 million. *See* SAC at ¶ 135. Of these sales, Mr. Weingarten sold (1) 182,529 shares for approximately $3,238,491 pursuant to 10b5-1 plans; and (2) 1,237,918 shares for approximately $19,579,276.00 in the open market and outside of a trading plan. *See id.* at ¶¶ 135, 142. Plaintiff further alleges that the vast majority of these sales—1.2 million shares—took place over a short period of time, from December 13, 2022, to December 14, 2022. *Id.* at ¶¶ 137–38.

Unlike for Mr. Bernhardt, Plaintiff does provide some data for Mr. Weingarten's sales both before and after the Class Period. *See id.* at ¶¶ 139–41. Plaintiff alleges that in the year preceding the Class Period, Mr. Weingarten sold less than 400,000 shares. *See id.* at ¶ 140. In the year after the Class Period, Mr. Weingarten sold approximately 1.7 million shares. *See id.* at ¶ 141. However, Plaintiff points out that the sales both before and after the Class Period were either "non-discretionary" sales in connection with the vesting or settlement of RSUs, or were sold pursuant to a 10b5-1 plan. *See id.* at ¶¶ 140–41.

Defendants argue that there is nothing suspicious about these sales, and that they are in fact consistent with Mr. Weingarten's pre-Class Period trading. *See* Dkt. No. 76 at 18–19. The SAC does not contain any allegations about the percentage of Mr. Weingarten's holdings that he sold

during the Class Period.  *Id.*  In opposition, Plaintiff attempts to supplement his allegations in a footnote.  *See* Dkt. No. 79 at 23–24, n.23.  Plaintiff contends that Mr. Weingarten sold 24.2% of his Class A and Class B stock[8] and 13.7% of his exercisable stock options during the Class Period.  *Id.*  The Court notes that Plaintiff's attempt to amend the SAC in opposition is improper.  Still, even considering these percentages, the Court is not persuaded that they support a strong inference of scienter.  *See Metzler*, 540 F.3d at 1067 (concluding that selling 37% of total holdings did not support inference of scienter).

Plaintiff's own cases illustrate the weakness of these allegations.  In *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, for example, Oracle's CEO had sold just 2.1% of his holdings, but for $900 million, an amount the Ninth Circuit described as "a truly astronomical figure."  380 F.3d 1226, 1231–33 (9th Cir. 2004).  The Court also highlighted that the CEO had not sold any of his stock for the last five years, but then sold these shares just a month before reporting lower-than-expected sales.  *Id.* at 1132; *accord Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199–1200 (C.D. Cal. 2004), *aff'd in part*, 490 F.3d 778 (9th Cir. 2007) (finding sale of 18% of defendant's holdings suspicious where proceeds were over $661.6 million and were made less than a month after receiving insider information).  Similarly, in *In re Questcor Securities Litigation*, the district court actually stated that the percentage of holdings that the defendants sold during the class period, which ranged between 30 and 60%, "cut[] against a strong inference of scienter."  No. SA CV 12-01623 DMG, 2013 WL 5486762, at *5, *15–18 (C.D. Cal. Oct. 1, 2013) (collecting cases).  In finding that the sales were nonetheless suspicious, the court noted that all but one defendant had not sold any stock at all in the 18 months prior to the class period, then purchased throughout the class period and often right after significant jumps in the stock price.  *Id.* at *16–18; *see also In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) (finding stock sales suspicious where two defendants "more than doubled the relative proportion of their shares they sold during the class period" and the others "simply sold all of their shares").

---

[8] Plaintiff notes that Mr. Weingarten's Class B stock was convertible to Class A on a 1:1 basis. *See* Dkt. No. 79 at 23, n.23.

United States District Court
Northern District of California

1    In contrast, the proceeds from Mr. Weingarten's pre-Class Period sales and his Class

2    Period sales are nearly identical:  $19,038,000 in proceeds in the eight months before the Class

3    Period and $19,202,000 in proceeds during the Class Period.  *See* Dkt. No. 76 at 19; Dkt. No. 76-

4    20, Ex. 19 (Weingarten SEC Form 4s).  The timing of Mr. Weingarten's sales also undercuts

5    rather than supports Plaintiff's theory that they were suspicious.  As noted above, the vast majority

6    of Mr. Weingarten's Class Period sales—1.2 million of the approximately 1.4 million shares—

7    were made in December 2022.  These sales, which ranged between $15 and $17 per share, were

8    made at prices significantly below the Class Period stock price high of $29.33.  *Compare id.* at

9    ¶ 136, *with* Dkt. No. 76-21, Ex. 20 (Table of company's daily closing stock prices).  Plaintiff

10    offers no response to this context, which undermines the inference that Mr. Weingarten structured

11    the sales to take advantage of the alleged misstatements and maximize his profits.

12    Lastly, the Court notes that Plaintiff suggests that Mr. Weingarten's Class Period sales are

13    suspicious because, unlike his Class Period sales, they were discretionary and outside a 10b5-1

14    plan.  *See* Dkt. No. 79 at 24.  But Plaintiff cites no authority for this theory.  As already discussed,

15    the cases that Plaintiff references in a footnote, *Oracle*, 380 F.3d at 1231–33, and *Questcor*, 2013

16    WL 5486762, at *5, *15–18, involved defendants who had not sold *any* stock during the pre-class

17    period.  In short, the allegations about Mr. Weingarten's stock sales during the Class Period

18    simply do not give rise to an inference of scienter under the circumstances.

19    ### iii.  Attivo Merger

20    Plaintiff also suggests that Defendants had a strong motive to artificially inflate the price of

21    the company's stock because of a merger with Attivo Networks, Inc.  *See* SAC at ¶¶ 126–30.

22    Plaintiff alleges that as part of the deal, SentinelOne could pay for approximately $240 million of

23    the $616.5 million purchase price using shares of SentinelOne stock.  *See id.* at ¶ 128.

24    Accordingly, Plaintiff argues that the higher the stock price the fewer shares it would have to pay

25    to complete the purchase.  *See id.* at ¶ 129.

26    But even as alleged, the acquisition closed on May 3, 2022, before the Class Period began.

27    *See id.* at ¶ 127.  Plaintiff does not explain why a transaction that closed prior to the Class Period

28

United States District Court
Northern District of California

12

1  can support an inference that Defendants misled investors during the Class Period itself.[9]  In any

2  event, the Ninth Circuit has held that the desire to maximize profits during a merger does not

3  support a strong inference of scienter since this "personal profit motive is present in almost every

4  merger."  *See, e.g.*, *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008)

5  (citations omitted).  Despite Plaintiff's (unsupported) suggestion otherwise, *see* Dkt. No. 79 at 22,

6  n.20, the fact that this deal was being funded in part by stock does not in any meaningful way alter

7  the near-universal profit motive that exists when parties are contemplating a merger, which courts

8  have found insufficient.  As with the other allegations regarding scienter, Plaintiff offers

9  supposition with little factual or legal support.

10              **iv.    Core Operations Doctrine**

11              Lastly, Plaintiff argues that the core operations doctrine supports a strong inference of

12  scienter.  *See* SAC at ¶ 146.  "Proof under this theory is not easy.*"  Police Ret. Sys. of St. Louis v.*

13  *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  As before, Plaintiff points out that

14  the ARR was a "key operating metric" that was reported in public filings and on earnings calls.

15  *See* SAC at ¶ 146.  Plaintiff contends that as a result, "Defendants tracked this measure closely"

16  and there can "be no doubt that Defendants [] had extensive access to the most current available

17  ARR data . . . ."  *Id.*  But the Court already rejected this argument in the prior order, and noted that

18  Plaintiff must "produce either specific admissions by one or more corporate executives of detailed

19  involvement in the minutia of a company's operations" or "witness accounts demonstrating that

20  executives had actual involvement in creating false reports."  *See* Dkt. No. 69 at 13–14 (quoting

21  *Intuitive Surgical*, 759 F.3d at 1062).  Plaintiff does neither, and cannot totemically refer to the

22  core operations doctrine to support an inference of scienter.  As already explained, the SAC does

23  not allege that either of the individual Defendants played a role in calculating ARR or were aware

24  of any potential inaccuracies when the relevant statements were made.  That Defendants relied on

United States District Court
Northern District of California

---

[9] The Court further notes that neither the SAC nor the opposition alleges precisely when Defendants added the allegedly misleading "annualized data consumption and usage revenue" to the ARR.  The SAC simply states that this began in the first quarter of fiscal year 2023.  *See* SAC at ¶¶ 4–5.  But the first quarter began in February 2022, which is before SentinelOne and Attivo even signed the merger agreement.  *See id.* at ¶ 127.

1    ARR and discussed ARR growth does not suggest that they had access to or involvement with the

2    underlying and allegedly misleading data.  Nor does Plaintiff explain why this is the "rare

3    circumstance" where it would be "absurd" to suggest Defendants were unaware of the

4    miscalculations.  *See Intuitive Surgical*, 759 F.3d at 1062–63.

5                                        *          *          *

6            As discussed above, none of Plaintiff's allegations alone are sufficient to plead a strong

7    inference of scienter.  But even considering all Plaintiff's allegations holistically, they still fall

8    short and are not more compelling than competing innocent inferences.  As the Court previously

9    explained, "[t]he more convincing theory is that Defendants failed to catch certain accounting

10   errors and at most might unintentionally have misled investors by defining ARR with less than

11   ideal clarity."  *See* Dkt. No. 69 at 14.  Plaintiff's Section 10(b) claim therefore fails, and

12   accordingly, his Section 20(a) claim likewise fails.  *See Zucco*, 552 F.3d at 990 ("Section 20(a)

13   claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation

14   of section 10(b).").

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

                                                14

**IV.    CONCLUSION**

The Court **GRANTS** the motion to dismiss.  Dkt. No. 76.  Lead Plaintiff now has had ample opportunity to amend the complaint and has failed to cure the deficiencies that the Court previously identified.  As discussed above, it seems apparent that Plaintiff has little more than supposition and bare assertions to support his claims.  This is not enough.  The Court therefore **DISMISSES** the case against Defendant without leave to amend.  *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) ("Leave to amend should be granted unless the pleading could not possibly be cured by the allegation of other facts, and should be granted more liberally to pro se plaintiffs.") (quotations omitted); *Zucco*, 552 F.3d at 1007 ("[W]here the Plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, [t]he district court's discretion to deny leave to amend is particularly broad." (quotation omitted)).  The Clerk is directed to enter judgment in favor of Defendants SentinelOne, Inc., Tomer Weingarten, and David Bernhardt, and against Plaintiff and to close the case.

**IT IS SO ORDERED.**

Dated:    10/2/2025

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge